# United States Court of Federal Claims

### No: 98-419 L
January 23, 2009

---

**RESOURCE INVESTMENTS, INC.
AND LAND RECOVERY, INC.,**

**Plaintiffs**,

**v.**

**THE UNITED STATES
OF AMERICA,**

**Defendant.**

---

Fifth Amendment; Regulatory Takings;
Temporary Takings; Categorical Takings;
Partial Takings; Parcel as a Whole;
*Mahon*; *Penn Central*; *First English*;
*Lucas*; *Tahoe-Sierra*; *Seiber*;
Extraordinary Delay; Ripeness; Summary
Judgment; Causation

*Daniel David Syrdal,* for the plaintiffs.

*Sue Ellen Wooldridge and Susan V. Cook*, Environmental & Natural Resources Division,
United States Department of Justice, for the defendant.

### OPINION AND ORDER

**Block,** *Judge.*

Before this court are cross-motions for summary judgment pursuant to Rule 56 of the
RULES OF THE COURT OF FEDERAL CLAIMS ("RCFC").  The underlying claim is predicated on the
Takings Clause of the Fifth Amendment.[1]   In essence, plaintiffs are alleging a "temporary
taking"[2] of its solid waste disposal site due to a wrongful assertion of jurisdiction by the United
States Army Corps of Engineers ("Corps").  Am. Compl. ¶ 55.  The issues, both factual and legal,
are complex, and, as such, some initial background is in order.

At first blush, it might not seem that a regulatory dispute over refuse can give rise to a
constitutional claim.  Yet the disposal industry has become big business.  The United States

---

[1] U.S. CONST. amend. V ("Nor shall private property be taken for public use, without just
compensation....").

[2] *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304,
318–19 (1987) ("'[T]emporary' takings which, as here, deny a landowner all use of his property, are
not different in kind from permanent takings, for which the Constitution clearly requires
compensation. . . . Where this burden results from governmental action that amounted to a taking,
the Just Compensation Clause of the Fifth Amendment requires that the government pay the
landowner for the value of the use of the land during this period.").

generates approximately 220 million tons of municipal solid waste per year, which amounts to about 4.5 pounds of garbage per person per day.[3]  The United States' production of municipal solid waste, commonly known as garbage, is the highest in the world and continues to grow. Bruce R. Parker & John H. Turner, *Overcoming Obstacles to the Siting of Solid Waste Management Facilities*, 21 N.M. L. REV. 91, 91 (1990).  In addressing the problem of what to do with all our garbage, the Environmental Protection Agency ("EPA") prefers reuse and recycling over landfills.[4]  Nevertheless, Americans dispose of 75–90 percent of their garbage in landfills. Parker & Turner, *supra*, at 92.

Landfill disposal, however, presents certain issues.  For example, most people do not want an unsightly or odorous landfill nearby—a serious problem also known as "Not in My Backyard," or "NIMBY" for short.[5]  Additionally, decomposing garbage produces methane, which, if left uncaptured, can travel through the ground into nearby homes and other buildings, creating the potential for explosions.[6]  Landfills also run the risk of contaminating groundwater through a byproduct known as leachate.  *See* Pls.' Ex. 43 at 343.  Finally, overlapping federal, state, and local regulations, adopted in response to public concerns, have made it more difficult to increase landfill capacity to match the growth in garbage, thus leading to a "solid waste disposal crisis."[7]  In the absence of available local landfills, many municipalities opt to "longhaul," or transport their refuse via truck, train, or other means, to distant places. [8]

Regulators in Washington State, the site of the case now before this court, face these same issues in deciding how best to dispose of the state's solid waste.  In 2006, Washington State produced almost 5.4 million tons of municipal solid waste for deposit in its 16 solid waste landfills.[9]  This works out to roughly 7.9 lbs of garbage per citizen per day, which is above the

---

[3]  Environmental Protection Agency's Frequent Questions About Waste, http://www.epa.gov/epaoswer/osw/basifact.htm (last visited Aug. 4, 2008).

[4] Frequent Questions About Recycling and Waste Management, http://www.epa.gov/msw/faq.htm (last visited Aug. 4, 2008).

[5] *See* Paula C. Murray & David B. Spence, *Fair Weather Federalism & America's Waste Disposal Crisis*, 27 HARV. ENVTL. L. REV. 71, 72 (2003) (highlighting the tensions between states and public interest groups fighting to keep new landfills from being located in their "backyards").

[6] Michael R. Harpring, Comment, *Out Like Yesterday's Garbage: Municipal Solid Waste & the Need for Congressional Action*, 40 CATH. U. L. REV. 851, 855–56 (1991).

[7] Parker & Turner, *supra*, at 92–93.

[8] *See id.* at 92 (observing that many cities in Connecticut, Pennsylvania, and New Jersey send their waste to other states and that California, Maine, New York, Texas, and Wisconsin contain 40 percent of the country's municipal solid waste landfills).

[9] Washington State Department of Ecology, *Solid Waste in Washington State: Sixteenth Annual Status Report* 58–60 (2007), http://www.ecy.wa.gov/pubs/0707048.pdf .

national average.[10]   However, because of a robust recycling program, only about half of Washington's municipal garbage ends up in a landfill.[11]  Yet, following the nationwide trend, the residents of Washington State are expected to generate increasingly more waste even as their available landfill space decreases.[12]   This may have already started—each year since 1994, Washington State's residents have, on average, generated six percent more waste per capita than the prior year.[13]  Like much of the United States, many counties in Washington State choose to longhaul their garbage, often shipping it to Oregon or other landfills in southern Washington. [14]

As the saying goes, "one man's trash is another man's treasure,"[15] and the solid waste management business can be lucrative.  Plaintiffs in this case are two interrelated companies in the business of solid waste management.  Plaintiff Land Recovery, Inc. ("LRI") was formed in 1977 to manage the solid waste system in Pierce County, the second most populous county in Washington State.  *See Weyerhaeuser v. Pierce County* ("*Weyerhaeuser I*"), 873 P.2d 498, 500–01 (Wash. 1994) ; *see also* Pls.' Ex. 1.  In turn, LRI formed plaintiff Resource Investments, Inc. ("RII") in 1986 for the express purpose of locating and purchasing a new landfill site in Pierce County.  Def.'s Facts ¶ 3; *see also* Pls.' Ex. 4.  Because the main difference between LRI and RII is that RII has one additional owner, Def.'s Facts ¶ 6, the court hereafter will refer to LRI and RII collectively as "plaintiffs" for convenience sake, unless the court must refer to only one particular plaintiff.

Plaintiffs' responsibilities included assuming the operation and management of Pierce County's Hidden Valley landfill.  Def.'s Ex. 1 at 5.  In the mid-1980s, it became obvious that the Hidden Valley landfill would soon reach capacity and that Pierce County would require new strategies for waste disposal.  Pls.' Facts ¶ 4; Def.'s Facts ¶ 3.  To address this issue, Pierce County contracted with plaintiffs to locate a site for a new solid waste landfill in Pierce County. *See* Def.'s Facts ¶ 12.  Plaintiffs spent several years searching for, and acquiring title to, what it claimed was the ideal site in Pierce County.  Pls.' Facts ¶¶ 9–11.

As municipal solid waste disposal is a highly regulated industry, plaintiffs faced a labyrinthine regulatory process to obtain the necessary permits to construct the landfill.  Def.'s Cross-Mot. Summ. J. 7–15; *see also Weyerhaeuser I*, 873 P.2d at 500–02 (relating the details of the local permitting process); *infra* Section I-B.  In all, to construct the landfill, plaintiffs had to obtain a total of twelve state or local permits, four quasi federal-state permits, and one federal Clean Water Act ("CWA") permit, the last of which is at the heart of this Fifth Amendment

---

[10] *See id.* at 82.

[11] *Id.* at 80.

[12] *Id.* at 78, 92.

[13] *Id.* at 78.

[14] *Id.* at 100, 104–05.

[15] This oft-quoted saying apparently cannot be attributed and is likely of fairly recent origin.  *See, e.g.*, http://www.marketwatch.com/news/story/video-medialink-siemens-turning-trash/story.

takings claim. Def.'s Ex. 73. Plaintiffs commenced the state and local permitting process in 1989. On September 20, 1989, the Corps asserted jurisdiction over the site and required plaintiffs to obtain a permit under section 404 of the CWA ("404 permit") to construct a solid waste landfill. *See* 33 U.S.C. § 1344. Nine years and several legal battles later, the U.S. Court of Appeals for the Ninth Circuit held that the Corps did not have jurisdiction over the landfill site because solid waste landfills, even those constructed in wetlands, were outside the Corps' jurisdiction. *Resource Invs., Inc. v. U.S. Army Corps of Eng'rs* ("*Resource I*"), 151 F.3d 1162 (9th Cir. 1998). No longer needing a 404 permit, and armed with the two critical state and local permits, plaintiffs filed for and obtained the remaining necessary permits and began construction of the landfill in October 1998. Operation of the landfill began on or about December 13, 1999.

On May 4, 1998, plaintiffs filed their complaint initiating this action, alleging a taking. In 2005, plaintiffs filed an amended complaint, alleging instead a temporary taking, in part predicated on *Resource I*'s holding that the Army Corps of Engineer's assertion of jurisdiction was erroneous. Supplemental briefing, oral argument, and status conferences occurred in 2006–08, which focused in large measure on the issue of causation—*e.g.*, whether the county and state or the federal government were responsible for the alleged delay and whether that delay rose to the level of a taking. Currently before this court are the parties' cross motions for summary judgment, which, as explained more fully below, are denied.

## I. Background [6]1

### A. FACTS

In the mid-1980s, plaintiffs identified a roughly 320-acre site ("project site") in Pierce County, Washington, of which the landfill would comprise 168 acres. Pls.' Ex. 21 at 122; Def.'s Ex. 1(B) at 131; Def.'s Ex. 51 at 496, 500. In all, plaintiffs spent about $2.3 million to purchase the properties comprising the project site. Pls.' Ex. 138 ¶ 6. Plaintiffs claimed they selected the site because it was located in Pierce County and because it contained hydrological features that made the contamination of groundwater extremely improbable. *See* Pls.' Mem. Summ. J. 6; Pls.' Ex. 43 at 351. These special features included "a 30 to 40 foot thick, uninterrupted layer of

---

[16] Facts for this section are drawn from Plaintiffs' Renewed Motion for Summary Judgment and Memorandum in Support (Pls.' Mem. Summ. J.); United States' Cross Motion for Summary Judgment (Def.'s Cross-Mem. Summ. J.); Defendant's Proposed Findings of Uncontroverted Fact (Def.'s Facts); Plaintiffs' Facts (Pls.' Facts); Plaintiffs' Response to Defendant's Facts (Pls.' Resp. to Def.'s Fact); Plaintiff's Memorandum in Response to Defendant's Cross-Motion for Summary Judgment (Pls.' Resp.); Memorandum of the United States in Opposition to Plaintiffs' Renewed Motion for Summary Judgement (Def.'s Resp.); Plaintiffs' Reply Memorandum in Support of Plaintiffs' Renewed Motion for Summary Judgment (Pls.' Reply); Defendant's Reply Memorandum in Support of its Renewed Cross Motion for Summary Judgment (Def.'s Reply); Plaintiffs' Exhibit (Pls.' Ex.), Defendant's Exhibit (Def.'s Ex.); Plaintiffs' Supplemental Memorandum in Response to Court's May 3, 2006 Order (Pls.' Supp. Mem.); Defendant's Supplemental Brief Pursuant to This Court's Order of May 3, 2006 (Def.'s Supp. Br.); Defendant's Response to Plaintiffs' Second Supplemental Memorandum (Def.'s Supp. Reply).

Vashon till, [which is] a highly compacted soil with low hydraulic conductivity." Pls.' Ex. 43 ¶ 20. Beneath the Vashon till flows a "confined aquifer. . . . [which] pushes water to within 2 feet of the surface during certain times of the year and saturates the till." *Id.* at ¶ 31. However, the project site also overlies the Central Pierce County Aquifer System, which serves more than 400,000 people. Pls.' Resp. 7–8. The EPA had designated this aquifer system as a "sole source aquifer," meaning that it provided most of the drinking water for the county. Def.'s Cross-Mem. Summ. J. 5–6. Yet the project site's proximity to the aquifer system was not unique; most of Pierce County—including all of its industrial and agricultural facilities, gas stations, and other potential sources of environmental effluent—is located over the same sole source aquifer system. Pls.' Resp. 7–8. Nevertheless, plaintiffs found this configuration desirable, because "the confined aquifer will provide a constant upward flow gradient [that] will push any leachate escaping from the landfill into a leak detection and collection system (LDCS) which will be located on top of the Vashon till and below the protective liners of the landfill." Pls.' Ex. 43 ¶ 31. In other words, the plaintiffs expected that the combination of the pressure within the aquifer and the special nature of the Vashon till would protect the aquifer from any contamination leaking out of the landfill. Pls.'s Mem. Summ. J. 6.

As is typical in the modern regulatory state, before plaintiffs could begin construction of the landfill, they had to obtain a number of federal, state, and local permits. Of the many permits, plaintiffs identify the county Conditional Land Use Permit ("CUP")[17] and the state Solid Waste Handling Permit ("Solid Waste Permit")[18] as the key permits necessary to construct and operate the landfill. Pls.' Mem. Summ. J. 16. Plaintiffs also claim that the remaining permits, with the notable exception of the 404 permit, were ministerial in nature and, thus, could not be denied once the CUP and Solid Waste Permit were in hand. Pls.' Resp. 16. Plaintiffs accordingly applied for the CUP and Solid Waste Permit on December 29, 1989. Def.'s Ex. 73.

The Corps asserted jurisdiction and required a 404 permit because the project site included about 70 acres of wetlands. Def.'s Ex. 1(B) at 138. Specifically, the landfill required the destruction of about 21.6 acres of wetlands, including 13.7 acres of forested wetlands, 6.1 acres of scrub-shrub wetlands, and 1.8 acres of emergent meadow wetlands. *Id.* at 132. Plaintiffs proposed to mitigate the loss of wetlands by creating or enhancing wetlands on an 85-acre mitigation area, situated elsewhere on the landfill site. *Id.* at 227–28.

1. Obtaining the State Permits

The CUP, along with the Solid Waste Permit, required plaintiffs to comply with the State Environmental Protection Act ("SEPA"),[19] which in turn necessitated the preparation of a state Environmental Impact Statement ("SEIS").[20] Def.'s Ex. 27 at 393. In September 1990, Pierce

---

[17] *See* Pierce County Code ("PCC") § 18.25.030.

[18] *See* PCC § 19.80.080.

[19] WASH. REV. CODE 43.21C.010–43.21C.914.

[20] WASH. REV. CODE 43.21C.031.

County issued a draft SEIS, which concluded favorably towards plaintiffs' project. *Weyerhaeuser I*, 873 P.2d at 500. The final version was published on November 28, 1990. *Id.* From December 1990 though January 1991, the county held several public hearings to assess the adequacy of the SEIS and plaintiffs' CUP application. *Id.* On April 10, 1991, the county's Hearing Examiner released a report and decision upholding the adequacy of the SEIS and approving the CUP—subject to certain conditions, including a requirement that plaintiffs "secure the permits that are required from the other agencies prior to activation of the landfill." Pls.' Ex. 12 at 97; *see also Weyerhaeuser I*, 873 P.2d at 500–01.

The Hearing Examiner's decision with regard to both the CUP and the SEIS was appealed to the Pierce County Council, which remanded the decision for further fact-finding and additional hearings. *See* Def.'s Ex. 56 at 632. The Hearing Examiner held the second set of public hearings on plaintiffs' CUP application and, on January 31, 1992, issued his second report, once again approving the permit. *Id.*; Pls.' Ex. 169. On April 13, 1992, the county council resumed its hearing on the appeals, approved the Hearing Examiner's decision on the CUP, and denied the SEIS appeal, thus approving the SEIS. *Weyerhaeuser I*, 873 P.2d at 501.

At this point, Gail and William Weyerhaeuser, neighbors to the project site, petitioned Pierce County Superior Court for a writ of review. *Id.* On February 12, 1993, the trial court reversed the issuance of the CUP and the county's dismissal of the SEIS appeal. *Id.* In response, both plaintiffs and Pierce County sought direct review by the Washington Supreme Court, bypassing the intermediate Court of Appeals. *Id.* The Washington Supreme Court granted review, and, on May 26, 1994, affirmed the Superior Court's reversal of the CUP. *Id.* at 500, 504. The court further held that where the county's alternatives analysis was concerned, "[t]he findings and conclusions are clearly inadequate to determine the basis for the hearing examiner's decision upholding the adequacy of the EIS." *Id.* at 504. The court also opined that the SEIS was unsatisfactory with regard to the Solid Waste Permit because the SEIS treated the county's Solid Waste Management Plan ("SWMP")[21] as a non-binding guideline instead of a mandatory criteria. *Id.* at 508–09. The court remanded the matter for further hearings on the CUP. *Id.* at 506. The court further required the county to revise the SEIS to "contain a sufficient discussion of offsite alternatives," and to consider plaintiffs' compliance with the SWMP's mandatory criteria. *Id.* at 509. Accordingly, before the county could hold a third round of public hearings, it had to complete a supplemental SEIS, a process that took eleven months. Pls.' Ex. 78 ¶ 25.

In October 1994, while the SEIS revisions were underway, the county Planning and Land Use Services Department ("Planning Department"), the lead agency on the CUP review and SEIS drafting processes,[22] informed plaintiffs that it would no longer act on their CUP application, and instead, plaintiffs would have to file a new CUP application. *Weyerhaeuser v. Pierce County* ("*Weyerhaeuser II*"), 976 P.2d 1279, 1282 n.5 (Wash. Ct. App. 1999); *see also* Def.'s Ex. 26 at 389–91. Plaintiffs sought a writ of mandamus to force the county to consider its

---

[21] *See* WASH. REV. CODE 70.95.080.

[22] *See* PCC §§ 18D.10.050; 18D.10.060(B).

original application.  *Weyerhaeuser II*, 976 P.2d at 1282 n.5.  On January 13, 1995, the state Superior Court granted plaintiffs' writ, ordering the county to proceed on plaintiffs' original application.  *Id.*; Def.'s Ex. 26 at 389–91.

Additionally, during the SEIS revisions, the county Health Department would not process plaintiffs' Solid Waste Permit application.  Def.'s Ex. 27.  On April 21, 1995, in an attempt to reinitiate the Solid Waste permitting process, plaintiffs submitted a clarifying report to the department.  Def.'s Ex. 25 at 385.  On June 15, 1995, the department recognized plaintiffs' clarifying report, but stated that until the revised SEIS had been finalized, the department could not consider plaintiffs' Solid Waste Permit application complete.  *Id.* at 385–87.

Once the revised SEIS was complete, the county held the final set of public hearings in September 1995, and on January 2, 1996, the local Hearing Examiner approved the CUP for the third time, subject to conditions that plaintiffs obtain: (1) a Reasonable Use Exception ("RUE") under the Pierce County Wetland Management Regulations ("Wetland Regulations"),[23] *Weyerhaeuser II*, 976 P.2d at 1282, 1282 n.6; Pls.' Ex. 43 at 340; and, (2) a 404 permit from the Corps, Def.'s Ex. 56 at 632–33.  The Hearing Examiner also favorably reviewed plaintiffs' Solid Waste Permit application.  Following the Hearing Examiner's report in favor of plaintiffs' project and a review by the state Department of Ecology, the Health Department issued the Solid Waste Permit on February 7, 1996.  Pls.' Ex. 7.  Again, a condition of this permit required plaintiffs to "obtain a 401 Certification from the Department of Ecology and a 404 permit from the United States Army Corps of Engineers (Corps) prior to implementing any construction of mitigation activities at this site as required by federal and state law."  Def.'s Ex. 34 at 482.

At this point, plaintiffs and the Weyerhaeusers each sought judicial review in Superior Court.  The Weyerhaeusers appealed the grant of the two permits, while plaintiffs appealed the RUE requirement.  *Weyerhaeuser II*, 976 P.2d at 1282.  On March 13, 1997, the court upheld both the Hearing Examiner's approval of the CUP and the RUE requirement.  *Id.* at 1282 n.6.  The court also upheld the Solid Waste Permit, finding that "[t]he Health Officer's decision to issue this permit is supported in the record and is therefore not arbitrary and capricious."  Def.'s Ex. 56 at 634.

Plaintiffs, but not the Weyerhaeusers, then appealed to the Court of Appeals, which reversed on May 29, 1999, holding that under Washington's vested rights doctrine, the RUE did not apply to plaintiffs because the county enacted the RUE requirement in 1992, after plaintiffs filed their permit applications.  *Id.* at 1280–81.  The court held that plaintiffs' CUP application was subject only to the "regulations in effect at the time LRI submitted its application."  *Id.* at 1286.

Meanwhile, while waiting for the RUE issue to wind its way through the state judicial system, plaintiffs filed an application for a RUE with the Planning Department on May 23, 1996.  Def.'s Ex. 73.  On November 27, 1996, the county issued the RUE, subject to the condition that plaintiffs obtain "all appropriate federal, state, and local approvals, including a federal permit under Section 404 of the Clean Water Act."  Pls.' Ex. 52 at 525.

---

[23] *See* PCC ch.18E.30 (originally codified at PCC ch. 17.12).

2.  Obtaining the Federal Permit

As if the state and local processes were insufficiently convoluted, because the landfill project apparently involved the fill of wetlands, plaintiffs apparently believed that they had to obtain a 404 permit from the Corps.  *See* 33 U.S.C. § 1344.  Plaintiffs contend that they had no knowledge of the presence of wetlands on the project site until June 1989, when officials from the county Planning and Health Departments first suggested the presence of federal wetlands.  Pls.' Ex. 79 ¶ 2.  Subsequently, plaintiffs' wetlands consulting firm confirmed that, under the Corps' wetlands delineation guidelines, the project site likely contained jurisdictional wetlands.  *Id.* at ¶ 3.  Plaintiffs first met with the Corps in September 1989, and, after concluding that it would be unwise to proceed without a 404 permit, filed their application for a 404 permit nearly a year later, in August 1990.  Pls.' Ex. 10; Pls.' Ex. 79(A); Pls.' Facts ¶ 18.

The 404 permit process was rife with disagreements between plaintiffs and the Corps, commencing with the publication of the public notice of plaintiffs' permit application.  Regulations require the Corps to issue a public notice within 15 days of the submission of a 404 permit application, but only if the application is complete.  *See* 33 C.F.R. § 325.2.  Here, the parties disagree as to what happened.   Defendant asserts that the Corps did not consider plaintiffs' application complete and therefore could not move forward to publish a public notice on the application.  Def.'s Ex. 1 at 12; Def.'s Facts ¶¶ 145–47; Def.'s Cross-Mem. Summ. J. 21; Def.'s Reply 5; *but see* Pls.' Resp. to Def.'s Facts ¶¶ 145–47 (disputing that the application was incomplete).  For the next 18 months, plaintiffs, nevertheless, in their own words, "constant[ly] badger[ed] and prodd[ed]" the Corps to issue the public notice.  Pls.' Ex. 79 ¶ 17; *see also id.* at (C), (E).  This alleged "badgering and prodding" apparently ended on March 13, 1992, when the Corps issued the required public notice.  Pls.' Ex. 79(H).

Disagreements continued after the publication of the public notice, this time concerning the statement of the project purpose.  This statement is important because it impacts the scope of the Corps' practicable alternatives analysis,[24] which in turn affects whether a project receives approval.  Plaintiffs originally stated that the project purpose was to "[c]onstruct and operate municipal solid waste landfill to respond to the requirements of the Pierce County Solid Waste Management Plan and to comply with Federal, State, and local sitting [sic] requirements."  Pls.' Ex. 79(J) at 1083.

The Corps considered this statement of purpose too restrictive and wanted plaintiffs to rework it to allow the Corps to consider longhaul as a practicable alternative.  Pls.' Ex. 79(J) at 1083.  Plaintiffs believed that they had correctly stated the project purpose and that the Corps' position was contrary to case law.  *Id.* at (I) (citing *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989), and *Louisiana Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985)).  Over the next 14 months, the parties went back and forth over the necessity of revising the project purpose, but could not agree.  *See, e.g.*, Pls.' Ex. 79 ¶¶ 21–23; Def.'s Ex. 19.  Finally, on February 25, 1994, plaintiffs acceded to the Corps' demand and changed their project purpose, "[r]ecognizing that we have reached a stalemate" and not wanting "to delay the 404 process any further."  Pls.' Ex. 79(P) at 1022.  The final project purpose "provide[d] the un-

---

[24]  Pursuant to 40 C.F.R. § 230.10(a), the Corps must deny a permit application if there are practicable alternatives to the fill of wetlands.

incorporated areas and the incorporated cities in Pierce County that participated in the 1989 Tacoma-Pierce County Solid Waste Management Plan (SWMP), with a viable, affordable, environmentally sound solid waste project to meet the projected needs." Def.'s Ex. 1(B) at 143.

Furthermore, on March 4, 1994, to plaintiffs' dismay, the Corps determined that it would require a federal EIS. *See* Def.'s Ex. 24 at 381–83. Plaintiffs assert that the Corps initially told them that a federal EIS would not be necessary, but nonetheless agreed to the development of a federal EIS because they calculated that it would require the Corps to assign more people to their application and provide an opportunity for plaintiffs to address Corps' concerns about their plans to mitigate the impacts on affected wetlands. Pls.' Ex. 79(P) at 1103; Pls.' Ex. 80 ¶ 8(b). Accordingly, the parties met to plan an expedited schedule for the preparation of the federal EIS. Pls.' Ex. 79(P) at 1103. The schedule called for the drafting of the federal EIS by December 13, 1994, and its completion by May 8, 1995. Pls.' Ex. 25 at 159. However, the federal EIS took longer to draft than the initial schedule allotted, and thus did not issue until December 8, 1995. Pls.' Ex. 40. Public hearings occurred in January 1996.

During the drafting of the federal EIS, plaintiffs altered their landfill project plan, specifically attempting to address the Corps' stated concerns. Specifically, plaintiffs' revised plan reduced impacted wetlands from 37 acres to 21.6 acres, abandoned plans to relocate the South Creek, a small stream on the project site, and modified the original wetlands mitigation plan. Def.'s Ex. 1 at 13.

A key component of the federal EIS involved the Corps' analysis of practicable alternatives. After publishing the draft EIS and reviewing the public comments, the Corps preliminarily concluded that plaintiffs had not fully demonstrated that there were no practicable alternatives to the proposed landfill project.[25] The Corps asked plaintiffs for any additional information weighing on the subject, but claims that it did not receive any new information. Def.'s Ex. 1 at 13. Plaintiffs then requested that the Corps terminate the federal EIS process and, on June 7, 1996, the Corps terminated the EIS process without a final draft. *Id.*

On September 30, 1996, the Corps issued its Record of Decision ("ROD") officially denying plaintiffs' application. Def.'s Ex. 1. Plaintiffs subsequently filed a challenge to the Corps' denial of plaintiffs' 404 permit application in the U.S. District Court for the Western District of Washington on October 31, 1996. Def.'s Ex. 2; Pls.' Ex. 56. The district court issued an oral opinion on September 16, 1997, upholding the Corps' denial under the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (governing judicial review of agency factfinding and legal interpretation). Def.'s Ex. 2; Pls.' Ex. 56. Shortly thereafter, plaintiffs appealed to the Ninth Circuit. *Resource I*, 151 F.3d at 1165.

On July 27, 1998, the Ninth Circuit held that the Corps had "unreasonabl[y]" asserted jurisdiction over the project site. *Id.* at 1169. The court determined that because the project in question was a solid waste landfill, rather than a fill or dredged material project, the EPA under RCRA, not the Corps through the CWA, had jurisdiction over federal permits for the project site. *Id.* Central to the court's decision was a 1986 Memorandum of Agreement between the Corps and the EPA providing that the EPA would assume jurisdiction over the disposal of solid waste into wetlands under RCRA. *Id.* As such, the court held that requiring a 404 permit from

---

[25] *See* 40 C.F.R. § 230.10(a)(3).

plaintiffs exceeded the Corps' authority. *Id.* On February 3, 1999, the Ninth Circuit denied the Corps' petition for reconsideration and rehearing *en banc.* Def.'s Facts ¶ 202. On February 10, 1999, defendant's deadline to petition the Supreme Court for certiorari passed and the Ninth Circuit's decision issued its mandate, making the decision final.

    3.  Aftermath

    In October 1998, approximately a decade after plaintiffs began the federal, state, and local permitting processes, plaintiffs finally began construction of the landfill. While plaintiffs still had to obtain some permits, they considered these "only ministerial permits, that the agency had no discretion to deny." Def.'s Ex. 52 at 610. Additionally, plaintiffs explain that some of the permits required the placement of bonds of significant amounts of money that plaintiffs did not want to expend until construction was imminent. Pls.' Supp. Mem. 8 n.6. The remaining permits, and a brief summary of the application and issuance dates, are listed below. *See also* Pls. Supp. Mem. 9–11.

    1.  Forest Practices Permit. Applied November 5, 1990; reapplied November 16, 1998; issued April 9, 1999. Def.'s Cross-Mem. Summ. J. 14; Def.'s Ex. 48.
    2.  Hydraulic Project Approval. Applied March 16, 1992; issued February 25, 1999. Def.'s Cross-Mem. Summ. J. 13; Def.'s Ex. 46.
    3.  National Pollutant Discharge Elimination System ("NPDES") Permit for Stormwater Discharge Associated with Construction Activities & NPDES Permit for Stormwater Discharge Associated with Industrial Activities. Applied January 2, 1996; issued February 16, 1996. Def.'s Cross-Mem. Summ. J. 12; Def.'s Ex. 45.
    4.  Industrial Wastewater Discharge Permit. Effective February 15, 1996. Def.'s Ex. 73.
    5.  Dam Safety Permit. Applied May 22, 1996; issued March 31, 1999. Def.'s Exs. 45, 47.
    6.  County Wetlands Approval. Applied February 8, 1996, issued April 7, 1999. Def.'s Exs. 49, 73; Pls.' Ex. 91.
    7.  Access Connection Permit. Applied November 20, 1998; issued July 27, 1999. Def.'s Supp. Br. 8; Def.'s Ex. 45.
    8.  Site Development Permit. Applied February 11, 1999; issued April 27, 1999. Def.'s Ex. 73.
    9.  Clean Air Act Permit. Applied November 5, 1999; issued December 10, 1999. Def.'s Ex. 55.
    10. Five Building Permits. Applied April 27, 1999, September 1, 1999, November 1, 1999; issued September 17, 1999, October 21, 1999; December 7-8, 1999, respectively. Def.'s Ex. 73.

    4.  The Instant Complaint

    On May 4, 1998, plaintiffs filed their original complaint against the United States in this court, seeking "just compensation" for a permanent regulatory taking under the Fifth Amendment, pursuant to this court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a). Pls.' Mem. Summ. J. 1; *see also Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1362 (Fed. Cir. 2005) (observing that this court's Tucker Act jurisdiction "includes all takings claims

against the United States"). On January 27, 2000, defendant filed a motion for summary judgment; plaintiffs responded by filing a cross-motion for summary judgment on February 28, 2000. Pls.' Mem. Supp. Summ. J. 3. Subsequently, both parties submitted to mediation; those proceedings were terminated by court order on August 30, 2005.

Plaintiffs then filed an amended complaint on October 14, 2005, contending that any potential permanent taking converted into a temporary one when the Ninth Circuit's *Resource I* opinion became final, on February 3, 1999. The parties then renewed their respective motions for summary judgement on November 29, 2005. This court heard oral arguments on the motions on April 27, 2006, and on May 3, 2006, entered an order requesting supplemental briefs from the parties on the issues of causation and the preclusive effect of the Ninth Circuit's opinion. Scheduling Order, May 3, 2006. The parties filed their supplemental briefs on July 10, 2006. On February 25, 2008, the court held a telephone status conference with the parties. Currently before the court are these cross-motions for summary judgment as to the issue of liability.

## B. REGULATORY PROCESS

Given the complex, overlapping regulatory processes at work in plaintiffs' case, and the government's argument that state and local regulatory requirements (as opposed to the federal ones) caused the ills of which plaintiffs complain, it is useful at this point to provide an overview of the relevant regulations.

### 1. State & Local Landfill Regulations

The Solid Waste Division of the Pierce County Department of Public Works and Utilities is responsible for the development and administration of comprehensive solid waste management policy for Pierce County and its cities and towns. Washington State law requires the Solid Waste Division to prepare a Solid Waste Management Plan ("SWMP"). WASH. REV. CODE 70.95.080. The SWMP is a planning tool that provides the legal basis for Pierce County to make permitting decisions on solid waste facilities.[26] Pierce County developed its SWMP jointly with neighboring Tacoma County. In 1991, Pierce County amended the SWMP to expressly "select[] a local landfill as a long-term solid waste technology for disposal of source separated waste." Pls.' Ex. 43 at 347–48 (quoting Pierce County Ordinance 91-126).

Landfills in Pierce County require the acquisition of a solid waste handling permit and a conditional use permit. *See* Pierce County Code ("PCC") § 19.80.080; SWMP. Both the solid waste handling permit and the conditional use permit require compliance with Washington's State Environmental Policy Act ("SEPA"), WASH. REV. CODE 43.21C.010–43.21C.914. WASH. ADMIN. CODE 173-351-700 (specifying state criteria for municipal solid waste landfills); 173-351-720 (detailing application procedures for landfill permits, including evidence of compliance with SEPA). SEPA requires a detailed environmental impact statement where the proposed activity constitutes an "action[] having a probable significant, adverse environmental impact." WASH. REV. CODE 43.21C.031. Further, under SEPA, the health department can order mitigation of any adverse environmental impacts. WASH. ADMIN. CODE 173-351-750(1). As a

---

[26] SWMP ch.1.1, *available at*
http://www.co.pierce.wa.us/pc/services/home/environ/pdf/solidwaste/pdf/2000plan.htm .

general rule, Washington prohibits the construction of landfills over sole source aquifers, as designated by the EPA, unless the permit applicant "can demonstrate . . . that the sole source aquifer is not vulnerable to potential ground water contamination from the active area." WASH. ADMIN. CODE 173-351-140(1)(b); *see also* 173-351-140(1)(b)(vii).

Solid waste handling permits are reviewed and approved by the state Department of Ecology and the relevant county health department. WASH. ADMIN. CODE 173-351-185. In reviewing the permit application, the agencies must ensure that the application meets the SEPA criteria, satisfies the local SWMP, and complies with any zoning laws. WASH. REV. CODE 70.95.180. For wetlands, the agencies require, among other criteria, that the permit applicant rebut the presumption that other alternatives are available that do not require the destruction of wetlands. *See* WASH. ADMIN. CODE 173-351-130(4)(a)(iii). In addition, solid waste landfills "must comply with any other applicable federal, state, and local rules, laws, regulations, and other requirements." WASH. ADMIN. CODE 173-351-120.

Additionally, the county code requires a conditional use permit—the written decision of hearing examiner authorizing a conditional use—when the characteristics of a site "require[] a special degree of control to determine if uses can be made compatible with the [Pierce County] Comprehensive Plan, adjacent uses, planned uses, and the character of the vicinity." PCC § 18.25.030. The Planning Department is the lead agency for CUP review and SEIS development. *See* WASH. ADMIN. CODE 197-11-924 (defining rules for determining the lead agency); 197-11-050(2) ("The lead agency shall be the agency with the main responsibility for complying with SEPA's procedural requirements and shall be the only agency responsible for: (a) The threshold determination; and (b) Preparation and content of environmental impact statements."); PCC §§ 18D.10.050; 18D.10.060(B) (mandating that the Planning Department prepare a SEIS).

To approve a conditional use permit, the hearing examiner must make findings, based on the record, including that: (1) the proposed use will not harm the public health; (2) the proposed use will not adversely affect the character of the neighborhood; and (3) any hazardous conditions will be mitigated. PCC § 18A.75.030(B)(1). The burden of proving these elements lies with the permit applicant. PCC § 18A.75.040(B)(2). The hearing examiner is authorized to impose conditions or restrictions on the permit as necessary to ensure that the proposed use does not violate any of the required findings. PCC § 18A.75.030(B)(3). Under SEPA, these conditions can include mitigation requirements. WASH. ADMIN. CODE 197-11-660; PCC § 18D.40.060 (authorizing the hearing examiner to attach conditions that "are necessary to mitigate specific probable adverse environmental impacts identified in environmental documents prepared pursuant to [Pierce County's environmental laws implementing SEPA]").

2. Federal Wetlands Regulations

On the federal level, either the Corps or the EPA, but typically not both, will have jurisdiction over permits that can affect wetlands. For example, the EPA has authority over solid and hazardous waste disposal under RCRA. 42 U.S.C. § 6942(a). This authority covers all solid waste landfills, even if they are located on wetlands. *Id.*; *see also* 40 C.F.R. § 258.12(a)(1). Indeed, the Corps, recognizing the potential for regulatory overlap, entered into a Memorandum of Agreement ("MOA") with the EPA agreeing to cede authority for solid waste disposal into

wetlands with the promulgation of final RCRA regulations incorporating federal wetlands protection standards. Water Pollution Control; Memorandum of Agreement on Solid Waste, 51 Fed. Reg. 8871 (Mar. 14, 1986). The EPA promulgated most of these regulations on October 9, 1991. Solid Waste Disposal Facility Criteria, 56 Fed. Reg. 50,978 (Oct. 9, 1991) (eff. Oct. 9, 1993). On May 17, 1993, the EPA and the Corps extended the 1986 MOA "in its entirety until further notice . . . ." Def.'s Ex. 33 at 465 (memorandum from John G. Studt, Chief, Regulatory Branch, U.S. Army Corps of Engineers).

The Corps has broad authority under section 404 of the CWA to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters . . . ." 33 U.S.C. § 1344(a); *see also* 33 U.S.C. § 1344. "[N]avigable waters" includes certain wetlands. 33 C.F.R. § 328.3(a)(3); 40 C.F.R. § 2303(s)(3). *See generally United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985). "Dredged material" includes "material that is excavated or dredged from the waters of the United States," 33 C.F.R. § 323.2(c), (f), while "fill material" is defined as

> material placed in waters of the United States where the material has the effect of:
> (i) Replacing any portion of water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of water of the United States . . . .
> *The term fill material does not include trash or garbage.*

33 C.F.R. § 323.2(e) (emphasis added).

It is significant that, neither all wetlands nor all "waters of the United States" fall within the Corps' jurisdiction. *See, e.g.*, *Rapanos v. United States*, 547 U.S. 715 (2006) (holding that more than a remote hydrological connection to navigable waters is required for Corps' jurisdiction); *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) (holding that the Corps' CWA jurisdiction does not extend to non-navigable, hydrologically isolated, intra-state wetlands adjacent to navigable waters). For the Corps to exercise jurisdiction over a wetland on private property, the wetlands must be delineated as a "jurisdictional wetland." Since January 1989, the Corps has operated under a wetlands delineation manual developed jointly with other federal agencies to identify such jurisdictional wetlands. *See generally* 53 AM. JUR. *Trials* § 511 (2008).

Once the delineation is complete and jurisdiction has attached, an application for the 404 permit follows. Undertaking this permit application process is no small feat, as it can "begin[] months, and often years before a project proponent actually files an application." George A. Somerville, *Developing Water Supplies: Navigating Federal Regulatory Requirements*, *in* WATER LAW: TRENDS, POLICIES, AND PRACTICE 229, 229 (Kathleen Marion Carr & James D. Crammon, eds. 1995). Indeed, "[a] major project requires extensive evaluation and documentation of alternatives and impacts before the Corps will consider the permit application complete." *Id.* Once the application is complete, however, the regulations require the Corps to issue a public notice within 15 days of receipt. 33 C.F.R. § 325.2; *see also* 33 U.S.C. § 1344(a) ("Not later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit [for dredged or fill material], the Secretary shall publish the notice . . . ."). If incomplete, the Corps must notify the applicant of the remaining information necessary to complete the application within that same 15-day period. 33 C.F.R. §

325.2. Despite the legal requirement to do so, it appears that the Corps rarely meets this deadline. *See* 53 AM. JUR. *Trials* § 511 ("In practice, Army Corps offices are nearly always late despite the clear mandate of the regulations."); Pls.' Ex. 175 at ¶ 7.2 ("[I]t is very rare for any Corps district to react within the required 15 days of receipt of an application.").

In evaluating whether to issue a permit, the Corps considers a number of factors including "the probable impacts . . . of the proposed activity and its intended use of the public interest," 33 C.F.R. § 320.4, as well as the public and private needs and practicability of alternative locations for the proposed activity. 40 C.F.R. § 320.4(a)(2). The Corps also requires a statement of project purpose. This statement impacts how the Corps determines if there are "practicable alternatives" to the dredge or fill of wetlands. This practicable alternatives provision is one of the more important and controversial aspects of the Corps' application review process. 53 AM. JUR. *Trials* § 511. In brief, Corps regulations prohibit the discharge of dredge or fill material if "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Wetlands are included under this provision, as "special aquatic sites." 40 C.F.R. § 230.3(q-1), 230.41. More specifically, where a project is not "water dependent," meaning that it "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose" (as defined in the project purpose), like a landfill, the Corps will presume that practicable alternatives are available. 40 C.F.R. § 230.10(a)(3). There is a further presumption that all practicable alternatives that do not require discharge into the wetlands will have a "less adverse impact . . . unless clearly demonstrated otherwise." *Id.* An applicant must rebut both these presumptions to obtain a permit. 53 AM. JUR. *Trials* § 511. The Corps will consider an alternative practicable if it can be done "after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

If there are no practicable alternatives available, the Corps can still require "mitigation" to offset some of the damage from filling wetlands. *See* KIM DIANA CONNOLLY, WETLANDS LAW & POLICY: UNDERSTANDING SECTION 404 253, 257 (2005); *see also* 33 C.F.R. § 320.4. Mitigation commonly involves the redevelopment of former wetlands or the rehabilitation of degraded wetlands. *Id.* at 258. The Corps alone decides whether the applicant must mitigate and the amount of mitigation required, but the Corps' guidance documents also require it to consider input from the applicant, other relevant federal agencies, state and local agencies, and the public. *Id.* at 256.

The National Environmental Protection Act ("NEPA"), 42 U.S.C. §§ 4321–70, is also relevant to the permitting process because the creation of Environment Assessments and EIS helps the Corps conduct the analysis set forth above. Under NEPA, the Corps first prepares an Environmental Assessment, which briefly outlines the potential environmental impacts from the proposed project and determines the necessity for a more comprehensive EIS. 40 C.F.R. § 1508.9. An EIS is required for "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 433(2)(c). In addition, as a prerequisite to the issuance of any 404 permit, the applicant must also obtain a state water quality certification under Section 401 of the CWA for any activity "which may result in any discharge into the navigable waters." 33 U.S.C. §1341.

The whole process finally concludes when the Corps' District Engineer issues a Statement of Findings ("SOF").  33 C.F.R. § 325.2.  Alternatively, in when the Corps has prepared an EIS, the process can conclude when the District Engineer issues a ROD explaining the Corps' reasons for granting or denying the permit.  *Id.*

## II. Discussion

### A.  Legal Standards

As the court faces cross-motions for summary judgment, a brief discussion is in order on summary judgment standards in the takings context.  It should be emphasized that "[w]hether or not a taking has occurred is a question of law based on factual underpinnings."  *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001).  Thus, due to the "fact-intensive" nature of takings claims, courts are typically reluctant to decide such claims at the summary judgment stage, preferring to wait for a trial to fully develop the factual record.  *See Moden v. United States*, 404 F.3d 1335, 1346 (Fed. Cir. 2005); *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983); *Sartori v. United States*, 67 Fed. Cl. 263, 266–67 (2005).  Nevertheless, just because this is a takings case does not render summary judgment unavailable if it is appropriate to the circumstances before the court.  *Avenal v. United States*, 100 F.3d 933, 936 (Fed. Cir. 1996); *Sartori*, 67 Fed. Cl. at 266–67.  Accordingly, the traditional standard for summary judgment remains applicable to this case.

Pursuant to that standard, it is well-accepted that summary judgment is only appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Therefore, a court therefore must deny a motion for summary judgment if there are any factual disputes that would affect the outcome of the case.  *Liberty Lobby*, 477 U.S. at 249.  The party moving for summary judgment initially bears the evidentiary burden to show that there are no genuine issues of material fact regarding the matter on which summary judgment is sought.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may discharge this burden by demonstrating that the record lacks evidence for a required element of the nonmoving party's case.  *Id.* at 325.  Therefore, the movant may succeed whether or not it relies "on the pleadings, depositions, answers to interrogatories and admissions on file."  *Id.* at 324.

When the movant properly identifies an absence of evidence in the non-movant's case, the non-movant then has the burden to establish that element by identifying specific facts in the record that show a genuine issue of material fact for trial.  *Id.* at 322.  Under these circumstances, the non-movant must go beyond its own pleadings to defeat a motion for summary judgment; "the court may not simply accept a party's statement that a fact is challenged."  *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835–36 (Fed. Cir. 1984); *see also* RCFC 56(e)(2); *Celotex*, 477 U.S. at 324; *TechSearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002) ("conclusory statements . . . entirely lacking in factual support" are insufficient for summary judgment).  Instead, the non-movant must oppose the summary judgment motion by identifying "an evidentiary conflict created *on the record* at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant.  Mere denials or conclusory statements are insufficient."  *Barmag Barmer*, 731 F.2d at 836 (emphasis added).  Thus, if the non-movant cannot identify a genuine

issue of material fact in the record, the court must render summary judgment in favor of the movant so long as the movant is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 324.

These same rules apply to cross-motions. *See Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338–39 (Fed. Cir. 2001); *GHS Health Maint. Org. v. United States*, 76 Fed. Cl. 339, 349 (2007), *aff'd*, 536 F.3d 1293 (Fed. Cir. 2008); Charles A. Wright, et al., 10A Federal Practice & Procedure § 2720 (2008). Cross-motions are not a claim that each side alone is entitled to summary judgment; rejecting one does not mean that the other is justified. *Rains v. Cascade Industries, Inc.*, 402 F.2d 241, 245 (3d Cir. 1968); *see also Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997); *General Elec. Co. v. United States*, 60 Fed. Cl. 782, 789 (2004); *J. Cooper & Associates, Inc. v. United States*, 53 Fed. Cl. 8, 15 (2002), *aff'd*, 65 Fed. App'x 731 (2003). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed. Cir. 1988); *see also California v. United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001); *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1364 (Fed. Cir. 2001).

## B. The Parties' Main Contentions

At this juncture, it is helpful to an understanding of the case to summarize the general positions of the warring parties. We shall see these a more detailed version of these arguments below when addressing the various specific issues emanating from the parties arguments. In their motion for summary judgment, plaintiffs argue that the Corps' wrongful assertion of jurisdiction over the project site amounted to a regulatory taking of plaintiffs' property, for which the federal government must pay "just compensation." U.S. Const. amend. V; Pls.' Mem. Summ. J. 2. Plaintiffs advance three overlapping theories in support of their takings claim, each thus becoming issues to be resolved. Pls. Mem. Summ. J. 2.

First, plaintiffs claim that the Corps, by denying plaintiffs' 404 permit application, has denied plaintiffs all economically viable use of their property and thus effected a categorical taking of their property pursuant to *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). *Id.* at 4. Plaintiffs contend that because the denial of economically viable use of their property was prospectively permanent, though subsequently cut short by the Ninth Circuit decision in *Resource I*, this court must find that there has been a taking if plaintiffs were without economically viable use of their land and their proposed use as a landfill was permissible under the background principles of Washington State's law of property and nuisance. *Id.* at 25–28. Plaintiffs assert that their operation of a landfill is a compensable use interest that is not barred by Washington State's law of nuisance, because Washington State's solid waste disposal statutes explicitly allow landfills. *Id.* at 29.

Plaintiffs also contend that once the Corps denied their Section 404 permit application to use the project site as a landfill, it was without any other economically viable use precisely because of the hydrogeological characteristics that made it so appropriate for a landfill. *Id.* at 30–38. According to plaintiffs, defendant's attempts to show that the project site had some

economically viable use are insufficiently supported by the record to create a genuine issue of material fact. *Id.* at 35–36; Pls.' Resp. 34–38; Pls.' Reply 16–20.

Plaintiffs further assert that this Court should grant summary judgment because there is no dispute as to any material fact that the Corps' actions throughout the 404 permit process constituted an "extraordinary delay" that caused an economic loss to plaintiffs. Pls.' Resp. at 39. Based on the Ninth Circuit's decision in *Resource I*, characterizing the Corps' assertion of jurisdiction as "unreasonable," plaintiffs claim that the entire period during which the Corps asserted jurisdiction is *per se* unreasonable (and thus extraordinary) as a matter of law. *Id.* at 40–42. Plaintiffs also maintain that the Corps unreasonably delayed processing their permit, treated plaintiffs differently than other similarly-situated applicants, and ultimately denied the permit based on grounds that were obvious from the moment plaintiffs filed their application. *Id.* at 42–44. Plaintiffs assert that this delay caused extensive economic harm as the project site had neither interim nor long-term viable use while the Corps maintained jurisdiction and prevented plaintiffs from operating their landfill. *Id.* at 44–56.

As a fallback to both their *Lucas* and extraordinary delay arguments, plaintiffs assert that they are still entitled to summary judgment that the Corps affected a taking under the *Penn Central* balancing test.[27] Pls.' Mem. Summ. J. at 57–58. Beyond the economic impact of being without economically viable use of the project site, plaintiffs contend that there are no genuine issues of material fact concerning either the Corps' interference with plaintiffs' reasonable investment-backed expectations or the economic impact of the Corps' permit denial. *Id.* at 60–62. Moreover, plaintiffs assert that the Ninth Circuit's opinion in *Resource I* has estopped defendant from asserting that the Corps' assertion of jurisdiction and the entire permitting process was anything other than unreasonable. This, according to plaintiffs, is sufficient to establish, at the summary judgment stage, that the Corps did not have any real interest in regulating the wetlands on the project site. *Id.* at 58–60.

For each theory, plaintiffs contend that summary judgment is appropriate, that they are entitled to judgment as a matter of law, and that they have adequately supported their motion with facts on the record. Pls.' Mem. Summ. J. at 20–22. According to plaintiffs, defendant has failed to show that a genuine dispute as to issues of material fact exists; thus, the Court should enter summary judgment for plaintiffs on all three theories.

Defendant, for its part, disputes both the factual and legal bases of all three theories in plaintiffs' motion. Defendant asserts that it, not plaintiffs, is entitled to summary judgment on plaintiffs' categorical and extraordinary delay takings claims. Defendant also argues that plaintiffs are not entitled to summary judgment on their *Penn Central* claim. Def.'s Cross-Mot. Summ. J. at 2–4.

Specifically, defendant asserts that plaintiffs are not entitled to summary judgment on their temporary categorical takings claim. *Id.* at 29. Instead, defendant urges that this court

---

[27] As will be explained below in greater depth, *Penn Central Transportation Co. v. New York*, 438 U.S. 104, 124 (1978), stands for the proposition that a court determines when regulation goes "too far" and effects a taking by balancing: (1) the "economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment backed expectations"; and (3) "the character of the governmental action."

grant it summary judgment on that same claim. *Id.* at 29. According to defendant, there is no such thing as a temporary categorical taking; instead, a temporary taking can only be determined by balancing, pursuant to *Penn Central*, the government's interest against the harm to the claimants, thus plaintiffs' claim must fail as a matter of law. *Id.* at 29, 32–36, 38–42. Defendant further maintains that even if plaintiffs are correct that temporary categorical takings exist, plaintiffs' alleged taking is not categorical because they did retain economically viable use of their land both while the 404 permit was pending and after its denial. *Id.* at 38–42.

Just as with plaintiffs' categorical takings claim, defendant asserts that it is, and plaintiffs are not, entitled to summary judgment on plaintiffs' extraordinary delay claim. *Id.* at 3. Defendant maintains that extraordinary delay only applies where an agency has not made a final decision, not in a situation where the relevant federal permit was denied, as plaintiffs charge in the instant case. *Id.* at 43–44. Defendant argues that even if the permit was denied, this court must still assess the alleged taking pursuant to *Penn Central*. *Id.* Moreover, according to defendant, the Corps' mistaken assertion of jurisdiction is legally insufficient to support plaintiffs' extraordinary delay claim; thus, the Court should enter summary judgment for defendant. *Id.* at 44–46.

Nor are plaintiffs entitled to summary judgment on their *Penn Central* claim, according to defendant, because all three prongs of the test, which this opinion discusses in detail below, cut against plaintiffs on summary judgment. *Id.* at 3–4. Defendant contends that because the Corps acted to protect the public interest by preventing any risks to wetlands or aquifers and because it had no reason to think that there were any legal defects in its assertion of jurisdiction over the project site, plaintiffs cannot establish the "character of the government action" prong at the summary judgment stage. *Id.* at 46–51. Similarly, defendant argues that the complex regulatory permitting scheme on the state and local levels prevents this court from granting summary judgment that plaintiffs had reasonable investment-backed expectations in operating a landfill on their property. *Id.* at 51–53. Defendant also maintains that plaintiffs retained substantially economically viable uses of the project site, such that plaintiffs cannot establish the economic impact prong of the *Penn Central* test at this stage of the litigation. *Id.* at 54–57.

Accordingly, the parties raise the following issues, which the court will address *seriatim*. For plaintiffs' categorical takings claim, there are three issues: (1) whether plaintiffs possessed a Fifth Amendment-protected property interest; (2) whether applying *Lucas* to plaintiffs' temporary regulatory takings claim would violate *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302 (2002), and the "parcel as a whole" rule; and if not, (3) whether plaintiffs retained economically viable use of their parcel despite the Corps' denial of their 404 permit application. For plaintiffs' extraordinary delay claim there are three related issues: (4) whether the Corps' denial of plaintiffs' 404 permit application is fatal to the extraordinary delay claim because such a claim must be based on agency inaction; if not, (5) whether *Resource I*'s finding that the Corps' assertion of jurisdiction was "unreasonable" is binding under the doctrine of collateral estoppel and whether this finding established a *per se* extraordinary delay as a matter of law; and, finally, (6) whether there was in extraordinary delay in the permitting process and if so, who bears such responsibility. For plaintiffs' fallback *Penn Central* claim, the parties dispute each of the three prongs prong of that balancing test: (7) the economic impact of the Corps' denial on  plaintiffs; (8) whether plaintiffs had reasonable

investment-backed expectations; and (9) the character of the government action. Additionally, and most critically, this court will separately address (10) the issue of causation as a requisite element in any takings claim. Because defendant contends that it was the actions of state and local authorities, or even plaintiffs' own actions, that effected the alleged taking, and not those of the federal government, the question of causation becomes a paramount one. *See Moden*, 404 F.3d at 1343 (observing that causation must be shown in an inverse condemnation case because it is necessary to establish liability); *Applegate v. United States*, 35 Fed. Cl. 406, 415–16 (1996) (holding that causation is an essential element in a takings claim). This also means that the discussion of the above enumerated legal issues becomes an exercise in adjudication of whether plaintiffs' claims are cognizable.

Nevertheless, to address these multiple issues in a coherent manner, it is desirable to first turn to the substantive law of takings. Some background in the development of the law of takings is necessary because the holdings of certain case law permeate all the issues and arguments in the instant action. It is this underlying commonality that justifies its own introductory discussion. As is customary, it is always a good idea to begin at the beginning.

## C.  Traveling the Path to a Taking

The Fifth Amendment of the Constitution specifically protects private property from governmental incursions by preventing "private property [from] be[ing] taken for public use without just compensation."[28] U.S. CONST. amend. V. The "Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Indeed, James Madison, often described as "the Father of the Constitution,"[29] explained that such protection is government's chief responsibility,[30] because, in the words of Arthur Lee, a Founding Father from Virginia, property is the "guardian of all rights."[31]

---

[28] Yet, rather than the barrier of a property rule, the Constitution protects private property by placing in front of the government the hurdle of a liability rule. *See Preseault v. I.C.C.*, 494 U.S. 1, 11 (1990) ("[the Fifth Amendment] is designed 'to secure *compensation* in the event of otherwise proper interference amounting to a taking'" (emphasis in original)). *See generally* Guido Calabresi & Douglas A. Melamed, *Property Rules, Liability Rules and Inalienability: One View of the Cathedral*, 85 HARV. L. REV. 1089 (1972) (discussing property rules and liability rules).

[29] *See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1, 57 (2005) (O'Connor, J., dissenting); *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 n.9 (1994); *Nelson v. Carland*, 42 U.S. 265, 273 (1843) (Catron, J., dissenting); *Adams v. United States*, 2003 WL 22339164 at *1 (Fed. Cl. Aug. 11, 2003). *See generally* IRVING BRANT, JAMES MADISON: FATHER OF THE CONSTITUTION, 1787–1800 (1950).

[30] Thus, in a 1792 essay on property published in the National Gazette, James Madison contended that because private property is the foundation of a civil society, property, "being the end of government, that alone is a just government, which impartially secures to every man, whatever is his own." James Madison, *Property*, in JAMES MADISON: WRITINGS 515 (Jack Rakove ed. 1999).

[31] Indeed, Arthur Lee, a Virginia delegate to the Continental Congress, observed that "the right of property is the guardian of every other right, and to deprive a people of this, is in fact to deprive

Over the years, the law has distinguished three broad categories of takings: those defined by the governments' powers of eminent domain,[32] those resulting from a "physical invasion" by the government without bringing an eminent domain proceeding,[33] and those resulting from the impact of regulation.[34]   The first two, having an older lineage, could be referred to as "traditional takings," and the latter two require a landowner to file an "inverse condemnation" suit seeking just compensation.   *See Agins v. City of Tiburon*, 447 U.S. 255, 258 n.2 (1980) (distinguishing eminent domain from inverse condemnation); *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 800 n.3 (Fed. Cir. 1993) (quoting *Agins*); *see also Hendler v. United States*, 952 F.2d 1364, 1371–74 (Fed. Cir. 1991) (tracing the historical development of these categories).   "While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings."   *First English Evangelical Lutheran Church v. County of Los Angeles*, 482, U.S. 304, 316 (1987).

them of their liberty." JAMES W. ELY, JR., THE GUARDIAN OF EVERY OTHER RIGHT: A CONSTITUTIONAL HISTORY OF PROPERTY RIGHTS 26 (2d ed. 1998) [hereinafter ELY] (quoting Arthur Lee).   *See generally* ELY at 5, 54.

[32] "Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property," in exchange for payment of just compensation to the landowner.   *Agins v. City of Tiburon*, 447 U.S. 255, 258 n.2 (1980); *see, e.g.*, *Kelo v. City of New London*, 545 U.S. 469 (2005); *United States v. 50 Acres of Land*, 469 U.S. 24 (1984).   *See generally* NICHOLS ON EMINENT DOMAIN (3d rev. ed. 1984).   "At the time of the writing of the Constitution and for many years thereafter a government taking meant exactly that—the Government would physically occupy the land."   *Hendler v. United States*, 952 F.2d 1364, 1371 (Fed. Cir. 1991).   Before the Civil War, most constitutional issues concerning private property and economic rights and liberties arose under the Commerce Clause and the Contracts Clause.   *See* ELY 63–75.   The federal government "undertook relatively few projects"; accordingly, it did not make much use of eminent domain.   *Id.* at 76.   Due to its relative rarity, "the use of eminent domain to take private property did not receive much attention from the federal courts" during this period.   *Id.* at 75.   Yet when the government did use eminent domain, it was clear that the Constitution required the government to pay the landowner just compensation.   *Id.* at 76; *see also Calder v. Bull*, 3 U.S. (3 Dall.) 386, 400 (1798) (concluding that when landowners must give up their land for public use, "justice is done by allowing them a reasonable equivalent").   In fact, "[m]uch of the law of eminent domain—both statutory and case —developed for the purpose of providing the procedural structure for government takings; the main issue in the cases was what compensation was just."   *Hendler*, 952 F.2d at 1371.

[33] *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982); *Ridge Line v. United States*, 346 F.3d 1346 (Fed. Cir. 2003).   The aftermath of the Civil War, coupled with industrialization and the growth of corporate enterprise, transformed economic life in America.   *See* ELY 82, 85.   Land became more valuable as the country became more prosperous and more settled; the states began to take a much more active role in regulating economic affairs and uses of property. *See id.* at 85, 91.

[34] *See, e.g.*, *Penn Central Transp. Co. v. New York*, 438 U.S. 104 (1978); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922).

Traditionally, all three categories covered interference with private property "to an extent that, as between private parties, a servitude is taken." *United States v. Dickinson*, 331 U.S. 745, 748 (1947).

For the purposes of the cross-motions for summary judgment, several cases establishing binding legal precedent (which crisscross the multiple issues facing the court) create a conceptual roadmap that this court must follow. A brief discussion that will establish that the law binding this court is thus is in order. The first, *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), established the legal standard to evaluate takings resulting from regulatory actions as opposed to eminent domain or physical invasions. The Supreme Court faced a challenge to Pennsylvania's Kohler Act, which banned the mining of anthracite coal "in such way as to cause the subsidence" of a dwelling. *Id.* at 412–13. In essence, the regulation made it commercially impracticable to mine the coal where the owner possessed the underlying mineral rights but not the surface estate. *Id.* at 412, 414–15.

Writing for the Court, Justice Holmes recognized the conundrum that "[g]overnment hardly could go on if, to some extent, values incident to property could not be diminished without paying for every such change in the general law. " *Id.* at 413. Yet, just because a government should not pay for every such change does not meant that the government need not pay for *any* such change. *Id.* The Supreme Court highlighted the extent of diminution of "values incident to property" as a key consideration in determining when a government need compensate a landowner. *Id.* "[W]hen [the diminution of values incident to property] reaches a certain magnitude, in most if not in all cases, there must be an exercise of eminent domain and compensation to sustain the act." *Id.* Thus, Pennsylvania could not enact the Kohler Act without compensating the landowners, because its requirement to retain surface support extensively interfered with value of mining rights, did not treat a public nuisance, was not justified by personal safety, and purported to abolish what Pennsylvania recognized as a valid and valuable property interest. *See id.* at 413–14.[35] Justice Holmes then summarized the holding in the now-famous maxim "[t]he general rule is that while property may be regulated to a certain extent, if regulation goes too far, it will be recognized as a taking." *Id.* at 415. It would not be inaccurate to characterize all subsequent regulatory takings jurisprudence as the search for directions to Justice Holmes's "too far" destination. Whether the federal government went "too far" in its alleged regulation of plaintiffs' property is one, if not the paramount, issue in this case.

---

[35] The Court did note an exception to its rule: compensation would not be required when there existed "an average reciprocity of advantage" whereby the regulated received an advantage from the regulation. *See id.* at 415. This rule has been applied by the Federal Circuit. *See Creppel v. United States*, 41 F.3d 627, 631 (Fed. Cir. 1994) ("[Non-compensable] '[m]ere diminution' occurs when the property owner has received the benefits of a challenged regulation, such that an "average reciprocity of advantage" results from it. A [compensable] 'partial taking' occurs when a regulation singles out a few property owners to bear burdens, while benefits are spread widely across the community." (internal citations omitted)); *Florida Rock Indus., Inc. v. United States* (*Florida Rock V*), 18 F.3d 1560, 1570 (Fed. Cir. 1994) (observing that zoning is the paradigmatic example of reciprocity of advantage, the sort of land use control that is typically considered non-compensable).

Although the Supreme Court did not provide turn-by-turn directions to this destination, it identified some useful landmarks along the way in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), elaborating on just how far is "too far." In *Penn Central*, the owners of Grand Central Station ("the owners") sought compensation for its designation as a landmark[36] pursuant to New York City's Landmarks Preservation Law ("Landmark Law"), which prevented the owners from using their air rights[37] to construct a building over the eight-story Grand Central Station building. *Id.* at 109–115, 129–30.[38]

Subsequently, the owners sought further review in the Supreme Court, which began with an extensive historical exposition of takings law. *Id.* at 122–24. The Court observed that takings typically do not occur when: (a) government causes economic harm to interests that were not "sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes";[39] or (b) a state validly exercises its police power, such as zoning, to promote "'health, safety, morals, or general welfare' by prohibiting particular contemplated uses of land . . . [and thereby] destroyed or adversely affected recognized real

---

[36] Under city ordinance, this designation meant that the owners could transfer their development rights from the landmark-designated property to another lot or lots that they owned. *Id.* at 114–16. The owners owned a number of buildings in the area that were eligible to receive the development rights that originally belonged to the Grand Central Station parcel. *Id.* at 115.

[37] The Supreme Court had previously held that a physical invasion of airspace in which a landowner held property rights was a taking for which government must pay just compensation to the affected landowner. *See, e.g.*, *Griggs v. Allegheny County*, 369 U.S. 84 (1962) (pattern of flight for aircraft landing and departing at airport, which required very low-altitude flights over landowner's property, effected a taking of an air easement for which the county must pay just compensation); *United States v. Causby*, 328 U.S. 256, 262–63 (1946) (low overflights that destroyed landowner's use of property as a chicken farm was a taking for which the government need pay just compensation); *Portsmouth Co. v. United States*, 260 U.S. 327 (1922) (military installations' repeated firing of guns over claimant's land was a taking for which the government must pay just compensation).

[38] The original design for Grand Central Station called for a 20-story office tower located above the terminal, but it had remained unbuilt despite the foundation's inclusion of columns to support such a tower in the future. *Id.* at 115 & n.15. When the owners applied for approval to construct a 50-plus-story office building over Grand Central Station, the city rejected the owners' plans as inconsistent with Grand Central Station's status as a landmark because the proposed buildings would overwhelm the terminal's distinctive features and detract from the scenic view of the building. *Id.* at 116–119. The owners sought just compensation in New York State court, and although the trial court determined that the city effected a taking of the owners' air rights, both the intermediate appeals court and the New York Court of Appeals found no taking because the Landmarks Law had merely restricted the owners' use of the property. *Id.* at 119–22.

[39] Although the Court cited cases holding that a claimant lacked a compensable property interest in the navigability of waters and runoff from the high-water level of a river, it did not explain just how the "reasonable expectations of the claimant" were relevant to defining the term "property" in the Fifth Amendment. *See id.* at 124–25.

property interests." *Id.* at 125. In turn, the Court characterized those precedents finding a taking without a permanent physical invasion as divided between: (a) those like the regulation gone "too far" in *Mahon*, where the functional destruction of a property interest or denial of economically viable use of property "so frustrates distinct investment-backed expectation to amount to a taking"; and (b) those in which "government actions that may be characterized as acquisitions of resources to permit or facilitate uniquely public functions" without functionally *destroying* the property right, such as those caused by periodic invasions of air rights for air traffic and military purposes.[40] *Id.* at 127–28.

Significantly, the Court, unlike in *Mahon*, did not view the issue before it as whether state law regulated out of existence a valid, clearly-defined, property interest. *Id.* at 124–25. Instead, the *Penn Central* Court abandoned the common law-based inquiry into the contours of the police power, nuisance law, and property interests in favor of "essentially *ad hoc*, factual inquiries," crafting a balancing test that included weighing "the character of the government action," "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *See id.* at 124–25. Moreover, the Court differentiated between government interference with property rights "from adjusting the benefits and burdens of economic life to promote the common good," and interference that can be characterized as a physical invasion, the latter being more likely to effect a taking. *Id.* at 124.[41]

Even more important to the modern law of takings (and an important issue in the case at bar), the Supreme Court established what came to be known as the "parcel as a whole" rule when it rejected the argument that *any* restriction on *any* possessory interest or parcel of property affected by regulation could rise to a level of a taking. *Id.* at 130–31. Instead, the

---

[40] Plaintiffs' temporary categorical takings claim, asserting that plaintiffs lacked economically viable use of their land after the Corps denied their 404 permit application, falls into the former category; their extraordinary delay and *Penn Central* claims, into the latter.

[41] The *Penn Central* Court emphasized that the Landmark Law did not interfere in any way with the present uses of Grand Central Station. 438 U.S. at 136. Rather, it explicitly permitted the owners to continue to use Grand Central Station in exactly the same manner as they had for the previous 65 years—as a railroad station with concessions and office space. *Id.* According to the Supreme Court, the impact of the Landmark Law was to prevent the landowners from using their parcel in a way that they had planned to at some unspecified point in the future. *See id.* Even so, the Court recognized that the Landmark Law did not merely permit the owners to earn a profit, but also to get a reasonable return from their investment. *Id.* Nor did the city rule out all development, as it had only denied the owners' specific plans rather than all buildings over Grand Central Station. *Id.* at 136–37. Moreover, the Court determined that even if the owners' air rights were restricted over Grand Central Station, these rights were only restricted, not destroyed, because they were transferrable to at least eight other parcels in the vicinity, some of which were suitable for new office buildings. *Id.* The Court opined, in *dicta*, that even if the Landmark Law effected a taking, the transferrability of the air rights "undoubtedly mitigate whatever financial burdens" the Landmark Law had imposed on the owners, even if the transfer of air rights alone might not be just compensation for a taking. *Id.* at 137.

*Penn Central* Court focused on the "nature and extent of the interference with rights in the parcel as a whole," which in this case was the entire block, rather than just the air rights over Grand Central Station. *Id.* at 130–31. Nevertheless, the viability of the "parcel of the whole" approach was thrown in some doubt by the Court in *Keystone Bituminous Coal Assn. v. de Benedictus*, 480 U.S. 470, 479 (1987), which required the application of the so-called "denominator test." The denominator test typically looks to the degree of harm suffered by the property owner instead of the extent of the property interest owned by the property holder as is the case in the "parcel as a whole approach." The degree of harm under the denominator test depends on the extent of property affected by the restriction. This was termed the "takings fraction," where the numerator is the diminution in the value of the property right and the denominator is the owner's relevant property interest, *i.e.*, the "affected interest" of property impacted by the regulation. *See generally* Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 HARV. L. REV. 1165, 1190–93 (1967) (discussing the difficulties in identifying the "denominator" against which the diminution in value is to be compared). Clearly, the more restrictive the denominator, the greater the chance the law will find a taking. *See id.* The Court in *Palazzolo* seemed to favor the denominator test. *See* 535 U.S. at 631–32 (declining to answer "the difficult, persisting question of what is the proper denominator in the takings fraction" because the petitioner alleged a taking of the entire parcel); *see also Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1346–47 (Fed. Cir. 2004) (assessing the relevant denominator for an alleged taking of multiple mining leases); *Florida Rock V*, 18 F.3d at 1578–79 (concluding that the appropriate denominator is the entire fee interest because there is no question of the taking of a severable interest such as mineral rights).

In short, subsequent decisions have characterized *Penn Central* to require a three-pronged balancing test weighing: (1) the "economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment backed expectations"; and (3) "the character of the governmental action." *See, e.g.*, *Cienega Gardens v. United States* (*Cienega Gardens IX*), 503 F.3d 1266, 1279 (Fed. Cir. 2007); *Appolo Fuels*, 381 F.3d at 1344–45; *Cooley v. United States*, 324 F.3d 1297, 1306–07 (Fed. Cir. 2003). Nonetheless, the *Penn Central* Court did not resolve whether its balancing test applied to all regulatory impingements—regardless of the amount by which the regulation reduced the value of the affected property interest—and exactly what remedy courts may award when a taking has occurred without just compensation.

The Supreme Court, in *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 306–07, 311 (1987),[42] resolved the second issue by holding that once a taking has occurred, just compensation is the only proper remedy. Importantly, in considering this issue, the Supreme Court established the concept of a

---

[42] In *First English*, the County of Los Angeles adopted an ordinance that barred the church from rebuilding its retreat after it had been destroyed by flooding. The state courts held that once a court determines that state action effects a taking, government need not pay *any* compensation to the affected landowner if it rescinds the action and abandons the taking. *Id.* at 311–13. Thus, the issue before the Court was not whether the ordinance effected a taking, but only whether the County need pay just compensation even if it had abandoned the taking. *Id.* at 313, 317–18, 321–22.

"temporary takings," whereby the property owner was entitled to compensation for the period a regulation had unconstitutionally taken the property interest in question until it had been rescinded or repealed—or, in other words, the effect of the taking had been "cut short."

The other issue left open in *Penn Central*—whether its balancing test is applicable to all regulations regardless of the degree of harm the regulation caused—was answered in the negative in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992).[43]   In essence, the Court held that if a regulation works a complete "wipe out" of economic value, the balancing factors do not apply, because the regulation is a *per se* taking (also called a "categorical" taking), because it is functionally equivalent to a taking caused by physical destruction or eminent domain. *Id.* at 1016–18.   It should be pointed out that even before *Lucas*, the Court had recognized the two classes of *per se* regulatory takings that side-stepped the *Penn Central* "case-specific inquiry into the public interest advanced in support of the restraint."   *Id.* at 1015–16.   The first "encompasses regulations that compel the property owner to suffer a physical 'invasion' of his property. . . . no matter how minute the intrusion." *Lucas*, 505 U.S. at 1015 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)).   As the *Lucas* Court explained, it had already held that *Penn Central* did not abrogate the rule that a permanent physical occupation is a taking without regard to other factors discussed at length in *Penn Central*. *Id.* at 1016–17; *see also Loretto*, 458 U.S. at 426.

The other category of *per se* takings are those in which "regulation denies all economically beneficial or productive use of land." *Lucas* at 1016–17.   While the Supreme Court had previously identified this category,[44] the *Lucas* Court noted that it "ha[d] never set forth the justification for this rule," *id.*, nor previously held that a regulatory prohibition denying all economically beneficial use of land, as opposed to a physical invasion, sufficed to establish a *prima facie* [in other words, a *per se*] taking. *Id.* at 1016–18.[45]   To be sure, implicit

---

[43] *Lucas* concerned a landowner's facial challenge to the South Carolina Beachfront Management Act of 1988 ("BMA"), which established a zone along the waterfront where "construction of occupiable improvements was flatly prohibited" to prevent further erosion. *Lucas*, 505 U.S. at 1009. Some small non-habitable improvements, such as wooden walkways less than six feet wide and wooden decks under 144 square feet, were nevertheless permitted. *Id.* at 1009 n.2. However, after Lucas filed suit, "the Beachfront Management Act was amended to authorize the Council . . . to issue 'special permits' for construction . . . of habitable structures" within the hitherto prohibited area. *Id.* at 1010–11. By cutting short the total ban on development, the BMA, as amended, meant that "Lucas [might] yet [have been] able to secure permission to build on his property." *Id.* at 1011.

[44] *E.g.*, *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987); *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295–96 (1981); *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980).

[45] The Court offered several reasons for sidestepping the *Penn Central* balancing test, which assumes that the regulation at issue is "'merely adjusting the burdens and benefits of economic life'" to secure an "'average reciprocity of advantage'" *Id.* at 1017 (quoting *Penn Central* and *Mahon*, respectively). Explaining its use of a categorical rule, the *Lucas* Court emphasized the practical equivalence of government appropriation and the rare regulation that leaves a landowner without economically viable use of his property. *Id.* at 1017–19. Such regulations thus "carry with them

in *Lucas* is that the concept of *per se* or categorical taking is its corresponding opposite doctrine of "partial taking," determined not by a bright line *per se* rule, but by application of the *Penn Central* balancing factors. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) ("Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a congruence of factors, including the regulation's evasive effect on the landowner, the extent to which the regulation interferes with reasonable investment backed expectations, and the character of the government action." (citing *Penn Central*, 438 U.S. at 124)); *Florida Rock V*, 18 F.3d at 1568 (noting that "[n]othing in the language of the Fifth Amendment compels a court to find a taking *only* when the Government divests the total ownership of . . . private property without reference to the owner's remaining property interest" (emphasis in original)).

What is more, the *Lucas* Court refused to adopt an exception for regulation to combat "noxious use" of property, reasoning that such an exception would swallow the rule and nullify *Mahon*'s holding that a total taking, even pursuant to the police power, requires just compensation. *See id.* at 1025–26. Instead, the Court identified two much narrower exceptions in setting forth the test to assess whether the regulation amounts to a categorical taking. *Id.* at 1027–30. As a threshold matter, a court must "determine the nature of the owner's estate" to ensure that the proscribed use interests were not excluded from the owner's title, either by transaction or by the "background principles of the State's law of property and nuisance."[46] *Id.* at 1027, 1029. If the proscribed uses are indeed compensable property interests, a court must then assess whether the owner has been deprived of *all* economically beneficial use of that interest.[47] *Id.* at 1018, 1029–30. Thus, if the landowner owns a use interest that is not prohibited by the background principles of the state's law of property and nuisance, and the taking of which leaves the landowner without economically viable use of his land, that denial of use is a *per se* taking for which the landowner must be compensated. *See id.* at 1027–30.

---

a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm." *Id.* at 1018 (citations omitted).

[46] However, the exclusion of those use interests alone, if not in line with the background principles of the state's law or property and nuisance, may not bar a takings claim. *See Palazzolo v. Rhode Island*, 533 U.S. 606 (2001).

[47] Exactly what this means is debatable, because the *Lucas* rule did not address the denominator, "the property interest against which the loss of value is to be measured." *Lucas*, 505 U.S. at 1016–17 n.7. The court declined to indicate whether it would assess a regulation requiring that 90% of a rural tract to be left in its natural state as a deprivation of all economically viable use of that 90% or instead as a diminution in value of the entire tract. *See id.* With regard to mining interests, the Federal Circuit has held that even takings over 90%, but less than 100%, are not to be assessed as categorical takings. *See, e.g.*, *Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1349–50 (Fed. Cir. 2001) (91% reduction in the amount of coal that may be mined is not a categorical taking); *Appolo Fuels*, 381 F.3d at 1347 (a prohibition on mining 92% of coal in one mining lease and 78% in the other was "manifestly insufficient" to effect a categorical taking ).

The final, and most controversial, piece of the puzzle is *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 320 (2002).   Like *Lucas*, *Tahoe-Sierra* presented the Supreme Court with a facial challenge to local land use regulation.   *Id.*   Yet, unlike *Lucas*, the regulation at issue in *Tahoe-Sierra* specified that it was only temporary, a moratorium on development.   *Id.*   It was not a permanent regulation "cut short" as was the case in *First English*.   *See id.*   Furthermore, and significantly, the *Tahoe-Sierra* Court breathed new light into the "parcel of the whole" approach.   *See id.* at 327, 331–32.

The regulation at issue in *Tahoe-Sierra* consisted of two moratoria "to maintain the status quo while studying the impact of development on Lake Tahoe and designing a strategy for environmentally sound growth."   *Id.* at 306.   Ordinance 81-5 "prohibited the construction of any new residences" in areas that were considered vulnerable to adverse impacts from development and "specified that it would terminate when the regional plan" to deal with the threat development posed became final.   *Id.* at 311, 317 n.13.   After the regional plan was delayed in development, the land use authority passed Resolution 83-21 "'which completely suspended all project reviews and approvals' . . . . until a new regional plan was adopted . . . ."   *Id.* at 311.   This resolution specifically stated that it was limited to 90 days.   *Id.* at 317 n.13.   These two moratoria, in concert, prevented all construction on certain lands in the Tahoe-Sierra basin for 32 months.   *See id.* at 312.   Two months into Resolution 83-21, a group of landowners whose property was affected by the moratorium filed suit, claiming, like in *Lucas*, that the mere enactment of the two moratoria had taken all viable economic uses of their property without compensation.   *Id.* at 313.

The Supreme Court, however, disagreed, "relying on the familiar *Penn Central* approach when deciding cases like this, rather than by attempting to craft a new categorical rule."   *Id.* at 342.   Whereas the regulation at question in *Lucas* stated that the ban on development "'was unconditional and permanent,'" the Court found it dispositive that the regulations at issue in *Tahoe-Sierra* were merely temporary measures, which specifically stated that they would terminate.   *Id.* at 329 (quoting *Lucas*, 505 U.S. at 1012).   Nonetheless, the Court did not hold that "the answer to the abstract question whether a temporary moratorium effects a taking is [either] 'yes, always' [or] 'no, never'; the answer depends upon the particular circumstances of the case."   *Id.* at 321.

This temporizing was the result of the revival of the "parcel of the whole" approach.   Instead of analyzing a taking from the perspective of the harm to that portion of property or property interest affected by the regulation, the Court looked to the harm with respect to all of the property or to the entirety of all the property owner's interests.   *Tahoe-Sierra* at 327, 331–32 (citing to *Penn Central*, it was clear that the Court rejected the denominator approach that it used in *Keystone* and advocated in *Palazzolo*).   The *Tahoe-Sierra* Court thus explained that because an interest in real property is defined by the metes and bounds of its geographic dimensions and bounded by the length of the owner's temporal interest, any analysis of the "parcel as a whole" must consider both.   *Id.* at 331–32.   In other words, the "whole" in "parcel of a whole" included temporal future interests as well as present possessory interests (such as tenancies or easements) recognized at common law.[48]   *See id.* (discussing "the temporal aspect

---

[48] The Federal Circuit has indicated that it will consider multiple properties as its "whole" if they are functionally related or likely to be so, based on the economic expectations of the claimant.

of the owner's interest").  Therefore, the Supreme Court in *Tahoe-Sierra* held that "a permanent deprivation of the owner's use of the entire area is a taking of 'the parcel as a whole,' whereas a mere temporary restriction that simply causes a diminution in value is not," presumably because, much like a future interest, the property owner will regain the use of the property at a future date.  *Id.* at 332.

Based on that logic, the Supreme Court in *Tahoe-Sierra* deemed it improper to assess the impact of the 32-month moratorium on only the landowner's use interests over that same 32-month span.  *Id.* at 326–27, 330–31.  The Court criticized this approach as one of "conceptual severance,"[49] which ignores the "parcel as a whole" approach by severing a mere temporal slice from the entire use interest, rather than assessing the regulation's impact on the entire parcel.  *Id.* at 326–27, 330–31.  Deeming it improper to find a total taking of some stick in the bundle of rights only after slicing up the temporal dimensions of the landowner's property interests, the Court refused to analyze this isolated 32-month segment in isolation.  *See id.* at 331–32.  Instead, the Court emphasized that *Lucas* treatment is only appropriate if "there was a total taking of the entire parcel; if not, then *Penn Central* [is] the proper framework."  *See id.* at 331.  The Court reasoned that a temporary prohibition on economically viable use could not logically could not effect a taking of an entire fee simple estate, which would recover its value when the prohibition is lifted.  *Id.* at 332.  Such a temporary prohibition, according to the Court, is only a temporary restriction on property, rather than a taking.  *See id.*  Thus, because the landowner alleged a total taking of only a temporal segment, rather than one of "the parcel as a whole," the Court did not apply *Lucas*.  *Id.* at 306, 331–33.  Instead, the Court instructed that without a total taking of the parcel as a temporal whole, the *Penn Central* test will determine whether regulation has effected a partial taking.  *Id.*; *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2001) (O'Connor, J., concurring) (observing that *Penn Central*, along with other partial regulatory takings cases, is the "polestar" for such analysis).

Based on the foregoing discussion, several points are clear, and helpful in framing this court's analysis of the issues presented by the parties' cross-motions for summary judgment.  Government regulation goes "too far," and effects a total or "categorical" taking, when it

---

*Norman v. United States*, 429 F.3d 1081, 1091 (Fed. Cir. 2005); *Board of County Supervisors of Prince William County v. United States*, 276 F.3d 1359, 1364–65 (Fed. Cir. 2002) (allowing the use and value of the parcel at issue to be evaluated with other parcels if there was "a reasonable probability that the parcels would have been so combined in the reasonably near future"); *Palm Beach Isles Assocs. v. United States* (*Palm Beach Isles I*), 208 F.3d 1374, 1378–81 (Fed. Cir. 2000) (concluding that the relevant parcel was not the whole of the landowner's original purchase, but was instead the functionally coherent portion that the landowner retained), *aff'd in relevant part on reh'g*, 231 F.3d 1354, 1364; *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1365 (Fed. Cir. 1999) (discussing combining separate interests into a functional whole).

[49] *See generally* Nestor M. Davidson, *The Problem of Equality in Takings*, 102 Nw. U. L. Rev. 1 (2008) (discussing conceptual severance in depth).  The term, characterizing an approach to takings focusing on the sticks rather than the value of the bundle, was coined by Professor Margaret Jane Radin.  *See* Margaret Jane Radin, *The Liberal Conception of Property: Cross Currents in the Jurisprudence of Takings*, 88 Colum. L. Rev. 1667 (1988).

deprives a landowner of all economically viable use of his "parcel as a whole." *See Palm Beach Isles Assocs. v. United States* (*Palm Beach Isles II*), 231 F.3d 1354, 1359–65 (Fed. Cir. 2000) (differentiating categorical takings from partial ones). If the taking is not of the *entire* parcel as a whole, either temporally or by its metes and bounds, government regulation can still effect a *partial* taking pursuant to the fact-intensive *Penn Central* balancing test. *See id.*; *Florida Rock V*, 18 F.3d at 1568 (justifying application of *Penn Central* balancing test to partial takings). And, once an uncompensated taking has occurred, the remedy is for government to provide just compensation for what it has taken, even if the government action causing the taking is later rescinded, discontinued, or abrogated. *See Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 800–802 (Fed. Cir. 1993) (quoting *First English* for the proposition that the government must provide just compensation for what it has taken). Further, for a court to find an unconstitutional taking by applying either the *per se* rule or the *Penn Central* balancing test, the property owner must establish a legitimate property interest that is detrimentally affected by the governmental action. *See, e.g., Air Pegasus of D.C. Inc. v. United States*, 424 F.3d 1206, 1212 (Fed. Cir. 2005) (observing that only those with a valid property interest are entitled to just compensation). However, a showing of a mere diminution in value of a property interest alone is insufficient to constitute an unconstitutional taking. *See Florida Rock V*, 18 F.3d at 1570 (differentiating partial takings from non-compensable "mere diminutions"); *see also Cienega Gardens v. United States* (*Cienega Gardens VII*), 331 F.3d 1319, 1343–44 (Fed. Cir. 2003) (quoting *Florida Rock V*).

With the relevant background in hand, we now turn to assessing, in turn, each of plaintiffs' specific theories that the Corps' actions concerning plaintiffs' 404 permit application effected a taking of the project site.

**D. The Specific Issues Before the Court**

**1. Did Plaintiffs Possess a Fifth Amendment-Protected Property Interest?**

Before assessing plaintiffs' categorical takings claim, this court must, as a threshold matter, determine whether plaintiffs possessed a property interest protected by the Fifth Amendment. *See, e.g., Colvin Cattle Co. Inc. v. United States*, 468 F.3d 803, 806 (Fed. Cir. 2006); *Chancellor Manor v. United States*, 331 F.3d 891, 901 (Fed. Cir. 2003); *M & J Coal Co. v. United States*, 47 F.3d 1148, 1153–54 (Fed. Cir. 1995);   The Federal Circuit, whose precedent binds this court, explicitly requires a two-step approach to takings claims regardless of the type of taking before the court.  "First, a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, *i.e.*, whether the plaintiff possessed a 'stick in the bundle of property rights.'" *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002) (quoting *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (internal citation omitted)); *see also Lucas*, 505 U.S. at 1030 (explaining that relevant state law to is typically used to define the interests that qualify as "property" under the Fifth Amendment).  If the plaintiff does possess such an interest, "the court proceeds to the second step, determining 'whether the governmental action at issue constituted a taking of that 'stick.'" *Boise Cascade* at 1343 (quoting *Karuk Tribe*, 209 F. 3d at 1374).

Concerning this first step, both plaintiffs clearly had valid property interests.  Plaintiff RII owned the project site in fee simple and LRI initially had a right of entry, which then

converted to a 99-year lease with the right to use the property for any purpose, including building construction and general improvements. Def.'s Ex. 7, 32; Def.'s Facts ¶¶ 7–10. There is no evidence that either plaintiff acquired a property interest specifically excluding the right to construct and operate a solid waste landfill. Because neither plaintiff's title excluded landfill use, each plaintiff's respective title implicitly permitted such use. *See Lucas*, 505 U.S. at 1029 (regulations leaving property without economically viable use must "inhere in the title itself"); *Karuk Tribe*, 209 F.3d at 1375 ("the term 'property' as used in the Taking Clause includes all rights inhering in ownership, including the right to possess, use, and dispose of the property"); *see also Billings v. United States*, 232 U.S. 261, 280–81 (1914) (discussing use inherent in the right of ownership); *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 217 (Fed. Cir. 1993) (same). *See generally* 1 WILLIAM BLACKSTONE, COMMENTARIES 138 ("The third absolute right, inherent in every Englishman, is that of property: which consists of the free use, enjoyment, and disposal of his acquisitions."); *Hansen v. United States*, 65 Fed. Cl. 76, 98–101 (2005) (discussing the history of the common law right to use property). But merely observing that neither plaintiff's title excluded such use is only a starting point for this court's analysis. *See Chancellor Manor v. United States*, 331 F.3d at 901.

Crucially, Washington State statutes neither prohibit solid waste landfills nor considers them a nuisance, which would have meant that plaintiffs could not have suffered a taking. *See Lucas*, 505 U.S. at 1029–31 (abating and preventing nuisance is never a taking, because the landowner never has the right to create a nuisance). Rather, Washington State law explicitly allows solid waste landfills (though not without some regulation). *See* WASH. REV. CODE 70.95 (solid waste statute regulating landfills). Moreover, Washington State statute also expressly bars nuisance actions for anything "done or maintained under the express authority of a statute." *See* WASH. REV. CODE 7.48.160. Thus, merely constructing and operating a solid waste landfill, as plaintiffs planned to do, is not a nuisance in the abstract in Washington State.

But if the particulars of plaintiffs' proposed use created a nuisance under Washington State common law, it would mean that plaintiffs did not have a valid use interest in creating and/or operating their landfill. *See Lucas*, 505 U.S. at 1029–31 (requiring that regulations barring economically viable use of land already be present in "the background principles of the State's law of property and nuisance"). In evaluating whether plaintiff's proposed construction and operation of a landfill was likely to create a nuisance, the Pierce County hearing examiner found that plaintiffs' proposed solid waste landfill lacked adverse impact from noise, Pls.' Ex. 43 ¶¶ 72–79; air pollution, *id.* ¶¶ 80–84; traffic, *id.* ¶¶ 96–97; and groundwater and surface water, Pls.' Ex. 46 ¶¶ 8R, 9R; and did not qualify under the statutory definition of a nuisance, Pls.' Ex. 43 ¶ 109A. The Pierce County Superior Court eventually upheld all of these findings. Pls.' Ex. 53 at 528–59. Consequently, the particulars of plaintiffs' proposed uses were not within the state's power to bar absent payment of just compensation. *See Lucas* at 1029–31.

In short, plaintiffs' titles did not exclude their proposed use. That use, in the abstract, was expressly allowed by statute, and thus not a nuisance by statutory definition. Nor did the specifics of that proposed use constitute a nuisance or even a likelihood thereof under the background principles of Washington State's law of property and nuisance. Because that legal background defines the scope of the Fifth Amendment-protected property interests, plaintiffs each possessed valid and protected property interests in using their land to construct and operate a solid waste landfill.

**2. Does Plaintiffs' Temporary "Categorical" Regulatory Takings Claim Violate *Tahoe-Sierra* and the "Parcel As a Whole" Rule?**

Having determined that plaintiffs did possess a compensable stick in their bundle of property rights, this court must now assess whether the Corps' actions effected a taking of that stick, the second prong of this inquiry. *See Boise Cascade*, 296 F.3d at 1343 (quoting *Karuk Tribe*, 209 F.3d at 1374). Because causation of the alleged taking is at issue in this case (that is, whether the taking was caused by federal, state, or local action), the discussion below assumes, *arguendo*, that any taking was the result of federal regulation. In other words, what is being tested is whether plaintiffs state a cognizable claim.

Defendant first disputes the legal theory underlying plaintiffs' categorical takings claim. According to defendant, a court can only apply the *Lucas* categorical test to an alleged taking when government action has completely eliminated "all value" from a parcel. Def.'s Cross-Mot. 39; Def.'s Br. Opp'n 7–8. Defendant thus asks this court to conclude that plaintiffs' temporary categorical takings claim is insufficient as a matter of law under *Tahoe-Sierra*, contending that plaintiffs did not suffer a total taking of their entire property simply because plaintiffs were eventually able to construct and operate their landfill. *See, e.g.*, Def.'s Cross-Mot. Summ. J. 3, 38, 41–42; Def.'s Br. Opp'n 7–8. Defendant further argues that the Federal Circuit has declined to apply the *Lucas* categorical (or *per se*) test to any temporary taking, and has instead required a *Penn Central* analysis for all temporary takings. Def.'s Br. Opp'n 13–14. But contrary to the map that defendant uses, these precedents do not require this court to arrive at defendant's preferred destination. Rather, as will be shown, a proper reading of Supreme Court and Federal Circuit precedent, far from precluding categorical treatment for these facts, instead invites it at this particular juncture.

According to defendant, no temporary taking can destroy the value of the "parcel as a whole," both temporally and geographically, as *Tahoe-Sierra* requires for categorical treatment. Def.'s Resp. 8.; *see* Def.'s Br. Opp'n 7–8; *see also Tahoe-Sierra*, 535 U.S. at 330–32. Defendant maintains that adopting plaintiffs' categorical taking theory would contravene *Tahoe-Sierra*'s requirement that courts not find a categorical taking by "conceptually severing" a temporal slice from the fee simple estate as a whole. Def.'s Br. Opp'n 8–9. Defendant contends that because "the Corps' regulatory authority over the property was terminated by virtue of the Ninth Circuit mandate on February 10, 1999, plaintiffs' property regained the landfill value it had lost," as was the case in *Tahoe-Sierra*. Def.'s Resp. 9; Def.'s Br. Opp'n 8–9. Thus, even if the Corps did effect a taking, defendant argues such a taking, as a mere temporal slice measured against the 99-year lease and fee simple estate that comprise plaintiffs' parcel "as a whole," therefore cannot be categorical by definition. *Id.* To be sure, defendant is correct that the categorical treatment requires a total taking of the parcel as a whole. But here, defendant's ambitious legal theory oversteps what precedent supports. In other words, defendant's reach exceeds *Tahoe-Sierra*'s grasp.

As the *Tahoe-Sierra* majority took pains to emphasize, its holding did not overturn or limit *First English*. *Tahoe-Sierra*, 535 U.S. at 328 ("*First English* was certainly a significant decision, *and nothing we say today qualifies its holding*." (emphasis added)). Nor did it, despite eschewing categorical treatment to the facts at bar, limit or overrule *Lucas*. *See id.* at 329–332.

Instead, it emphasized that *Lucas* applies to cases in which there was a total taking of the parcel as a whole, but does not apply to partial takings—those in which the landowner retains some interest in economically viable use in some of the parcel as a whole.  *See id.*

Thus, the *Tahoe-Sierra* majority made clear that "a permanent deprivation of the owner's use of the entire area is a taking of 'the parcel as a whole,' whereas a temporary restriction that merely causes a diminution in value is not."  *Id.* at 332.  The 32-month moratorium on economic development before the Court in *Tahoe-Sierra* was, from the point of enactment, only a *temporary* fix to maintain the status quo while a new conservation plan was developed.  *Id.* at 306, 337–38.  That the endpoint of the development moratorium was as-then unknown did not mean, unlike in *Lucas*, that an endpoint did not and could not exist under that legal regime.

And although the regulations creating the moratorium did not specify the date of their expiration, they were expressly temporary when enacted, serving as a stop-gap to maintain the current state of development pending the permanent land use plan that was in the works.[50]  *Id.* at 311.  When the *Tahoe-Sierra* regulations took effect, the affected landowners were without economically viable use of their land for a finite period of time; their future interests still existed.  *Id.* at 306.  After the regulations expired, as it was stipulated they would, the land would regain its value and the owners would be able to make economically viable use of that land once again.[51]  *Id.* at 317 n.13.  This, as the Supreme Court explained, was not a taking of the parcel of the whole because the landowners' future interests, though diminished in value, always remained intact.  *See id.*  Thus, at the moment the moratorium took effect, it effected a taking of property values for a finite and limited segment of time rather than permanently and indefinitely.

In contrast, when the BMA took effect in *Lucas*, it prohibited any and all further development of the affected property, extinguishing the present *and future* use interests rather than merely diminishing their value.  *See Lucas*, 505 U.S. at 1012; *see also Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1172–73 (Fed. Cir. 1991) (federal statute barring coal mining effected a taking upon enactment).  Although the South Carolina Legislature might have abrogated the Beachfront Management Act ("BMA") by subsequent statute or amended it, or some court found the BMA unconstitutional or otherwise legally insufficient, the BMA was not temporary at the time it was enacted.  *Lucas*, 505 U.S. at 1012; *see also Tahoe-Sierra*, 535 U.S. at 337–38 (contrasting *Lucas* with temporary moratoria and "interim development controls" like those in *Tahoe-Sierra*).  Nor was there even a *hypothetical* point at which the parcels' future use interests would spring back into existence.  Instead, if the BMA were to become temporary at some point in the future—in other words, a permanent taking "cut short"—the BMA would and

---

[50] In other words, the *Tahoe-Sierra* moratorium is analogous to a temporary restraining order or preliminary injunction, intended to preserve the *status quo* during the creation of a permanent solution, whereas the BMA in *Lucas* was akin to a permanent injunction.  *See Tahoe-Sierra* at 337–38 (observing that temporary moratoria are "used widely among land-use planners to preserve the status quo while formulating a more permanent development strategy").

[51] Provided, of course, that the desired use complied with the prospectively permanent land use plan that was to displace the prospectively temporary moratorium at issue.

could only be temporary *in retrospect*, as it was permanent by its own text.[52] *See Tahoe-Sierra*, 535 U.S. at 329–30. Because the BMA as enacted, as it was in force at trial, "effected a taking that 'was unconditional and permanent,'" the Supreme Court deemed the landowner's claim appropriate as a categorical taking. *See id.*; *Lucas*, 505 U.S. at 1012; *see also Seiber v. United States*, 364 F.3d 1356 (Fed. Cir. 2004) (explaining the interaction of *Tahoe-Sierra* and *Lucas*). This *prospectively* permanent restriction on economically viable use effected a taking of the parcel as a temporal whole, regardless of the interests that reverted to the landowner upon the BMA's subsequent amendment. *See Tahoe-Sierra*, 535 U.S. at 329–30; *Lucas* at 1012, 1020.

Further contrary to defendant's argument, the Federal Circuit has continually *refused* to hold that categorical treatment is inapposite for a temporary taking, despite numerous opportunities and invitations to do so. In the context of a physical invasion, to which the Supreme Court compared the totality of the taking in *Lucas*, "'permanent' does not mean forever, or anything like it. A taking can be for a limited term—what is 'taken' is, in the language of real property law, an estate for years, that is, a term of finite duration as distinct from the infinite term of an estate in fee simple absolute." *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed. Cir. 1991). The *Hendler* court further recognized that "[a]ll takings are 'temporary,' in the sense that the government can always change its mind at a later time, and this is true whether the property interest taken is a possessory estate for years or a fee simple acquired through condemnation, or an easement of use by virtue of a regulation." *Id.*; *see also Caldwell v. United States*, 391 F.3d 1226, 1234 (Fed. Cir. 2004) (observing that the precise nature of the takings claim, including whether it is permanent or temporary, may be unknown when it accrues), *cert. denied*, 126 S. Ct. 366 (2005). The Federal Circuit has explained that the category of temporary regulatory takings includes permanent takings cut short as well as prospectively temporary takings. *See, e.g.*, *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1371 n.11 (Fed. Cir. 2004) (observing that temporary takings occur when would-be permanent takings are cut short); *Seiber v. United States*, 364 F.3d 1356, 1364 (Fed. Cir. 2004) (same); *Wyatt v. United States*, 271 F.3d 1090, 1097 n.6 (Fed. Cir. 2001) ("The essential element of a temporary taking is a finite start and end to the taking."). That category clearly

---

[52] Thus, precedent deals with three temporal classes of categorical regulatory takings: (i) those that intend to be and are temporary (*Tahoe-Sierra*); (ii) those that intend to be and are permanent (*Loretto*); and (iii) those that intend to be permanent but are cut short (*Lucas* and *First English*, both in *dicta*). A fourth is possible, but the courts have yet to determine how to treat a categorical taking that purports to be temporary when enacted but shows no signs of being anything other than permanent. *See Tahoe-Sierra*, 535 U.S. at 333–34 (recognizing the concept that the Court could characterize the moratoria as part of "a 'series of rolling moratoria' that were the functional equivalent of a permanent taking," although the Court did not grant *certiorari* on that issue); *cf. Eldred v. Ashcroft*, 537 U.S. 186, 222 (2003) (holding that Congress' continued expansion of the term of copyrighted material did not violate the Constitution's requirement that copyrights be granted "for limited times"). *But see Tahoe-Sierra*, 535 U.S. at 347 (Rehnquist, C.J., dissenting) (observing that under the *Tahoe-Sierra* majority's holding, "[t]here is every incentive for government to simply label any prohibition on development 'temporary,' or to fix a set number of years. As in this case, this initial designation does not preclude the government from repeatedly extending the 'temporary' prohibition into a long-term ban on all development."); *cf. Eldred* at 255–56 (Breyer, J., dissenting) (expressing concern that Congress could intend to make copyrights effectively permanent by repeatedly extending the copyright term in finite increments).

includes scenarios like the one currently before this court, "when 'a court invalidates a regulation' that had previously effected a taking." *Seiber*, 364 F.3d at 1364 (quoting *Wyatt*).

Nor did the Federal Circuit interpret *Tahoe-Sierra* to require the *Penn Central* test for *all* temporary takings. *See Seiber*, 364 F.3d at 1368 (declining to adopt the government's argument that temporary categorical takings cannot exist and explaining that *Tahoe-Sierra* may have only "rejected [the] application of the per se rule articulated in *Lucas* to temporary development moratoria" and not to takings that are temporary only in retrospect because they have ended); *see also Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1350–52 (Fed. Cir. 2002) (observing that *Tahoe-Sierra* rejected the *Lucas per se* rule for temporary moratoria). Despite these suggestive dicta, which assumed that temporary categorical  takings could exist for the purposes of analyzing those plaintiffs' claims, the Federal Circuit has not determined whether categorical treatment is proper for a retrospectively temporary regulation that leaves the landowner without economically viable use of his land. *See Seiber*, 364 F.3d at 1368.

Instead, the Federal Circuit has recognized, albeit in *dictum*, that categorical treatment has not been foreclosed for all temporary takings.  In *Seiber v. United States*, 364 F.3d 1356 (Fed. Cir. 2004) the Federal Circuit provided its most extensive discussion of temporary regulatory takings in light of *Tahoe-Sierra* and *Lucas*.   *Seiber* concerned an inverse condemnation suit seeking just compensation for the Department of the Interior's denial of an "incidental take permit," ("ITP") which would have permitted the Seibers to engage in logging on their property.[53]   *Id.* at 1359–61.   The Oregon Department of Forestry ("ODF") had designated 40 acres of the Seibers' 200-acre property as a habitat for spotted owls, which are protected as a threatened species under the federal Endangered Species Act ("ESA").  *Id.* at 1359–60.  Consequently, ESA prevented the Seibers from removing any trees on the 40 acres without an ITP.  *Id.*  After the Seibers exhausted their administrative remedies, they filed suit in the Court of Federal Claims, alleging that the denial of the ITP effected a taking of their property without just compensation.  *Id.* at 1361–62.  Subsequently, ODF informed them that their property was no longer designated as a habitat for spotted owls, and as such, they would no longer need an ITP to engage in logging.  *Id.* at 1362.  Based on this change, the Seibers amended their complaint to seek just compensation for a temporary, rather than permanent, taking.  *Id.* at 1362, 1363–64.  The Court of Federal Claims granted the government's motion for summary judgment, ruling that the Seibers did not have a viable categorical takings claim under *Lucas*, because only 20% of their property was without economically beneficial use.  *Id.*

On appeal, the Federal Circuit first observed that both Supreme Court and its own precedent permit temporary regulatory takings claims.  *Id.* at 1364.  In addition to extraordinary delay in government decision making (discussed in subsections 4–6, *infra*), "a temporary taking occurs when *what would otherwise be a permanent taking* is temporally cut short."  *Id.* (emphasis added; internal quotation marks omitted); *see also Am. Pelagic*, 379 F.3d at 1371

---

[53] The ITP was not a permit to engage in logging, nor were the Seibers under an injunction that prevented them from logging.  *See id.* at 1359–62.  Instead, the legal effect of an ITP is, as its name states, a permit to "take" an endangered species incident to activity on the designated property that was otherwise forbidden under the ESA.  *See id.* at 1362.  The Court observed that the Seibers could have engaged in logging without an ITP, but that the Seibers would have been liable for any "take" of the spotted owls that would have occurred incident to logging.  *See id.*

n.11 (same); *Wyatt*, 271 F.3d at 1097 n.6 (same). This can occur when: (1) "a court invalidates a regulation that had previously effected a taking," as in the facts of *Lucas* (though the temporal issue was not before the Supreme Court—*see* 505 U.S. at 1011–14); (2) "the government elects to discontinue regulations after a taking has occurred," as in *First English*; or (3) "when the government denies a permit . . . [and] at some [later] point reconsiders the earlier denial and grants a permit (or revokes the permitting requirement)," as was alleged in *Seiber*. 364 F.3d at 1364–65 (internal quotation marks and citations omitted); *see also Boise Cascade*, 296 F.3d at 1347 (discussing observing that takings can be temporary because when the government reconsiders an earlier permit denial or revokes the permitting requirement); *Wyatt*, 271 F.3d at 1097 n.6 (recognizing that temporary takings can result when a taking is cut short by a judicial invalidation of a regulation or the government's election to discontinue the taking).

Having established the appropriate legal framework, the Federal Circuit turned to the Seibers' claim that they suffered a temporary categorical taking during the period when they needed an ITP to engage in logging on their property. *Seiber* at 1368. Specifically, the Seibers alleged that the denial of their ITP application left them without economically beneficial use of their 40 acres of land. *Id.* In response, the government argued that because an affected property will recoup some value when the temporary taking ends, no temporary taking can be categorical under *Tahoe-Sierra*. *See id.* In essence, the government contended that applying categorical treatment to the Seibers' temporary takings claim would result in the sort of impermissible "temporal severance" of the parcel a whole that *Tahoe-Sierra* foreclosed. *See id.* (citing *Tahoe-Sierra*, 535 U.S. at 331).

But because the Seibers alleged a categorical taking of only 40 acres of their 200-acre property, they were not without economically viable use of their parcel as a whole for *any* length of time. *Id.* at 1368. Consequently, even if the Seibers suffered a taking, such a taking could not be categorical without regard to the temporal severance issue. *Id.* at 1368–69. Therefore, the Federal Circuit declined to address that issue in its holding, though it did address the government's argument in *dicta*. *Id.* at 1369–70. As the Federal Circuit observed, its precedent instead suggested that temporary categorical takings remained viable. *Id.* (citing *Boise Cascade*, 296 F.3d at 1350). The Federal Circuit expressed concern with the government's broad reading of *Tahoe-Sierra*, reiterating its earlier observation "that the Supreme Court may have only rejected [the] application of the *per se* rule articulated in *Lucas* to temporary development moratoria, and not to temporary takings that result from the rescission of a permit requirement or denial." *Id.* (alteration in original; internal quotation marks and citations omitted).

Just as in *Seiber*, defendant cites *Tahoe-Sierra* to support its argument that merely because plaintiffs regained economically viable use of their land after *Resource I*, the Corps could not have effected a taking of the parcel as a temporal whole. *See, e.g.*, Def.'s Resp. 9 ("it becomes clear that any deprivation suffered by plaintiffs did not constitute a 'total loss'"). But it is well-settled that when a regulatory takings claim arises from a permit denial, the taking accrues when a permit is denied. *See Riverside Bayview*, 474 U.S. at 127 ("Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred."); *Cooley v. United States*, 324 F.3d 1297, 1301–02 (Fed. Cir. 2003) ("To be ripe, a taking claim based on a § 404 permit denial must spring from a final decision"). Because it is the permit denial that can effect a regulatory taking, this court must examine the effect of that denial on plaintiffs' property interests. *See id.*;

*Whitney Benefits*, 926 F.2d at 1172–73 (observing that a taking occurs when economic development is effectively prevented).

Thus, whether that denial effected a categorical taking depends on if it left plaintiffs without any present or future interest in economically viable use in their parcel as a whole or only diminished the value of their use interests. *See Tahoe-Sierra*, 535 U.S. at 329–31. To be sure, events after the taking has accrued (as with the amendment of the BMA in *Lucas*, *see* 505 U.S. at 1011–14, and the abandonment of the prohibition on construction in *First English*, *see* CITE) can certainly reduce the impact of a taking by cutting it short.[54] (In effect, it goes to the amount of "just compensation" that must be paid.) Yet, such subsequent events cannot change what property interests the taking took when it accrued. Applying this precept to the facts of the case at bar, the fact that *Resource I* later abrogated the effect of the Corps' denial does not alter the interests that the denial took. In other words, whether the denial effected a categorical taking of the parcel as a whole, a partial taking, or no taking at all depends *only* on the effect of that particular denial on plaintiffs' property interests at the time of the denial.

Unlike the *Tahoe-Sierra* moratorium, the Corps' denial of plaintiffs' 404 permit application specified no date or condition on which it would terminate. From the point it took effect, it was unconditional and permanent, thus effecting a taking of the parcel as a temporal whole. Here, like *Lucas*, it appeared to plaintiffs that they would never be able to develop their property. 505 U.S. at 1010–11. The Corps stated in its September 30, 1996 letter:

> Your application for a Department of the Army permit is denied. . . . Denial occurred for the following reasons: Resource Investments, Inc. has failed to clearly demonstrate that there are no less environmentally damaging practicable alternatives for achieving the project purpose. The proposed project represents an unacceptable risk to public heath and safety due to the potential contamination of the Central Pierce County Aquifer System. Based on the above finding, the proposed work is not in the public interest.

Pls.' Ex. 50, at 489. Unlike the moratorium in *Tahoe-Sierra*, which was explicitly temporary and set to terminate once the permanent land use plan took effect, this statement accompanying the denial of plaintiffs' 404 permit application cannot be read to be anything other than permanent. *See Whitney Benefits*, 926 F.2d at 1172–73 (holding that the taking of all economically viable use of property accrued when the enacting statute passed). Had *Resource I* not abrogated the Corps' denial, plaintiffs, like the landowner in *Lucas*, would have never been able to make any economically viable use of their property without a change in the law.

Merely because *Resource I* cut short any alleged taking does not diminish the extent of what, if anything, the Corps had taken from plaintiffs (who, unlike *Seiber*, contend that they were without economically viable use of their parcel as a whole—*see* subsection 3, *infra*). The Corps' denial of plaintiffs' 404 permit application was prospectively permanent, extinguishing the future interests rather than damaging them as did the temporary moratorium in *Tahoe-*

---

[54] The impact of the taking, however, is generally an issue for the *Penn Central* inquiry, *see* subsections 7–9, *infra*. Here, however, the issue for a categorical taking is whether the taking was a total one of the parcel as a whole, both temporally and geographically, *when it took effect*. *See Tahoe-Sierra*, 535 U.S. at 329–31.

*Sierra*. To be sure, it is important that the Corps' jurisdiction over the project site was terminated by *Resource I*. Yet, that the taking was "cut short" does not transmute the interests that it had taken, but instead informs the amount of just compensation, an issue that is not currently before this court.[55] *See Tahoe-Sierra*, 535 U.S. at 327–28 (quoting *San Diego Gas & Elec.*, 450 U.S. at 636); *Lucas*, 505 U.S. at 1030 & n.17 (quoting *First English*). Therefore, it matters not *for liability* whether a regulation remains in force or has been rescinded by the time the case makes it to court. *See Lucas*, 505 U.S. at 1011–12 (citing *First English*); *cf. Esposito v. South Carolina Coastal Council*, 939 F.2d 165, 168 (1991) ("Even if the amended [BMA] cured all of the plaintiffs' concerns, the amendments would not foreclose the possibility that a taking had occurred during the years when the 1988 Act was in effect.").

That plaintiffs' original complaint only sought relief for a permanent taking further supports assessing the Corps' denial of plaintiffs 404 permit application as a categorical taking. Pls.' Mem. Summ. J. 1. When plaintiffs brought suit, they were without any future interest in the economically viable use of their parcel. Only after the Ninth Circuit's decision in *Resource I* terminated the Corps' jurisdiction did plaintiffs amend their complaint to seek compensation only for a temporary taking. Pls.' Mem. Summ. J. 2–3 & n.2. As in *Lucas*, plaintiffs had no reason to proceed on a temporary takings theory when, to their knowledge, the alleged taking for which they sought compensation was permanent. *See* 505 U.S. at 1010–13 (observing that when the plaintiff filed suit "the taking was unconditional and permanent"). Therefore, as the Supreme Court did in *Lucas*, this court must examine the extent of the alleged taking when it accrued.

Thus, that plaintiffs eventually regained economically viable use of their property is not *ipso facto* fatal to their categorical takings claim. But in order to determine whether the denial effected a categorical taking as a matter of law, this court must now inquire whether plaintiffs lacked any economically viable use of their property after the Corps denied plaintiffs' permit.

---

[55] Here, this court addresses only the issue of liability. However, for the sake of completeness, the length of a taking determines the amount of interference with the property interest for which government must pay just compensation. *Tahoe-Sierra*, 535 U.S. at 328. Plaintiffs' *Lucas* claim (subsections 1–3) and *Penn Central* claim (subsections 7–9) accrued when the Corps denied plaintiffs' 404 permit application on September 30, 1996. This court cannot determine when plaintiffs' extraordinary delay claim accrued because, as discussed in subsection 9, *infra*, it cannot conclude on summary judgment that there was extraordinary delay attributable to the Corps.

The date on which the taking ended also affects the amount of compensation. Defendant asserts, citing *Creppel v. United States*, 41 F.3d 627, 631–34 (Fed. Cir. 1994), that this date is July 27, 1998, when the Ninth Circuit issued *Resource I*. Def.'s Resp. 29–30. In *Creppel*, the Federal Circuit determined that the taking at issue ended when the district court ordered the project to proceed, thereby restoring some value. 41 F.3d at 631–64. Here, the district court ruled against plaintiffs, not for them; thus, there was no court order requiring the government to proceed. Further, as this court discusses in subsection 3, it is not mere value that ends a *Lucas* taking, but the ability to engage in lawful economically viable use. The legality of plaintiffs' proceeding without a 404 permit from the Corps was not certain until the Ninth Circuit's opinion in *Resource I* became final on February 10, 1999, after the Corps could no longer petition the Supreme Court for *certiorari*—not, as defendant asserts, on July 27, 1998, when the Ninth Circuit released its opinion.

*See Lucas*, 505 U.S. at 1030 & n.17 (citing *First English* for the proposition that government can rescind a regulation to avoid paying for a permanent taking, but must still compensate for what it has taken).

### 3. Did Plaintiffs Retain Economically Viable Use of Their Parcel Despite the Corps' Denial of Plaintiffs' 404 Permit Application?

Defendant also denies that plaintiffs were without economically viable use of their property, contending that "[e]ven had the Section 404 permit denial been upheld by the Ninth Circuit . . . Plaintiffs could still not establish a categorical taking. Instead, plaintiffs would only have been deprived of their preferred use of their property as a landfill, not all use." Def.'s Resp. 10. Defendant asserts that plaintiffs were only denied the "highest and best use"[56] of the land, and instead maintains that plaintiffs enjoyed some economically viable use of their property. Def.'s Resp. 10. Significantly, according to defendant, plaintiffs' property had some value, which means that the taking is not categorical and thus renders *Lucas* inapposite. *See* Def.'s Cross-Mot 39; Def.'s Br. Opp'n 7–8. The latter is at best misleading.

As *Lucas* elaborates, categorical assessment of an alleged taking is appropriate when the property is purportedly without *economically viable use*, and does not require the parcel to be without all accounting or appraisal value.[57] Both in its holding and its reasoning, *Lucas* thus

---

[56] To support this argument, defendant cites *Florida Rock Indus., Inc. v. United States* (*Florida Rock II*), 791 F.2d 893, 901 (Fed. Cir. 1986). *Florida Rock II* observed that "[t]he fifth amendment, as backed by the safety net of the Tucker Act, does not find a taking in a mere denial of the 'highest and best use,' *i.e.*, most profitable use, that would be available in the absence of regulation." This term means

> [t]he reasonable probable and legal use of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability.

*Board of Supervisors of Prince William County v. United States*, 276 F.3d 1359, 1365 n.2 (Fed. Cir. 2002) (citing Appraisal Institute, THE DICTIONARY OF REAL ESTATE APPRAISAL 171 (3d ed. 1993). But here, and as this opinion discusses at length, *see* subsection 3, *infra*, plaintiffs allege that they were unable to engage in *any* economically viable use of their property following the Corps' denial of their 404 permit application. Rather than the "mere denial" of *the most* profitable use, plaintiffs instead allege that they are without *any* profitable use.

[57] It is the *Lucas* dissents, which are neither binding nor law, that focus on the property's retaining *residual value*. *See, e.g., Lucas*, 505 U.S. at 1043–44 (Blackmun, J., dissenting) (characterizing the majority opinion as "based on the trial court's finding that the property had lost all economic value"), 1044 (observing that "State courts frequently have recognized that land has economic value where the only residual economic uses are recreation or camping," and that the ability to alienate the property means that it retains value); *id.* at 1065–66 (Stevens, J., dissenting) (discussing situations in which the property would have value without economically viable use). Regardless of the phrasing of the South Carolina courts, which responded to the trial court's having found that the

focuses on whether a regulation permits *economically viable use* of the property, not whether the property retains some value on paper.[58]   *See, e.g.*, 505 U.S. at 1027 (observing that a property owner cannot expect to be deprived of "all economically beneficial use" if those uses were part of the owner's title), 1028 (rejecting South Carolina's argument that a property owner's title is "subject to the 'implied limitation' that the State may subsequently eliminate *all economically valuable use* "), 1030 ("When, however, a regulation that declares 'off-limits' *all economically productive or beneficial uses* of land goes beyond what the relevant background principles [of the state's law of property and nuisance] would dictate, compensation must be paid to sustain it."), 1031–32 (discussing the BMA's impact on "essential use" and "beneficial uses" of land) (all emphases added).   Instead, the *Lucas* majority looks to uses of the land as a touchstone for categorical takings analysis.   *See id.* at 1019 n.8 ("our prior takings cases evince an abiding concern for the productive use of, and economic investment in, land"); *see also* James S. Burling, *Use Versus Value in the Wake of* Tahoe-Sierra, in TAKING SIDES ON TAKINGS ISSUES: THE IMPACT OF *TAHOE-SIERRA* 99–106 (Thomas E. Roberts ed., 2003) (concluding that economically viable use is the criterion for categorical takings, for which value is sometimes a convenient shorthand); James Burling, *Can Property Value Avert a Regulatory Taking When Economically Beneficial Use Has Been Destroyed?*, *in* TAKINGS SIDES ON TAKINGS ISSUES: PUBLIC AND PRIVATE PERSPECTIVES, ch. 19 at 463–67 [hereinafter Burling, *Property Value*] (Thomas E. Roberts, ed. 2002) (same).

The Federal Circuit, as well, has explained that it is the lack of economically viable use, rather than impact on property values, that triggers categorical treatment for an alleged taking. *Florida Rock II*, 791 F.2d 893, 895–97 (Fed. Cir. 1986), concerned the denial of a permit to dredge and fill 98 acres of a 1560-acre tract that only had economically viable use for limestone mining.   The government, trying to prove that there was no taking, nevertheless maintained that the parcel as a whole retained value to "investors willing to forego immediate income in favor of long-term gain."   *See id.* at 902.   The Federal Circuit agreed, recognizing that the location of this piece of land, in proximity to Miami, had "substantial residual value" even without the mineral rights.   *See id.*   Following up after remand in *Florida Rock V*, 18 F.3d 1560, 1567 (Fed. Cir. 1994), the Federal Circuit did use the change in the parcel's value in assessing whether it had suffered a categorical taking.   However, the Federal Circuit recognized that a categorical taking turned on whether the parcel retained economically viable use, for which the change in market value was not a substitute but merely a measure of it.   *See id.*   Thus, the *Florida Rock V* court concluded that when "a regulation prohibits less than all economically beneficial *use* of the land and causes at most a partial destruction of its *value*, the case does not come within the Supreme Court's 'categorical' taking rule."   18 F.3d at 1564–65.

Similarly, in *Palm Beach Isles Assocs. v. United States* (*Palm Beach Isles II*), 231 F.3d 1354 (Fed. Cir. 2000), the Federal Circuit reiterated that the relevant consideration in finding that

property was "valueless" because of the BMA, the *Lucas* majority, which binds this court, did not limit its holding to circumstances where the property was left without value.

[58] The majority does, however, discuss diminution of "value" in two footnotes, but only in responding to an argument in Justice Stevens's dissent questioning why a 95% loss of value would not merit categorical treatment but a 100% loss of value would.   *See id.* at 1016–17 n.7, 1019 n.8. The majority simply responded to this argument in its own terminology.

there was a categorical taking was whether there was "a total wipeout of economically viable *use*." *Id.* at 1365 (emphasis added).  The landowner in *Palm Beach Isles II* asserted a categorical taking based on the Corps' denial of a dredge and fill permit for the 1.4 acres of wetlands and the adjacent 49.3 acres of submerged lands comprising the property. *Id.* at 1364.  Discussing its earlier precedents assessing claims of categorical takings, the Federal Circuit characterized those inquiries as requiring that there be "a sufficient denial of economically viable use,"[59] "a prohibition of all economically viable use of land,"[60] or "[r]emoval of all use."[61]  *Id.* at 1359.  In contrast, the Federal Circuit described its cases finding no categorical taking as concluding that the claimant's property "had substantially reduced [] value"[62] or "retains value . . . for development."[63]  *Id.* at 1360–61. The Federal Circuit did recognize that the parcel's value retained some role in categorical takings, but only insofar as the value determined "just compensation" for the taking. *See id.* at 1363–64.

To be sure, the complete elimination of a property's value may be *sufficient* to establish a categorical taking under many circumstances, given the obvious correlation between uses and their market values; a parcel of real property without value would usually have no lawful economically viable use.[64]  Yet the lack of value is not *necessary* to effect a taking, as a parcel will typical retain some quantum of value even without economically viable use. *See* note 64, *supra*.  Such a scintilla of value is insufficient to defeat an otherwise-viable takings claim. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 631 ("Assuming a taking is otherwise established, a State may not evade the duty to compensate on the premise that the landowner is left with a

---

[59] *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1176–77, 1179–83 (Fed. Cir. 1994).

[60] *Florida Rock V*, 18 F.3d at 1564–65.

[61] *Creppel v. United States*, 41 F.3d 627, 631–32 (Fed. Cir. 1994).

[62] *Avenal v. United States*, 100 F.3d 933, 936–38 (Fed. Cir. 1996). *Palm Beach Isles II* adds that "Nowhere was the taking [in *Avenal*] described as 'categorical' [because] [t]he plaintiffs retained the *use* of their leaseholds." 231 F.3d at 1360 (emphasis added).

[63] *Good v. United States*, 189 F.3d 1355, 1359–60 (Fed. Cir. 1999). *Palm Beach Isles II* elaborates, "[f]or our purposes, the single most important fact in [*Good*] is that the case did not involve a categorical taking. . . . the same as *Avenal*, a case in which there was less than a total wipeout as a result of the regulatory imposition, and thus a case in which all three of the *Penn Central* criteria are properly at issue." 231 F.3d at 1360.

[64] *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 699–701 (1999) (discussing a taking from leaving a property without economically despite that it had sold while it was without economically viable use); *Florida Rock II*, 791 F.3d at 902 (reasoning that even the most heavily-regulated property would still retain value based on the possibility that some beneficial use may be allowed in the future). *But see Andrus v. Allard*, 444 U.S. 51, 64–67 (1979) (holding that barring the sale of lawfully-acquired eagle feathers, thereby rendering them without legal market value, did not mean that their owners were without economically viable use, such as exhibiting them for a fee; nevertheless, the Court in *Lucas*, 505 U.S. at 1027–28, explained that the result in *Andrus* was perhaps due to the fact that *Andrus* involved personalty).

token interest."); *see also* notes 54 & 57, *supra.*  Even the property at issue in *Lucas* retained some accounting or appraised value.  *See Lucas*, 505 U.S. at 1044 (Blackmun, J., dissenting) (recognizing that the parcel nevertheless retained *value* despite its lack of economically viable use).  Indeed, it is not difficult to identify other circumstances, such as purchasing a parcel to preserve development-free open space or natural land, in which a parcel may have some value despite its lack of economically viable uses.  Therefore, categorical treatment remains appropriate even if a parcel retains some nominal value, so long as that the claimant is without economically viable use of his property.  *Palazzolo*, 533 U.S. at 631; *see* Burling, *Property Value*, *supra* (discussing use as the touchstone for a categorical taking).

To be sure, defendant is certainly correct that the plaintiffs must be without economically viable (or "beneficial") use of the "parcel as a whole," as *Penn Central* and *Tahoe-Sierra* dictate. Def.'s Cross-Mot. Summ. J. 41–42; *see, e.g.*, *Palm Beach Isles Assocs. v. United States* (*Palm Beach Isles I*), 208 F.3d 1374, 1378–81 (Fed. Cir. 2000).  Yet defendant's contention that plaintiffs retained economically viable use of the project site collapses under the weight of the record evidence before this court.  *Cf. Cienega Gardens VII*, 331 F.3d at 1341 (requiring "specific findings of fact about the effects of the legislation *on the plaintiffs* are necessary to complete the analysis of the economic impact factor [of a non-categorical taking]." (emphasis added)).  Nevertheless, defendant's speculation about potential economically viable use of the parcel is not supported by record evidence and thus is insufficient to create a genuine issue of material fact.  *See Board of County Supervisors of Prince William County v. United States*, 276 F.3d 1359, 1365 (Fed. Cir. 2002) (requiring that a proposed "use" show a "reasonable probability that, at the time of the taking, the land was both physically adaptable for such use and that there was a need or demand for such use in the reasonably near future"); *Formanek v. United States*, 26 Cl. Ct. 332, 339 (1992) (rejecting proffered uses that were "convenient arguments rather than feasible alternatives); *see also* Section II-A, *supra* (discussing non-movant's summary judgment burden under *Celotex*).

Preliminarily, defendant contends that simply because LRI held a 99-year lease from RII on the parcel, under which LRI paid a total of $360,000 in rent pending the beginning of disposal operations, the parcel had economic value and was being used in an economically viable manner. Def.'s Resp. 40–41.  As defendant admits, the companies have overlapping ownership (identical but for RII's having one additional owner) and management.  *Id.* at 4–5.  In fact, the affiliation was so encompassing that Harold LeMay, the president of both companies, signed this lease for both RII and LRI.  Def.'s Ex. 30.  This lease, obviously no arms-length transaction, was entirely unrelated to any use of the land after the Corps denied the 404 permit application; instead, it was the vehicle by which LRI scheduled payments on its debt to RII for the fund to purchase the parcel.  Pls.' Resp. 36.  Furthermore, the lease itself contained not one, but two different payment provisions: LRI was to pay $30,000 per month until disposal operations began, and $0.60 per ton of waste disposed at the site thereafter.  Def.'s Facts ¶ 11.  Only the latter payment method, a condition subsequent that did not trigger until after *Resource I* took effect, constitutes an economically viable use of the land.  The former, by contrast, is explicitly based on the plaintiffs being *unable* to use the land.  To shift from a flat fee to a rate thus required that LRI itself receive payment for actual waste disposal on the parcel, *i.e.*, engage in economically viable use of the land, so that it could in turn pay RII based on its disposal income.  It would be perverse to conclude that payments explicitly based on non-use nevertheless constitute economically viable use of the land.

As the Supreme Court has observed, regulatory takings jurisprudence "is characterized by 'essentially *ad hoc*, factual inquiries' designed to allow 'careful examination and weighing of all the relevant circumstances.'" *Tahoe-Sierra*, 535 U.S. at 322 (quoting *Penn Central*, 438 U.S. at 124); *see also Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1289 (Fed. Cir. 2008) (same); *supra* note 48, (discussing the Federal Circuit's functional approach to identifying "the parcel as a whole"). This court thus rejects defendant's invitation to focus on the form of plaintiffs' corporate and financial relationship over its substance. This rigidly formalistic approach does not accord with the function-oriented, fact-specific assessment that this court must perform.

Defendant also asserts that, before plaintiffs' purchased the land, "the parcels were being used for various purposes including residential, agricultural and forestry. . . . The market value of the acquired parcels, as well as the ability to continue their current uses, did not magically terminate upon their acquisition by Plaintiff RII." Def.'s Resp. 12. Plaintiffs could have, according to defendant, engaged in uses such as construction of housing or renting the land, or "any number of profitable endeavors" and "innumerable other uses," including leasing or selling the property for development or developing it themselves. Def.'s Cross-Mot. Summ. J. 57. According to defendant, "[a]ll four of the lots were immediately and individually marketable," Def.'s Resp. 12, and merely "[holding] the property for future investment appreciation . . . is also an economic use,"[65] Def.'s Cross-Mot. Summ. J. 57. Defendant further offers that the land could produce commercially salable hay as another such use. Def.'s Resp. to Pls.' Facts ¶ 88; Pls.' Ex. 95 at 1376. These are the sum total of alternative uses of the land that defendant provides to support that economically viable use did exist.

Yet, this court is bound to "discount proposed [economically viable] uses that do not meet a showing of reasonable probability that the land is both physically adaptable for such use *and* that there is a demand for such use in the reasonably near future." *Lovelaries Harbor, Inc. v. United States*, 21 Cl. Ct. 153, 158 (1990) (emphasis in original; internal quotation marks omitted). Upon further examination, some of these uses turn out to be mere attorney argument without support in the record; other nominal uses may exist, at least insofar as they are uses that

---

[65] Adopting defendant's argument would contravene *Lucas*: Lucas also could have, and did, hold onto his parcels that were without economically viable use while the BMA was in effect. Defendant's argument—that it is an economically viable *use* to hold for investment a parcel bereft of economically viable use—is patently absurd. Hoping for a change in the legal landscape cannot be considered "economically viable use of the land." Instead, it is perhaps the paradigmatic example of value without use. *See Florida Rock II*, 791 F.2d 893, 902 (recognizing that even the most heavily-regulated property may still retain value due to the possibility that regulations will be changed in the future). This argument results from defendant's failure to properly distinguish prospectively temporary regulations from those that are only temporary when "cut short," which this court has discussed. To be sure, certain *prospectively* temporary regulatory takings might have future investment appreciation, such as a development moratorium where pent-up demand might result in a windfall if a patient landowner waits out the permanent land use plan and has his own development grandfathered-in. However, this situation is not possible with a permanent taking cut short, because, viewed at the time of the taking, there is no point at which the parcel will regain economically viable use.

could have some accounting value in a line on a balance sheet. And as this court has just explained, that a parcel has some market value does not establish that it retains economically viable use. Despite these uses in name, defendant fails to identify any record evidence showing that plaintiffs could have made any other economically viable and legal use of the parcel. In particular, defendant overlooks that although a proposed use may have, in the abstract, a theoretical accounting value, that gross gain on paper might also create a net loss in reality. *Cf. Bowles v. United States*, 31 Fed. Cl. 37, 48–49 (finding no economically viable use because property taxes made the parcel a net liability).

The most glaring error of this sort ignores the property tax status of the parcel, which was undervalued for tax purposes because part of the property was classified as open space and thus taxed at a lower value.[66] Pls.' Ex. 97 at 1539–45. If plaintiffs developed the property for any interim economic use, they would not only lose this tax benefit, but would be responsible for seven years' worth of increased back taxes, along with a 20% penalty and interest on the amount in arrears. *Id.*; *see Bowles v. United States*, 31 Fed. Cl. at 48–49 (finding a proposed alternative use not economically viable because the property tax implications of that allegedly profitable use would result in a net loss). Defendant thus failed to establish that its proposed alternatives were economically viable for plaintiffs, *i.e.*, that these uses would be profitable rather than result in a net loss.

Even if plaintiffs grew hay, which was only possible on less than ten acres at the north end of the property, the hay itself could only generate up to $2,000–$2,500 in annual revenue. Pls.' Ex. 95 at 1376–77. Yet, the record shows, and there is no dispute, that this revenue would be insufficient to pay even the annual property taxes, thus rendering it not economically viable for plaintiffs. *Id.* at 1377; *see Bowles*, 31 Fed. Cl. at 48–49 (proposed uses incapable of paying property taxes are not economically viable). Nor was the parcel suitable for growing grass or any other agricultural use, nor even for grazing cattle, in any economically viable manner. Pls.' Ex. 96 at 1416, 1450. In fact, Anthony Gibbons, plaintiffs' expert appraiser and a member of the Appraisal Institute, testified that the site had no agricultural potential and that assessing its use for agricultural purposes instead of as a landfill is like "[c]omparing Microsoft with a lemonade stand" because "any agricultural use of that property is so insignificant that you couldn't consider it as any kind of reasonable interim use of that property." Pls.' Ex. 107 at 1792 (125:15–25). To be sure, defendant does contend that plaintiffs could make some agricultural use of the project site. Yet defendant provides no evidence showing that any agricultural use of the parcel is possible, legal, and economically viable for plaintiffs. *See Board of County Supervisors*, 276 F.3d at 1365 (requiring that a proposed "use" show a "reasonable probability that, at the time of the taking, the land was both physically adaptable for such use and that there was a need or demand for such use in the reasonably near future"); *Formanek v. United States*, 26 Cl. Ct. at 339 (rejecting proffered uses that were "convenient arguments rather than feasible alternatives").

Defendant repeats this same error in contending that plaintiff could have harvested the timber on the property. Charles Barber, defendant's timber expert, initially opined that the timber on the property had interim income potential. Pls.' Ex. 99 at 1577; Pls.' Ex. 103 at

---

[66] Plaintiffs paid annual property taxes of $12,062.73 (1991); $22,867.57 (1993); $22,034.18 (1996); $20,789 (1999). Pls.' Ex. 97 at 1539–45.

1663–67 (228:10–232:9), 1671–73 (236:1–238:6).   Yet, Mr. Barber's initial opinion did not address any of the myriad permitting or wetlands issues surrounding the project site.  *Id.*  When subsequently informed that the Washington Department of Natural Resources had denied plaintiffs a timber permit, required to cut and sell trees, for interim use pending the Corps' approval of the final landfill configuration, Mr. Barber retracted his earlier statement that the project site had potential for timber use.  *Id.*

Nor does defendant identify record evidence showing that there is a genuine issue of material fact concerning the economic viability of developing the parcel for residential, commercial, or industrial use, or leasing or selling the parcel for such use.  While defendant points out that the project site had been subdivided prior to plaintiffs' acquisition, the fact remains that subdivision of property does not constitute an economically viable use, nor does having road frontage mean that those individual lots have market value, let alone enable those lots to retain economically viable use.  Pls.' Ex. 97 at 1526.  Contrary to defendant's assertions, the record evidence unequivocally shows that the parcel was particularly unsuited for such development, whether by plaintiffs or by another party.  The parcel itself is in a rural neighborhood surrounded by vacant land and low-density residential development, with no commercial or industrial development in the immediate area other than a gas station/convenience store across the street from the parcel.  Pls.' Ex. 97 at 1515–27.  The past and present residential use of the parcel consists of two residences that could not be rented to generate net income. [7]6 Pls.' Ex. 110 at 1950.  Since 1996, the project site has been zoned "R-10," which only allows one home every ten acres; moreover, the project site is outside the urban growth boundary, which requires any development to preserve the property's rural character and renders unlikely extension of utilities like sewer and water service to the parcel.  Pls.' Ex. 97 at 1515–33.  In fact, there were no comparable properties in the vicinity of the parcel rented on an interim basis, pending the landowner's development, nor did defendant's experts find any during discovery. [8]6 Pls.' Ex. 105 at 1731–32 (31:16–32:20).

Defendant also attempts to create a genuine issue of material fact on the ability for residential development by asserting that plaintiffs' arranging septic service for the

---

[67] Defendant's own experts testified that there was no market for any interim rental of the property, and that none of the other properties in the area had been rented on an interim basis pending development.  Pls. Resp. 6; Pls.' Ex. 106 at 1752.  Defendant's lead expert failed to disclose this in his expert report.  Pls.' Ex. 106 at 1752.

[68] A search of western Washington by defendant's appraisers turned up only nine undeveloped properties that were rented on an interim basis.  All nine were government-owned, cleared of timber, located near major transportation corridors (airports, highways, railroads, navigable waterways), zoned for industrial or heavy industrial development (except that the ones leased for agricultural purposes were zoned for agricultural use), and had municipal water, sewer, and power hookups. Pls.' Ex. 100 at 1604–05, 1613–27; Pls.' Ex. 106 at 1752–53; Pls.' Ex. 110 at 1939–45, 1947–51; Pls.' Ex. 112.  None of those nine properties were in the vicinity of the parcel, none were used in ways possible for the parcel, and, as appraisers use the term, none were "comparable" to the property; the only similarity is that two of the nine parcels were similarly-sized.  Pls.' Ex. 104 at 1699, 1726 (154:1–8); Pls.' Ex. 106 at 1752–56; Pls.' Ex. 108 at 1836 (315:16–20), 1837 (316:9–17); Pls.' Ex. 110 at 1939, 1943–45.

site—essential for residential development—would not be "impossible or extraordinarily inconvenient," as active septic systems "had been observed" on the landfill site. Def.'s Resp. 12–13; Pls.' Ex. 108 at 1806. Yet Gerald Curtis, defendant's general appraisal expert and the head of defendant's expert team, admitted that neither he nor any other defense expert ever investigated whether the three septic tanks then in place on the entire project site complied with the health requirements nor whether septic systems could be installed in compliance with current health standards. Pls.' Ex. 108 at 1812 (246:5–7).

Defendant's evidence regarding the property's ability to percolate (and thus maintain a standard septic system) is similarly defective and therefore does not generate a conflict of material fact. Donald Heischman, defendant's local appraiser, prepared only a final report with "general background information," that did not analyze the percolation issue, let alone investigate it in preparing the report. Pls.' Ex. 97 at 1480, 1522–24. For his part, Mr. Curtis testified that he thought that the site might possibly percolate, but once again, Mr. Curtis failed to investigate the actual parcel in question, and instead based his speculation entirely on his experience at other sites. Pls.' Ex. 108 at 1828–29 (290:20–291:5). Instead, Mr. Curtis had specific information that the property soils did not percolate, and failed to provide this information to his own expert, Mr. Heischman. Pls.' Ex. 109 at 1868 (148:2–9), 1870 (150:22–151:7), 1876 (159:24–160:2). In fact, Mr. Heischman assumed that Mr. Curtis would have passed along any information on percolation, and testified that if the site did not percolate, it would "have had a substantial impact on its utility either for a long-term or short-term basis" and on its value. Pls.' Ex. 105 at 1737–38 (73:3–74:3), 1738 (74:13–21), 1742 (82:4–16). Mr. Heischman also conceded that his appraisal of the economic viability of adding septic systems was based on a hypothetical residential development with the explicit assumption that ordinary septic systems could be installed at no extra cost; this assumption was "not a statement of what [he] knew to be a fact." Pls.' Ex. 87 at 1139; Pls.' Ex. 109 at 1921–22 (298:23–299:5).

Unlike defendant's experts, who considered a parcel in the abstract, plaintiffs' experts analyzed and investigated the actual parcel that is the subject of the case currently before this court. Michael Brooks, a real estate agent who had attempted to sell the property for non-landfill purposes before plaintiffs purchased it, testified that all such attempts were unsuccessful because the property's soils would not support traditional septic systems, nor was a mound-type septic system or other community septic system economically viable. Pls.' Ex. 93 at 1174–75. Richard Tallman, a developer and previous owner of part of the parcel, had declined to purchase the remainder of the parcel for development purposes because the soils were not good enough for drainage and septic systems and the zoning did not allow sufficient density to make development worthwhile. Pls.' Ex. 90.

Indeed, Kevin Lakey, plaintiff's project hydrogeologist and expert witness, concluded that the property was not suited for residential, commercial, industrial, or agricultural development because the poor drainage and near-surface soil saturation meant that adequate septic systems that complied with the applicable regulations would be prohibitively expensive if not physically impossible. Pls.' Ex. 94 at 1180, 1193, 1194–97 (explaining how the particular hydrogeological characteristics of the site soils made these septic systems nearly impossible). Instead, Mr. Lakey concluded that the parcel was ideal as a landfill site for precisely those reasons. *See id.*

Moreover, Sean Comfort, a registered Civil Engineer who regularly advises clients on the economic feasibility of development, concluded that the parcel had no viable economic use on either an interim or long term basis, other than as a landfill.  Pls.' Ex. 96 at 1378–80.  Because standard septic systems were unavailable, Mr. Comfort calculated that, even assuming that non-standard septic systems could be built lawfully, a subdivision avoiding wetlands would be three to four times more expensive to build than a typical residential subdivision; the development price would exceed the sale price, so such development was not economically feasible.  Pls.' Ex. 96 at 1383–88.  Nor was commercial or industrial development economically feasible, based on the parcel's inability to support standard septic systems, lack of contiguous space due to scattered wetlands, residential/agricultural zoning, and remote location with little demand for commercial development.  *Id.* at 1380–90.

As the Hearing Examiner concluded in approving plaintiff's RUE permit, the project site had no reasonable economic use that would comply with state and county regulations, other than as a landfill; neither development, nor timber (even if allowed), nor agricultural use of any sort would constitute viable economic use of the parcel.  Pls.' Ex. 96 at 1417–18, 1420–21, 1450–51.  Plaintiffs' comprehensive expert reports and the entire factual record convincingly show that plaintiffs could not make any economically viable use for the project site other than as a landfill.  Defendant's speculative suggestions that economically viable alternatives exist neither demonstrate a defect in plaintiffs' evidence nor are sufficient to raise a genuine issue of material fact.  Thus, plaintiffs have shown, and defendant has failed to rebut, that there are no genuine issue of material facts regarding the project site's lack of economically viable use other than as a landfill.  *See Prince William County*, 276 F.3d at 1365 (requiring that a proposed "use" show a "reasonable probability that, at the time of the taking, the land was both physically adaptable for such use and that there was a need or demand for such use in the reasonably near future"); *Formanek*, 26 Cl. Ct. at 339 (rejecting proffered uses that were "convenient arguments rather than feasible alternatives"); *see also Processed Plastics Co. v. United States*, 473 F.3d 1164, 1170–71 (Fed. Cir. 2006) (observing that conclusory statements on the ultimate issue do not create a genuine issue of fact); *Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006) (rejecting "[c]onclusory allegations" and requiring "sufficient substance, other than attorney argument, to show that the issue requires trial"); *TechSearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002) ("conclusory statements . . . entirely lacking in factual support" are insufficient for summary judgment (internal quotations omitted)).  Or, as Gertrude Stein said, referring to Oakland, California: "There is no there, there."[69]

In conclusion, there appears to be no genuine issue of material fact that Corps' denial of plaintiffs' 404 permit application left plaintiffs without economically viable use of the project site.  Thus, plaintiffs' claim falls under *Lucas* rather than *Tahoe-Sierra* and *Penn Central*, and the Corps' denial of the 404 permit may very well have left plaintiffs without economically viable use of their property.  *See Palm Beach Isles I*, 208 F.3d at 1381 (finding categorical analysis appropriate where landowners were without economically viable use of their land after the Corps' denied their dredge-and-fill permit).

---

[69] Gertrude Stein, EVERYBODY'S AUTOBIOGRAPHY, ch. 4 (1937), *quoted in* THE COLUMBIA WORLD OF QUOTATIONS, No. 55537 (1996), *available at* http://www.bartleby.com/66/37/55537.html .

Yet the above analysis does not resolve the cause of plaintiffs' inability to make use of their land.  As stated, causation is a necessary element in every inverse condemnation claim. *Applegate v. United States*, 35 Fed. Cl. 406, 415–16 (1996).  This court cannot, therefore, grant summary judgment on plaintiffs' *Lucas* claim as a whole because, as discussed in greater detail below (*see* subsection 10, *infra* ), neither party has established causation on summary judgment.

### 4.   Is the Corps' Denial of Plaintiffs' 404 Permit Application Fatal to Plaintiffs' "Extraordinary Delay" Claim Because Such a Claim Must Be Based on Inaction?

Plaintiffs also claim that they suffered a taking by means of extraordinary delay in the government permitting process.  Pls.' Mot. Summ. J. at 39.  Relying heavily on the Ninth Circuit opinion in *Resource I* characterizing the Corps' assertion of jurisdiction as "unreasonable," plaintiffs contend that the entire period of the Corps' jurisdiction over the project site was extraordinary delay as a matter of law.  Pls. Mot. Summ. J. at 40–42.  Alternatively, plaintiffs argue that the Corps unreasonably delayed processing their permit and ultimately denied the permit based on grounds that were obvious from the moment plaintiffs filed their application. *Id.* at 42–44.  Plaintiffs assert that this extraordinary delay created extensive economic hardship to plaintiffs, as the project site had neither interim nor long-term viable use while the Corps maintained jurisdiction.  *Id.* at 44–56; *see supra* subsection 3 (discussing the project site's lack of economically viable uses other than as a landfill).

Just as it contended that plaintiffs could not bring a claim for a temporary categorical taking, so too does defendant maintain that plaintiffs cannot properly claim extraordinary delay because the relevant federal permit was denied.  *See* Def.'s Cross-Mot. Summ. J. 43–44; Def.'s Br. Opp'n 17–18.  According to defendant, extraordinary delay is only appropriate when a decision-making process remains stalled, and is inapposite for a permitting process that has become "unstuck" for any reason, as this process did after *Resource I* abrogated the Corps' jurisdiction.  *See id.*  Moreover, defendant contends that even if the court allows an extraordinary delay claim for a permit that was denied, the court must still assess the alleged taking pursuant to *Penn Central*, and thus should not grant summary judgment for plaintiffs on such a fact-intensive issue.  *Id.* at 43–44.

In order to determine whether plaintiffs' extraordinary delay contentions states a cognizable legal claim, the court once again should start at the beginning.  Generally, a final agency action is usually necessary to ripen a regulatory takings claim.  *See Riverside Bayview*, 474 U.S. at 127 ("Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred."); *Cooley v. United States*, 324 F.3d at 1301–02.  If permit denial were the only way for an agency to effect a regulatory taking, agencies could avoid implicating the Takings Clause by refusing to deny a permit, instead consigning it to regulatory limbo by not acting.  The precept of "extraordinary delay" is thus an exception to the general ripeness rule.

The concept of a taking based on extraordinary delay is first mentioned in *Agins v. City of Tiburon*, 447 U.S. 255 (1980),[70] wherein the Supreme Court observed, in a footnote, that

---

[70] In *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005), the Supreme Court clarified that, contrary to suggestions in *Agins*, the lack of a nexus between a legitimate state interest and government

"[m]ere fluctuations in value during the process of governmental decision making, absent extraordinary delay, are incidents of ownership. They cannot be considered as a taking in the constitutional sense." *Id.* at 263 n.9 (internal quotation marks omitted). By thus recognizing that most government delay cannot effect a taking, the Supreme Court also implied that certain delay can, so long as the delay is "extraordinary." *See id. Expressio unius est exclusio alterius.*[71] Subsequently, in *First English*, the Court declined to address "the case of *normal delays* in obtaining building permits" that was not before it, again suggesting that abnormal delays implicated the takings clause. *See First English*, 482 U.S. at 321 (emphasis added).

It was not until *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796 (Fed. Cir. 1993), that the Federal Circuit had a chance to elaborate on the concept of an "extraordinary delay" effecting a taking. In *Tabb Lakes*, a landowner sought just compensation for a temporary taking for the Corps' cease-and-desist order ("the CDO") to stop filling wetlands on the landowner's property, on the grounds that the CDO unreasonably delayed the landowner's development of its property. *Id.* at 798–99. Although the Corps thought it had jurisdiction over the landowner's property, the Corps' assertion of jurisdiction was procedurally defective. *Id.* According to the landowner, this jurisdictional defect made any delay *per se* unreasonable, and thus compensable pursuant to the aforementioned footnote 9 of *Agins*. *Id.* at 803. In assessing the landowner's claim, the Federal Circuit reiterated that "'the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking.'" *Id.* at 801 (quoting *Riverside Bayview*, 474 U.S. at 126–27). Yet, where the agency's assertion of jurisdiction is procedurally defective, the Federal Circuit held that a landowner cannot bring a takings claim, but instead may have a due process claim. *Tabb Lakes*, 10 F.3d at 803. The Federal Circuit further explained that a landowner can maintain a claim for just compensation based on an extraordinary delay, but such a taking accrues only when that delay becomes unreasonable or extraordinary, not upon the first preliminary act in the decision-making process. *See id.* Thus, the Corps' subsequent acts could not convert its initial assertion of jurisdiction into a taking, and as such, the Federal Circuit denied the landowner's takings claim. *Id.* at 803–04.

The Federal Circuit offered additional guidance on extraordinary delay in *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338 (2004), *cert. denied*, 543 U.S. 118 (2005). The owner of the mining leases in *Appolo Fuels* sought just compensation for extraordinary delay, based on the Office of Surface Mining's ("OSM") taking 30 months to reach a decision, 18 months beyond the statutorily-required one-year deadline. *Id.* at 1351–52. But the Federal Circuit found that delay irrelevant, because the *Appolo Fuels* plaintiff suffered neither a categorical nor a partial taking. *See id.* Moreover, the Federal Circuit suggested in *dicta* that when delay becomes extraordinary, it does not effect a taking but merely marks when a potential taking would accrue. *See id.* at 1351–52. Thus, the Federal Circuit indicated that, once delay becomes extraordinary, courts must use the *Penn Central* test to determine whether this delay, going forward, has

---

regulation did not in and of itself effect a taking; instead, government regulation lacking such a nexus was properly subject to challenge under the Due Process Clause. Importantly, *Lingle* did not overrule other holdings of *Agins* or affect discussion of "delay" or "extraordinary delay" at all in the opinion.

[71] "A canon of construction holding that to express or include one thing implies the exclusion of the other or of the alternative." BLACK'S LAW DICTIONARY 602 (7th ed. 1999).

effected a taking. *Id.* Even extraordinary delay requires that the landowner establish that the delay caused a taking, rather than merely retard a permitting process without the requisite impact on property interests. *See id.*

Rather than undercutting plaintiffs' claim, as defendant argues, *Appolo Fuels* supports that plaintiffs do state a cognizable claim for extraordinary delay notwithstanding the Corps' denial. Importantly, the plaintiff in *Appolo Fuels* sought compensation for a delay that had already occurred, not one that was ongoing. *See id.* at 1351 (observing that the plaintiff sought compensation for the eighteen-month delay *in reaching a decision*). The Federal Circuit did not suggest, let alone hold, that an extraordinary delay claim was unavailable to that plaintiff simply because the delay had ended. *See id.* at 1351–52. Instead, that plaintiff's claim was legally insufficient because, even assuming extraordinary delay or a permanent restriction, that plaintiff did not suffer a taking. *See id.* (reasoning that because there was no permanent taking under *Penn Central*, and a temporary taking is less onerous than a permanent one, there could not be a temporary taking even if delay were extraordinary). In contrast, this court cannot conclude that plaintiffs did not suffer a taking under either *Lucas* or *Penn Central* theories. Thus, the rationale that the *Appolo Fuels* court used—that there is no extraordinary delay because there, even a permanent restriction could not effect a taking—does not apply to the instant plaintiffs' claim.

This court is not aware of any authority requiring it to hold that an extraordinary delay claim is not cognizable once an agency has acted, thus ending the delay. Instead, just as with whether plaintiffs have a cognizable categorical takings claim, *First English* governs this issue: once a taking has occurred, the government must pay just compensation even if it rescinds or abandons that taking. *See First English*, 482 U.S. at 321–22. It is clear that once delay becomes extraordinary, that delay can effect a regulatory taking. *See Tabb Lakes*, 10 F.3d at 803. To be sure, once extraordinary delay in the government decision-making process has effected a taking, an agency's acting on the delayed issue will end that delay, thereby "cutting short" the taking. But here too, the government must pay for what it has taken. *First English* at 321–22. Abandonment is no more sufficient a remedy for a taking by extraordinary delay than it is for a taking by any other means. *See id.*

### 5. Does *Resource I*'s Conclusion That the Corps' Assertion of Jurisdiction Was "Unreasonable" Establish, Under the Doctrine of Collateral Estoppel, That Any Delay Plaintiffs Suffered Was *Per Se* Extraordinary As a Matter Of Law?

Having satisfied itself that plaintiffs can maintain their claim for an extraordinary delay taking, this court must now weigh plaintiffs' argument that collateral estoppel operates to prevent defendant from asserting that any delay attributable to the Corps is other than extraordinary. Plaintiffs claim that the Ninth Circuit's opinion in *Resource I*, which held that the Corps' ten-year exercise of jurisdiction and permitting process was "unreasonable," "unnecessary," and "duplicative," should be interpreted as binding on the extraordinary delay issue. Pls.' Mot. Summ. J. 39–41; Pls' Supp. Mem. 28–32. Furthermore, plaintiffs ask this court to hold that the Corps' "unreasonable" interpretation of its jurisdiction is tantamount to bad faith.

Defendant responds that the Corps' "mistaken" assertion of jurisdiction is legally insufficient to support any extraordinary delay claim. Def.'s Cross-Mot. Summ. J. at 44–46. According to defendant, *Resource I* held only that the Corps made a regulatory mistake in

asserting jurisdiction.  *Id.* at 45.  Thus, defendant maintains that *Resource I* is therefore not dispositive of the very different issue of extraordinary delay.  *See id.* at 44–46.

Collateral estoppel, or issue preclusion, is "grounded on the theory that one litigant cannot unduly consume the time of the court at the expense of other litigants, and that, once the court has finally decided an issue, a litigant cannot demand that it be decided again."  *Warthen v. United States*, 157 Ct. Cl. 798, 798 (1962); *see* RESTATEMENT (SECOND) OF JUDGEMENTS § 27 (1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.").  "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation of attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."  *Montana v. United States*, 440 U.S. 147, 153–54 (1979).

The Federal Circuit has developed a four-part test, under which the party invoking collateral estoppel (in this case, plaintiffs) must show that:

> (1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action.

*Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001).  Although this test contains four parts, its first part—the identity of the issues—is the lynchpin of collateral estoppel.  Without the identity of the issues, collateral estoppel cannot apply, rendering the remaining three parts superfluous.

In examining the identity of the issues, the question is whether *Resource I*'s conclusion that "[t]he Corps' interpretation of its jurisdiction under section 404 of the CWA is "unreasonable" is the same issue for the purposes of collateral estoppel as whether the delays that plaintiffs identify were "extraordinary."  This court determines that it is not.

*Resource I* was an APA case in which plaintiffs challenged the Corps' denial of their 404 permit application as contrary to law, an abuse of discretion, and an abuse of discretion.  *See Resource I* at 1165.  Plaintiffs contended in *Resource I* that the Corps lacked the authority under section 404 of the CWA to require them to obtain a dredge and fill permit.  *Id.*  The *Resource I* court agreed with plaintiffs' arguments, holding that the Corps interpretation of its jurisdiction was "unreasonable."  *Id.* at 1168–69.  The *Resource I* court reasoned that RCRA gave the states the authority to regulate municipal solid waste disposal,[72] even when that solid waste was disposed in landfills constructed on wetlands.  *Id.* at 1165–69.  Parsing the definitions in the CWA, the Corps' implementing regulations, and the 1986 Memorandum of Agreement between

---

[72] RCRA required that the EPA approve these state solid waste permit programs.  *Id.* at 1167–68. Otherwise, the EPA would retain jurisdiction over solid waste disposal.  *Id.*  But regardless of EPA approval, the Corps never had jurisdiction over solid waste disposal.  *See id.* at 1168–69.

the EPA and the Corps ("MOA," discussed in detail in Section I-B, *supra*), the *Resource I* court also concluded the Corps' jurisdiction over "dredged material" and "fill material" did not extend to solid waste disposal. *Id.* Moreover, the Corps' own regulations specifically excepted solid waste disposal from its definition of the fill material over which it had jurisdiction. *Id.* at 1168.

Thus, the Corps' interpretation of its jurisdiction was "unreasonable" because it would overlap with that of the states with potentially inconsistent results, contrary to the Corps' own regulations. *Id.* at 1168–69. In this sense, the Corps' interpretation of its jurisdiction was "unreasonable" in that it was legally erroneous or contrary to law, and incongruous with other statutory and regulatory definitions limiting the Corps' jurisdiction. *See* 5 U.S.C. § 706(2)(A) (requiring the reviewing court to set aside agency actions and conclusions "otherwise not in accordance with law"), and (2)(C) (requiring the reviewing court to set aside agency action, findings, and conclusions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"); *see also* "unreasonable," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (Merriam-Webster, 2002) (third definition, describing legally erroneous examples). It is not malice or bad faith. *See id.*

Therefore, the issue in *Resource I* was whether the Corps was right or wrong, *i.e.*, whether or not the Corps had jurisdiction over plaintiffs' proposed solid waste landfill. This is not the same issue as extraordinary delay, which, as this court will discuss below in subsection 6, is a fact-intensive examination of each specifically-identified delay to see whether it is disproportionate to the regulatory regime from which it arises, and whether the delay is the result of bad faith on the part of the government agency. *See Bass Enterprises Co. v. United States*, 381 F.3d 1360, 1366–67 (Fed. Cir. 2004). Further, the Federal Circuit has instructed that an agency's invalid assertion of jurisdiction is insufficient to effect a taking. *See Tabb Lakes*, 10 F.3d at 803 (rejecting the theory that the Corps' mere mistake in asserting jurisdiction, and imposing a permitting process pursuant to that jurisdictional basis, was a taking). Thus, this court cannot conclude that the Corps' legally erroneous interpretation of jurisdiction, and its actions pursuant to that interpretation, without more, constitute bad faith or extraordinary delay.

In sum, it is clear to this court that plaintiffs are trying to turn the molehill of *Resource I* into the mountain of extraordinary delay.[73] To be sure, as this court will discuss in subsections

---

[73] Defendant also identifies *Tabb Lakes*, in which the Federal Circuit considered the preclusive effect of the regional Circuits' APA decisions on subsequent regulatory takings claims stemming from the same agency conduct. 10 F.3d at 798, 802. In the case asserted to have preclusive effect in *Tabb Lakes*, the Fourth Circuit held that the Corps improperly asserted jurisdiction over the landowner's proposed residential subdivision. *Id.* at 798, 802. Based on that decision, the landowner subsequently brought a takings claim, arguing that "compensation must be paid where a mistake is made in the Corps' permit process." *Id.* at 803. The Federal Circuit disagreed, reasoning that a mere jurisdictional "mistake may give rise to a due process claim, not a taking claim . . . the due process clause of the Constitution is not a money-mandating provision[,]" and therefore not within the jurisdiction of the Court of Federal Claims. *Id.*

Plaintiffs here attempt to distinguish *Tabb Lakes*, emphasizing that the Corps' assertion of jurisdiction over the project site was not merely "mistaken," but "unreasonable." CITE. But plaintiffs here fail to see the forest for the trees. As just discussed, the Ninth Circuit's holding in

8–9, *infra*, that the Corps was without legally valid jurisdiction over the project site does play a role in determining whether the Corps effected a taking.  But this court cannot conclude that *Resource I* operates to bar defendant from litigating the extent of and responsibility for any delays in the 404 permitting process, nor that *Resource I* establishes that any delays that plaintiffs suffered were *per se* extraordinary and the fault of the Corps.  Instead, this court must examine the details of the permitting process itself to assess plaintiffs' claims of extraordinary delay.  *See Bass Enters.*, 381 F.3d at 1366–67; *Wyatt*, 271 F.3d at 1098–99; *see also Bailey v. United States*, 78 Fed. Cl. 239, 254–55 (citing *Tabb Lakes* and concluding that improper agency jurisdiction, though not dispositive, is nevertheless relevant to whether there has been a taking).

### 6. Was There Extraordinary Delay in the Permitting Process, and, If So, Who Bears Responsibility For It?

Having concluded that *Resource I* does not dispose of the issue, this court must now differentiate normal delay in agency decision-making from extraordinary delay, the sort of delay that, returning to *Mahon*, goes "too far."  Where there is extraordinary delay, the "property owner may be entitled to compensation for property loss incurred while the government was in the process of deciding whether to allow the contested activity."  *Seiber*, 364 F.3d at 1364–65.  This line is not an easy one to draw because, as discussed above (*see* subsection 4, *supra*), this sort of taking only accrues when delay becomes "unreasonable," *Tabb Lakes*, 10 F.3d at 803, or "substantial," *Bass Enters.*, 381 F.3d at 1366.  Thus, to determine when delay rises to that point, this court must engage in an extensive examination of the permitting processes surrounding plaintiffs' landfill.

To be sure, the mere requirement to obtain a permit does not, in and of itself, give rise to a taking.  *Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001).  Requiring a permit before undertaking certain activities cannot constitute a taking because "the very existence of a permit system implies that permission may be granted."  *Riverside Bayview*, 474 U.S. at 126; *see also Lucas*, 505 U.S. at 1011 (observing that the amended BMA replaced the total ban with a permitting process, thus implying that permission to engage in economically viable use may be granted).  Even "'mere fluctuations in value during the process of governmental decision making, absent extraordinary delay, are incidents of ownership.'"  *Wyatt*, 271 F.3d at 320 (quoting *First English*, 482 U.S. at 320).  But, because complicated permitting processes are rife with delays, the length of the delay alone cannot be "extraordinary" enough to effect a taking.  *See Cooley*, 324 F.3d at 1307 ("The length of the delay is not the only or necessarily the critical factor for finding a taking by extraordinary governmental delay."); *see also Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985) (eight years is insufficient delay to effect a taking); *Bass Enters.*, 381 F.3d at 1367 (45 months' delay is not extraordinary); *Wyatt*, 271 F.3d at 1098 (nearly ten-year permitting process including seven years' delay is not extraordinary); *1902 Atlantic Ltd. v. United States*, 26 Cl. Ct. 575 (1992) (five

---

*Resource I* does not make the Corps' conduct *per se* unreasonable, only the legal basis of the Corps' jurisdiction, which plaintiffs have already litigated and won before the Ninth Circuit.  To be sure, this court remains bound and cannot relitigate *Resource I*'s holding that the Corps' interpretation of its jurisdiction was unreasonable, unnecessary and duplicative.  But that holding, bereft of the factual details required to decide extraordinary delay, can do no more than identify a starting point for this court's examination of the Corps' permitting process.

years' delay not extraordinary); *Dufau v. United States*, 22 Cl. Ct. 156, 162–63 (1990) (16 months' delay is not extraordinary).

In *Wyatt v. United States*, 271 F.3d at 1092–95, the owners of a 3.5% royalty on coal extracted from land that they had previously sold sought just compensation for the government's delay in processing applications to mine coal on that land. According to the plaintiffs, this delay prevented the buyer of the land from leasing out the property to mining companies, which in turn prevented them from getting their 3.5% royalty on the coal that would have been extracted from the property. The Federal Circuit first observed that neither a permitting process alone nor the mere assertion of regulatory jurisdiction, without more, can constitute a taking; nor can mere fluctuations in value during the decision-making process, absent extraordinary delay. *Id.* at 1098–99 (citing *Agins*). The Federal Circuit explained that it is not the length of the delay alone that makes it "extraordinary," but rather, the reasons for delay and the nature of the permitting process will determine whether a delay is extraordinary. *Id.* at 1099. The nature of the regulatory scheme is especially critical when the permitting process requires detailed technical information necessary to determine environmental impacts." *Id.* at 1098. What is more, the Federal Circuit cautioned that only in rare circumstances can delay be extraordinary without a finding of bad faith on the part of the government. *See id.* Concluding that much of the delay was the fault of the prospective leaseholder's inadequate participation in the permitting process, the Federal Circuit reversed, holding that the record was insufficient to support a finding of bad faith. *See id* at 1099–1100.

*Bass Enters. Co. v. United States*, 381 F.3d 1360 (Fed. Cir. 2004) provided further guidance when a delay becomes "extraordinary." *Bass Enters.* concerned a claim by the owners of a Federal Oil and Gas lease ("lease owners") that the Bureau of Land Management's ("BLM") 45-month delay in evaluating permits to drill oil and gas wells effected a temporary taking for which the government need pay just compensation. *Id.* at 1361–62. This delay stemmed in large part from the BLM's need to evaluate whether these wells could release radioactive waste from an underground storage facility. *Id.* at 1361. In assessing the lease owners' claim, the Federal Circuit trod a familiar path, observing that there is no specific length of time at which mere delay effects a regulatory taking even though an extraordinary delay is usually a lengthy one as well. *Id.* at 1366–67. Instead, the purpose of the inquiry is to decide "if the delay is disproportionate to the regulatory permitting scheme from which it arises." *Id.* at 1366. Yet the Federal Circuit also indicated that bad faith on behalf of the government will usually accompany extraordinary delay. *Id.* at 1366–67. Finding no bad faith on the record, the Federal Circuit could not conclude that the delay was extraordinary because the potentially disastrous result of a possible nuclear waste leak further complicated the environmental impact of oil and gas drilling. *Id.* at 1367. Moreover, given the nature and extent of the harm from nuclear waste contamination, and that it was specifically stored underground *away* from oil and gas wells, the Federal Circuit was loathe to "encourage hasty decision making by the Government," and found neither extraordinary delay nor a regulatory taking. *See id.* (internal quotation marks omitted).

Thus, this court is bound to pay special attention to long delays without unduly focusing on the amount of delay. Instead, mindful of the admonition that extraordinary delay rarely travels without bad faith, this court will now examine the plaintiff's specific allegations of extraordinary delay to see whether those delays are disproportionate to the regulatory permitting scheme from which they arise. *See Bass Enters.*, 381 F.3d at 1366.

The court recognizes that landfill permitting is typically a lengthy and time-consuming process.  *See* Parker & Turner, *supra*, at 93 (observing that because of rigid environmental regulations, many landfill projects "languish for many years in the 'permitting process,' and few facilities are actually built," even if "they meet or exceed the strictest present or anticipated regulations"); Robert B. McKinstry, Jr. & Dean Jerrehian, *Special Places, Special Rules: The Place of NEPA, SEPAS, & Environmentally Sensitive Features in Regulation of Muncipal Solid Waste*, C355 ALI-ABA 79 (1988) (indicating that environmentally sensitive features, such as wetlands and streams, on proposed landfill sites, can "require special conditions affecting facility operation and usually will increase permitting costs and delays").

Further complicating matters in this case is that plaintiffs' project may have been the largest and most involved landfill ever contemplated in Washington State.  Certainly, several of the state and local agency officials who worked on the project considered it to be the biggest project they had worked on.  Specifically, Bill Leonard of the state Department of Ecology stated that plaintiffs' project "would be the single largest wetland fill ever permitted in the state of Washington."  Def.'s Ex. 75; Def.'s Supp. Br. 13.  Kathleen Larrabee, a Resource Management Supervisor for the Planning Department, stated that "[f]rom an environmental standpoint it's probably the most complex that I have ever been involved with . . . ."  Def.'s Ex. 76; Def.'s Supp. Br. 14.  Carla Vincent, who also worked for the Planning Department, noted that "none of my other projects were ever this complex."  Def.'s Ex. 78; Def.'s Supp. Br. 14.  In addition, Maria Peeler considered plaintiffs' project to be

> a unique project because Federal and State solid waste regulations were a portion, a large portion of what was being considered in the process . . . so regulatorily, if not technically, it was certainly a very complex process. . . . [S]cientifically it was also a fairly complex process.  Certainly one of the most complex I've seen.

Def.'s Ex. 77; Def.'s Supp. Br. 14.  Christopher Matthews, also of the Department of Ecology concurred that plaintiffs' project was very complex, "in terms of size and scope and issues involved," and that he did not "have another landfill project that's this size and magnitude."  Def.'s Ex. 79; Def.'s Supp. Br. 14.

Especially with the size and complexity of the proposed landfill, the nature of the Corps' 404 permitting process, therefore, entailed delays, assuredly frustrating ones for plaintiffs.  Nonetheless, it does not necessarily follow that all delays are inevitable or even acceptable, particularly accompanied by a showing of bad faith.

Specifically, plaintiffs contend that the Corps' actions, in total, delayed the opening of the landfill by about three years, from when plaintiffs had secured their CUP and Solid Waste Permit in February 1996, until February 1999, when *Resource I* became final.  Pls.' Supp. Mem. 7.  Plaintiffs also claim that once the Corps denied plaintiffs's 404 permit in September 1996, they could not move forward with the landfill project until *Resource I* became final, thereby establishing plaintiffs' legal right to move forward without the Corps' 404 permit.  Pls.' Supp. Mem. 19.  Additionally, plaintiffs detail a series of specific delays that  they claim "directly and substantially protracted the decision time needed for plaintiffs to secure their key discretionary permits, the CUP and the solid waste permit."  Pls.' Supp. Mem. at 13–14.  Specifically, plaintiffs complain that the Corps: (1) delayed the issuance of the public notice of plaintiffs' 404

permit application and issued an unnecessary second public notice; (2) delayed the issuance of the wetlands delineation of the project site; (3) required an unnecessary federal EIS; (4) took resources away from analysis of plaintiffs' project to work on applications filed after plaintiffs' application; (5) required plaintiffs to reconfigure their wetlands mitigation plans; (6) required plaintiffs to re-do the SEIS; (7) required an unlawful change to plaintiffs' statement of project purpose; and, (8) engaged in a faulty and unnecessary cost analysis of whether longhaul was a practicable alternative to plaintiffs' project. Pls.' Mem. Summ. J. 43–44; Pls.' Supp. Mem. 14–19. The court will examine each of these alleged delays in turn.

i. The Public Notices

According to plaintiffs, the Corps violated 33 U.S.C. § 1344 by failing to issue a timely public notice of their application, thus creating an unnecessary delay that added additional time and money to plaintiffs' project. Pls.' Supp. Mem. 15. Defendant counters that plaintiffs did not have a complete application until shortly before the public notice issued, and that the Corps communicated this to plaintiffs. Def.'s Cross-Mem. Summ. J. 21, 23; Def.'s Opp. Br. 5; Def.'s Facts ¶¶ 146,167.

The Corps is required by statute, 33 U.S.C. § 1344, to publish a public notice within 15 days of receipt of a completed 404 permit application. Here, plaintiffs filed their 404 permit application on August 15, 1990. Pls.' Ex. 10. Six days later, on August 21, 1990, the Corps responded, acknowledging receipt of the application, but that letter does not indicate whether the Corps considered the application complete. Pls.' Ex. 169. The Corps did not issue the required public notice until March 13, 1992. Pls.' Ex. 79(H).

Plaintiffs interpret the Corps' own regulations to require the issuance of a public notice 15 days after the submission of an application, even if the application is incomplete. Pls.' Mem. Summ. J. 8–9, 42. The statute at issue, however, only requires the Secretary to publish the public notice "[n]ot later than the fifteenth day after the date an applicant *submits all the information required to complete an application for a permit . . .*" 33 U.S.C. § 1344(a) (emphasis added). The regulation implementing this statute echoes the same standard, requiring, "[w]ithin 15 days of receipt of the application . . . the district engineer [to] either determine the application is complete . . . and issue a public notice . . . or that it is incomplete and notify the applicant of the information necessary for a completed application." 33 C.F.R. § 325.2; *see also* 33 C.F.R. § 325.1(d)(10) ("An application will be determined to be complete when sufficient information is received to issue a public notice . . . ."). Therefore, plaintiffs are incorrect to assert that a delay occurred simply because the public notice did not issue within 15 days of their August 15, 1990 filing date. Instead, the issue is whether the application was complete when it was filed, and, if not, whether the Corps notified plaintiffs of their application's specific deficiencies on or before August 31, 1990.

Plaintiffs offer no evidence to prove that their application was indeed complete on August 15, 1990, but defendant suggests that the Corps did not consider the application complete and that plaintiffs instead learned of the incompleteness in a meeting held on November 21, 1990 between plaintiffs, the Corps, and various other federal, state, and local agencies. Def.'s Cross-Mem. Summ. J. 21; Def.'s Resp. 5. This date is nearly two months after the district engineer was required to notify plaintiffs of any missing information required to complete the

application, according to 33 C.F.R. § 325.2(a),[74] and there is no evidence that the district engineer so notified plaintiffs. Although defendant never explains what precisely the Corps found lacking in plaintiffs' application, it identifies a section of the application in which plaintiffs state that "additional reports and analyses will be provided. For instance, we intend to submit a draft Alternatives Analysis and Mitigation Strategy for preliminary review in September." Def.'s Ex. 8 at 323. Defendant claims that this section demonstrates that plaintiffs knew their application was incomplete and intended to submit supplemental documentation, which the Corps received on June 5, 1992, Pls.' Ex. 20, and November 15, 1990, Def.'s Ex. 11, respectively. But the Corps cannot now claim that the Alternatives Analysis was required for a "complete" application when it published the public notice more than eight months before receiving that document. As to the mitigation strategy, Corps regulations require completed applications to contain a "statement describing how impacts to waters of the United States are to be avoided and minimized." 33 C.F.R. § 325.1(d)(7). However, without guidance from the parties, this court cannot determine whether the mitigation strategy falls within the scope of this required statement.

Finally, defendant suggests that the public notice could not be published because the issue of the delineation of wetlands on the project site had not yet been resolved. Def.'s Reply 13–14. As discussed below in greater detail, the court cannot decide this issue on summary judgment because there are genuine factual disputes of the cause of the delay. *See* subsection 10, *infra*. In consideration of the above, the court concludes that defendant's evidence consists only of the one meager statement that the Corps informed plaintiffs that their application was incomplete at the November 1990 meeting. Nevertheless, because plaintiffs offer no evidence in rebuttal, this 19-month period is insufficient to constitute a delay in the 404 permit process for summary judgment purposes.

In addition to alleged tardiness in publishing the initial public notice and/or notifying plaintiffs of its incompleteness, plaintiffs also object to the Corps' decision to issue a second public notice after plaintiffs altered their mitigation plans to reduce the environmental impacts. Mr. Goode, plaintiffs' environmental engineering consultant, noted that it is "uncommon for the Corps to issue a second public notice," and therefore the second public notice was "nothing more than another unnecessary delay tactic and . . . a way of restarting the processing time clock for reporting purposes." Pls.' Ex. 175 at ¶ 7.3. Thus, plaintiffs suggest that the Corps issued the second public notice in bad faith.

---

[74] This regulation states in relevant part:

> (1) When an application for a permit is received the district engineer shall . . . . review the application for completeness, and if the application is incomplete, request from the applicant within 15 days of receipt of the application any additional information necessary for further processing.
> (2) Within 15 days of receipt of an application the district engineer will either determine that the application is complete . . . or that it is incomplete and notify the applicant of the information necessary for a complete application.

While a second notice may be uncommon, it is nevertheless available at the Corps' discretion. *See* 33 C.F.R. § 325.2 (a)(2) ("The district engineer will issue a supplemental, revised, or corrected public notice if in his view there is a change in the application data that would affect the public's review of the proposal."). Here, plaintiffs' proposed project had received public attention, as evidenced by the county's three public hearings and the lawsuits filed in opposition to plaintiffs' proposed landfill project. *See, e.g.*, *Weyerhauser I*, 873 P.2d at 30. In addition, the other federal, state, and local agencies participated in the Corps' review process. *See* Pls.' Ex. 79 at ¶ 17 (describing the agencies' comments to the public notice as "extensive"). The Corps also received 200 public comment letters in response to the initial public notice for plaintiffs' application. Def.'s Ex. 1 at 12. Plaintiffs required seven volumes to rebut the comments received from the public notice. Pls.' Ex. 79 ¶ 18. Given the public and agency interest and the magnitude of plaintiffs' project, the Corps could conclude that after plaintiffs made changes to their project plan designed to reduce the environmental impacts, it might "affect the public's review of the proposal." Consequently, without bad faith, this court cannot consider the Corps' issuance of a second public notice to be a delay rather than a natural, albeit uncommon, part of the extensive permitting process.

ii. Wetlands Delineation

Next, plaintiffs complain that for 18 months the Corps delayed issuance of the wetlands delineation necessary to a consideration of any mitigation plan, again increasing plaintiffs' costs. Pls.' Supp. Mem. 17. Following the submission of the application, the Corps' project manager visited the project site to verify plaintiffs' wetland delineation. Pls.' Ex. 77 at ¶ 47. During the inspection, the Corps identified an additional 1.3 acres of wetlands.[75] Pls.' Ex. 77 at ¶ 48; Pls.' Ex. 79(B). Plaintiffs accepted this addition by letter dated January 2, 1991, and asked for a formal wetlands determination. Pls.' Ex. 79(B).

At that time, 404 permit applicants could choose between two wetlands delineation systems using either the 1987 or 1989 manuals. Def.'s Ex. 12. In identifying the additional 1.3 acres, the Corps had employed the 1989 manual. In contrast, the Corps determined that there would be no changes to plaintiffs' wetlands delineation under the 1987 manual. Def.'s Ex. 12. In a October 1, 1991 letter, the Corps gave plaintiffs the option to redelineate the wetlands under the 1987 Manual, instead of the 1989 Manual, and asked for a response within 30 days. *Id.* On October 6, 1991, plaintiffs inquired whether its original acceptance of the delineation under the 1989 manual ever became official, but received no response from the Corps. Pls.' Ex. 79(E). Plaintiffs subsequently requested two thirty-day extensions to decide which manual to use, each time requesting information on the status of the initial delineation. Pls.' Exs. 143, 145. On August 20, 1992, and without an answer from the Corps on the status of the original 1989 delineation, plaintiffs accepted the original delineation, stating that "redelineation under the 1987 version of the manual is not required." Def.'s Ex. 17. Subsequently, on March 2, 1992, the Corps issued the formal wetlands delineation using the 1989 manual. Def.'s Ex. 63.

---

[75] There is some discrepancy as to whether the Corps identified an additional 1.3 or 1.5 acres of wetlands. *See e.g.*, Pls.' Ex. 77 at ¶ 48 (identifying the additional wetlands as 1.5 acres); Pls.' Ex. 79 at ¶ 9 (1.3 acres); *id.* at (B) (1.3 acres); Pls.' Resp. 23 (1.3 acres). Because this is not a material fact, the Court has simply chosen to use 1.3 acres without making a judicial determination as to the actual amount of acreage involved.

There is, then, a genuine issue of material fact as to who was waiting on whom and thus, the court cannot decide on summary judgment whether the responsibility for this 18-month delay lies with the Corps or with plaintiffs.

### iii. The Federal Environmental Impact Statement

Plaintiffs claim that Corps' officials initially told them that producing a federal EIS would not be necessary because the SEIS already addressed the necessary environmental issues, and thus argue that the federal EIS was unnecessarily duplicative because "its principal ground for decision—that longhaul was a viable alternative . . .—made any environmental analysis superfluous." Pls.' Supp. Mem. 17; *see also* Pls.' Ex. 78 at ¶ 7; Pls.' Ex. 79 at ¶ 8. Plaintiffs therefore characterize the Corps' decision to prepare a federal EIS as an abrupt and suspicious turn-about. Pls. Mem. Summ. J. 11–12. Adding insult to plaintiffs' injury, the federal EIS took a year longer to draft than the initial schedule provided, and it was ultimately terminated before completion. Pls.' Exs. 40, 25 at 159–60. Initial schedules planned for a completed federal EIS by May 8, 1995; however, the Corps did not publish the first draft until December 8, 1995. Pls.' Ex. 40.

For its part, defendant objects to the source of plaintiffs' claim that the Corps promised that a federal EIS would not be needed: an affidavit by plaintiffs' former lawyer Polly McNeill. Def.'s Reply 14. Specifically, defendant asserts that Ms. McNeill's affidavit merely recounts her memory of a conversation with the Corps early in the application process and does not provide credible evidence. *Id.* Defendant objects to plaintiffs' reliance on the affidavit of Ms. McNeill (as well as that of Jody Synder, plaintiffs' employee) on the grounds that it is "biased," "self-serving," and not based on personal knowledge, Def.'s Supp. Mem. 15–20, and that it thus constitutes inadmissible hearsay. Def.'s 2d Supp. Mem. 27–31. This court rejects each of these contentions. Defendant's attack on this evidence is mere attorney argument; to find this evidence insufficient for defendant's reasons requires showing bias somewhere in the record evidence, which defendant fails to do. *See* RCFC 56(e); *Celotex Corp.*, 477 U.S. at 324. Nor are plaintiffs' expert affidavits based on inadmissible hearsay or lacking in personal knowledge. They do not stand for the truth of the government officials' assertions, but instead serve to establish plaintiff's sense of the regulatory environment based on affiants' personal interactions with local, state, and federal officials. Thus, because the alleged hearsay is instead circumstantial evidence of the plaintiffs' expectations concerning the regulatory environment, these affidavits fall outside the definition of hearsay. *See* FED. R. EVID. 801(c) (defining hearsay as a statement offered to prove the truth of the matter asserted). Thus, Ms. McNeill's affidavit is sufficient evidence for summary judgment purposes.

Defendant argues that, as a matter of law, a joint federal-state EIS was not an option because the SEIS was already substantially complete by the time plaintiffs submitted their 404 permit application. Def.'s Reply 15; *see also* 40 C.F.R. § 1506.2(b) (mandating the use of federal-state collaborative efforts in the preparation of EIS documents). Indeed, plaintiffs forwarded a copy of the draft SEIS to the Corps on September 14, 1990, one month after they filed the 404 permit application. Pls.' Ex. 164. Moreover, defendant asserts that any conclusions made in the SEIS did not relieve the Corps of its legal responsibility to independently analyze the basis for plaintiffs' 404 permit application. Def.'s Reply 15 (citing 40 C.F.R. § 1501.4(c), requiring the Corps to make the EIS decision based on the outcome of the

federal Environment Assessment); *see also* 42 U.S.C. § 433(2)(c) (mandating a federal EIS for all "major federal action significantly affecting the quality of the human environment").  Corps documents explain that it decided to produce the federal EIS after reviewing the comment letters opposing plaintiff's proposed project, receiving recommendations of denial from EPA, NMFS, and FWS, and receiving requests from the state Department of Ecology to hold the application in abeyance pending further consideration of water quality and hydraulic issues.  Def.'s Ex. 1 at 12–13; Def.'s Ex. 24 at 381–84.

The evidence further suggests that if plaintiffs did not request the federal EIS, they at least conceded to its development.  Specifically, Mr. Barrows, whom plaintiffs hired to help them navigate the 404 permit process, stated that he recommended that plaintiffs ask the Corps to prepare an EIS.  Pls.' Ex. 80 at ¶ 8(b).  Mr. Barrows reasoned that "[w]ith or without an EIS, the permit process would be lengthy and expensive.  However, with a EIS, the Corps would assign more staff and be forced by the process to be more responsive."  *Id.*  Ms. McNeill recalls that Mr. Barrows reported to her that "the Corps *would* require an EIS for this project" and that he "recommended that the EIS be prepared . . . ."  Pls.' Ex. 79 at ¶ 33 (emphasis in original).  In a February 25, 1994 letter to the Corps, Ms. McNeill also states, "we have decided that the most expeditious approach to determining whether the project or mitigation plan should be changed is to volunteer our agreement to the preparation of an EIS."  *Id.* at 1103.  In addition, Mr. Goode summarized the situation as such: "It appears that RII acquiesced in, and may have even encouraged, the Corps' 1994 decision to require an EIS out of desperation."  Pls.' Ex. 175 at ¶ 8.2.

While some of plaintiffs' evidence is compelling, this court must also accord the agency some deference in deciding when it will require additional information from permit applicants.  *See Wyatt*, 271 F.3d at 1098.  Additionally, if plaintiffs either asked for the federal EIS, or encouraged its development, then the source of this delay cannot be said to wholly come from the Corps.  With this in mind, the court cannot determine on summary judgment whether the decision to produce an federal EIS constituted additional delay.

### iv.  The Auburn Racetrack

Even after the federal EIS began, plaintiffs also complain that it took an additional year to draft than was scheduled, wasting more of their time and money.  Pls.' Mem. Summ. J. 12.  In particular, plaintiffs contend that the Corps focused its resources on the (unrelated) Auburn Racetrack project, a 404 permit application filed almost two years after plaintiffs' application, thus delaying the evaluation of plaintiffs' application.  Pls.' Supp. Mem. 19; Pls.' Ex. 77 at 940–41; Pls.' Ex. 78 at ¶ 12.  Plaintiffs assert that giving priority to the racetrack application violated the Corps' "first-come-first-served" policy.  *See* Pls.' Ex. 65 at 749–50.  In support, plaintiffs offer the affidavit of Jody Snyder, LRI's Director of Regulatory Services, who recounts her experience of a meeting in early 1995, between Ms. Snyder, plaintiffs' lawyer Dan Syrdal, and the District Engineer for the Corps' Seattle District, Colonel Donald T. Wynn.  According to Ms. Synder, Colonel Wynn stated in this meeting that the Auburn Racetrack was "his number '1' priority."  Pls.' Ex. 78 at ¶ 12.  Later, in his deposition, Colonel Wynn testified that the racetrack project may have delayed the development of the federal EIS:

Col. Wynn: . . . I remember that we had been working especially in the environmental section very intensely on the—on the EIS with regards to the racetrack.  And presumably that caused a slippage in availability of resources to service the EIS work, the landfill.

Plaintiffs' Attorney: So that could have been at least part of the reason for the time slippage was that need for those resources on another project.

Col. Wynn: That's a possibility, yes.

Def.'s Ex. 100 at 849 (lines 14–23).

Defendant explains that "first-come, first-served" may not have been the Corps' only consideration in determining which projects received priority.  In his deposition, Colonel Wynn indicated that he considered such factors as the order in which the applications arrived, the number of people affected by the proposed project, staff preferences, and political considerations.  Def.'s Ex. 100 at 850–53.  Defendant also denies that the Corps assigned a higher priority to the racetrack application and maintains that the Corps did not sit idly on plaintiffs' application, but remained actively involved in processing it.  Def.'s Reply 15–16; Def.'s Supp. Br. 16–17.  While defendant admits that the racetrack application was approved before the Corps had completed plaintiffs' application, it also explains that the racetrack provided "all of the necessary information . . . to the Corps at a particular point in time," and that the Corps staff worked on both applications simultaneously.  Pls.' Ex. 77 at 941.  As evidence, defendant points to a number of letters sent by Corps officials documenting the work that plaintiffs needed to undertake on their application.  *See* Pls.' Ex. 79(I) (Letter from Ann Uhrich, Chief, Environmental & Processing Section, Army Corps of Engineers to Polly L. McNeill (Oct. 23, 1992) (discussing NMFS recommendations for additional fishery studies and changes to plaintiffs contingency and monitoring plans)); *id.* at (J) (Letter from Col. Walter J. Cunningham, District Engineer, Army Corps of Engineers to Polly L. McNeill (Dec. 18, 1992) (summarizing "basic criteria" that the parties had to establish before the Corps could continue its review)).  In addition, defendant offers evidence from Stephen Martin, a Corps employee, suggesting that plaintiffs caused delays:

Q: Do you recall any delays cropping up, during the time that you were working on the federal EIS for the RII project, anything that you would characterize as a delay?

Mr. Martin: As a delay?  Well, [a] considerable amount of time was spent in obtaining acceptable information from the consultant.

Def.'s Ex. 103 at 890 (32:6–13).

The evidence shows that the Corps completed the Auburn Racetrack application before plaintiffs' application, notwithstanding that the racetrack application was filed after plaintiffs' application.  However, neither party offers any concrete evidence as to the criteria by which the Corps prioritizes applications.  While there is competing evidence as to whether there was any delay at all, neither party has indicated how long any such delay lasted.  In other words, while there is no evidence on the issue of wrongful conduct or the length of any potential delay from

the Auburn Racerack, there is a genuine issue of material fact as to whether the racetrack delayed plaintiffs' application in the first place.

v. Reconfigured Mitigation Plan

Plaintiffs next argue that the Corps required them to reconfigure their mitigation plan to eliminate plans to relocate the South Creek and to increase wetlands mitigation. Pls.' Supp. Mem. 18. Plaintiffs assert that "in order to have any chance of being federally permitted . . . they had no alternative but to agree to reconfigure the project . . . ." *Id.* Plaintiffs further argue that the Corps "induced" them into reconfiguring their mitigation plan and foregoing creek relocation by suggesting that those changes would "alleviate Corps' concerns about permitting the project . . . ." *Id.* at 22. Moreover, plaintiffs assert that this reconfiguration "had profound impacts on the state and local permitting process because plaintiffs and the agencies had no alternative but to accept the Corps' preferred configuration and redo the state and local permits." *Id.* at 23. As a result, plaintiffs claim that they had to "start over" on the SEIS and CUP, adding an additional year to the state permitting process. *Id.*

As evidence of the Corps' coercion and its impact on the state and local permitting processes, plaintiffs offer the affidavits of three individuals. First, Ms. Snyder explains that plaintiffs' 404 permit consultant, David Barrows, led her to understand that the Corps would likely grant the 404 permit "if we avoided relocation of a creek on the landfill and provided enhanced wetlands mitigation." Pls.' Ex. 78 ¶ 4. Ms. Synder further "understood from discussions with Corps staff that, as long as we made certain changes to mitigate wetlands and agreed to prepare an EIS, the key issue would come down to whether longhaul would be considered a practicable alternative to our project." *Id.* at ¶ 5. Mr. Barrows also led Ms. McNeill to believe that the Corps required reconfiguration of the project to increase wetlands mitigation. Pls.' Ex. 79 ¶ 33. Ms. McNeill explains that plaintiffs needed to address other federal agency concerns about "reconfiguration of the landfill to avoid more wetlands and relocation of the seasonal creek," and that plaintiffs could not start work on redoing the SEIS "until we could determine what project configuration would be acceptable to the Corps." *Id.* at ¶ 26. Concerning the mitigation plan, Mr. Barrows recalls discussions he had with the Corps:

> The Corps . . . stated that the agency concerns for environmental impacts to wetlands could be resolved through further on-site avoidance of wetlands and compensatory mitigation. The Corps project manager, Jim Green, encouraged me just to give the agencies something that further reduced the impacts to wetlands. Mr. Green indicated that a 20% reduction would help. Tom Mueller, the permit Branch Chief and Mr. Green's supervisor, told me that the mitigation issue could be resolved. The main project issues to be evaluated, according to Mr. Mueller, were questions about purpose and need for the project, wetlands issues, aquifer issues and the stream relocation.

Pls.' Ex. 80 ¶ 4.

Defendant acknowledges that the Corps may have "influenced" plaintiffs' decision to change the mitigation plan, but it asserts that the final decision was plaintiffs' alone, suggesting that this change was the result of pressure from the state and local agencies who also "expressed

significant concerns with the original configuration of the landfill's wetlands impacts." Def.'s Supp. Br. 22. The Washington State Department of Wildlife opined that plaintiffs' "project constitutes a major wetlands intrusion, with unacceptable mitigation for wetland and wildlife habitat loss." Def.'s Ex. 82. The Washington State Department of Ecology, which also reviewed plaintiffs' Solid Waste Permit application, noted several issues in the SEIS with regard to wetlands impacts and proposed mitigation, alternative mitigation measures, and the relocation of the South Creek. Def.'s Ex. 83 ¶¶ 2, 5–6, 9. Third, the Washington Department of Fisheries ("Fisheries") commented that the "proposed wetland mitigation is inadequate," and noted that plaintiffs' would require a Hydraulic Project Approval from Fisheries, an approval which Fisheries could not issue "for any project which will result in a net loss in wetlands." Def.'s Ex. 84 ¶¶ 2, 5. Defendant also highlights Mr. Barrows's recommendation to plaintiffs that they change the mitigation plan and forego relocation of the South Creek to address issues brought up by these other agencies as well as those of the Corps. Pls.' Ex. 80 at ¶ 8(c)–(d). Finally, defendant argues that because the CUP was still in the review process, plaintiffs have offered no evidence that they had to restart their state and local permits after reconfiguring the mitigation plan, nor that without the reconfiguration they would have still received the CUP and Solid Waste Permit. Def.'s Supp. Br. 22–24.

Undoubtedly, the Corps would not have approved plaintiffs' application had they not reconfigured the mitigation plan. But defendant has also produced evidence suggesting competing causes for the change. This evidence raises a genuine issue of material fact as to whether the state and local agencies also played a role in any reconfiguration to plaintiffs' wetlands mitigation plans and whether they would have received the CUP and Solid Waste Permits, or even the Hydraulic Project Approval, absent a change in the original mitigation plan. In order for plaintiffs show a delay resulting from the reconfigured mitigation plan, plaintiffs must show that the Corps, and only the Corps, required the change to the mitigation plan. For summary judgment purposes, at least, plaintiffs have not done so.

vi. SEIS Revisions

Plaintiffs also argue that because the landfill permit configurations had to be identical for all permits—federal, state, and local—the altered mitigation requirements required them to redo the CUP and the SEIS. Pls.' Supp. Mem 22–23. Plaintiffs' explain that "the work on the state EIS could not even begin until we could determine what project configuration would be acceptable to the Corps. Therefore . . . we could not start re-doing the EIS until we knew the project description to analyze" Pls.' Ex 79 at ¶ 26. Defendant, in response, suggests that plaintiffs have simplified the reasons behind the need to rework the CUP and SEIS. For example, the decision of the state Supreme Court in *Weyerhaeuser I* reversed the SEIS and remanded the CUP for additional hearings. While the court did reverse on procedural grounds—that the hearing examiner did not afford a proper opportunity for the Weyerhaeusers to cross-examine the local officials—it also held the SEIS inadequate because it did not "contain a sufficient discussion of offsite alternatives." *Weyerhaeuser I*, 873 P.2d at 35–36, 41. Because the decision in *Weyerhaeuser I* conflicts with Ms. McNeill's affidavit, this is yet another issue of material fact precluding summary judgment.

vii.  Project Purpose

Again, the statement of project purpose remains an important consideration because it impacts how the Corps will approach the analysis of practicable alternatives.  In this case, plaintiffs complain of a 16-month delay, from December 18, 1992 to February 25, 1994, during which they went back and forth with the Corps over whether plaintiffs should change the project purpose.  Plaintiffs' original purpose defined the project as one to: "[c]onstruct and operate a municipal solid waste landfill to respond to the requirements of the Pierce County Solid Waste Management Plan[76] and to comply with Federal, State, and local sitting requirements."  Pls.' Ex. 79(J) at 1083.  The Corps felt that this project purpose would "unduly restrict a reasonable search for potential practicable alternatives."  Pls.' Ex. 79(J) at 1083.  While the Corps asserts that it considered plaintiffs' views with regard to the project purpose, ultimately the Corps decided that it must make the final decision "independently."  *Id.*  After several attempts to compromise, in the end plaintiffs capitulated, "[r]ecognizing that we have reach[ed] a stalemate" and not wanting "to delay the 404 process any further."  Pls.' Ex. 79(P) at 1102.  The final project purpose, on which both parties agreed, stated the project purpose thusly: to "provide the un-incorporated areas and the incorporated cities in Pierce County that participated in the 1989 Tacoma-Pierce County Solid Waste Management Plan (SWMP), with a viable, affordable, environmentally sound solid waste project to meet the projected needs."  Def.'s Ex. 1(B) at 143.

Maintaining that the Corps' insistence on changing the project purpose was unlawful, plaintiffs consider these 16 months to be unreasonable delay on the part of the Corps.  Pls.' Reply Summ. J. 7.  Citing *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407 (9th Cir. 1989) and *Louisiana Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044 (5th Cir. 1985), plaintiffs argue that the Corps position went against established case law and that as long as plaintiffs' project purpose was legitimate, the Corps could not change it.  Pls.' Mem. Summ. J. 10; Pls.' Ex. 79(K) at 1089.  Plaintiffs further contend that they only agreed to change the project purpose because of the Corps' improper threats: Ms. McNeill stated that "the Corps sent a demand letter on January 28, 1994, threatened to cancel RII's permit if we did not accept the Corps' requirement of changing the project purpose."  Pls.' Ex. 79 at ¶ 34.  This letter, from Thomas Mueller, Chief of the Corps' Regulatory Branch, stated that unless plaintiffs provided a "final response" to the issues of the project purpose and revisions to the mitigation plan, "the application would be cancelled."  Pls.' Ex. 79(O); Def.'s Ex. 22; *see also* Pls.' Resp. to Def.'s Cross-Mem. Summ. J. 20.

Defendant agrees that the debate over the project's purpose was a "time consuming impasse," but as one might expect, attributes the delay to plaintiffs' unwillingness to accept the change in the project purpose.  Def.'s Resp. 5.  Defendant rejects any allegations that the Corps threatened plaintiffs into acquiescing to changing the project purpose.  Defendant further argues that plaintiffs' June 1992 alternatives analysis restated the project plan to specify that the purpose was to "'satisfy the SWMP and Ordinance 91-126 by developing an environmentally sound, cost-effective landfill in Pierce County . . . .'"  Def.'s Ex. 1(B) at 144 (quoting plaintiffs'

---

[76] The SWMP prefers in-county landfills over out-of-county long-hauling.  *See* Pls.' Ex. 6, at 28. Longhaul is only suggested "[i]f there is a lack of landfill capacity in Pierce County for solid waste generated in Pierce County . . . and if out-of-county disposal options are cost effective" for the county.  *Id.*

June 1992 Alternatives Analysis).   Therefore, according to defendant, the new purpose was unduly restrictive because it effectively ruled out any consideration of longhaul as a practicable alterative.  Def.'s Cross-Mem. Summ. J. 22–23.  Defendant also rejects plaintiffs' contention that the January 28 letter was a threat, pointing to the language that reads, "[w]e would also like to know whether or not you intend to significantly revise the project and/or mitigation plan." Pls.' Ex. 79(O).

With regard to the January 28 letter, defendant appears to have missed the point.  In this letter, the Corps indicated that plaintiffs' failure to provide a "final response" to the letter would result in a cancellation of their application.  But plaintiffs had been responding all along; the substance of their responses was to disagree with the Corps.  Plaintiffs reasonably interpreted this letter as an indication that the Corps would consider anything short of acceding to the Corps' position as a failure to provide a "final response."  Moreover, the language in the letter is far from ambiguous and the Corps must have known, or should have known, how plaintiffs would interpret it.

On the other hand, plaintiffs lean too strongly on *Sylvester* and *Louisiana Wildlife* for the proposition that the Corps has no role in determining the project purpose and must accept the applicant's formulation.  Rather, these cases show that the Corps must determine the legitimacy of the applicant's statement of purpose and can insist on changes.  *Sylvester* involved a challenge to the grant of a 404 permit to construct a golf course.  882 F.2d at 409.  That plaintiff complained that the Corps unfairly accepted the applicant's project, resulting in an alternatives analysis that was "skewed" in the applicant's favor.  The court recognized that "the Corps has a duty to consider the applicant's purpose[,]" but also acknowledged that "an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable."  *Id.*  Similarly, several environmental organizations, brought suit in *Louisiana Wildlife*, objecting to the Corps' grant of a 404 permit to private landowners to drain over 5,000 acres of wetlands for agricultural use, arguing that the Corps had to consider "environmental maintenance" factors in the alternatives analysis .  761 F.2d. at 1046–47. Recognizing the applicant's role in formulating the project purpose, the court rejected the organizations' theory, instead supporting the Corps' decision to use the applicant-drafted project purpose.  *Id.* at 1047.  Because "it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable," the organizations' preferred project purpose, environmental maintenance, would be wholly inapposite to the applicant's agricultural project.  *Id.* at 1048.  Thus, *Louisiana Wildlife* does not suggest that the applicant, rather than the Corps, is the final determiner of the project purpose, only that the Corps need not consider proposed project purposes that are not germane to the applicant's.

Whether plaintiffs were unfairly induced to change an otherwise legitimate purpose, or, as the Corps suggests, whether plaintiffs' purpose would have unduly restricted the investigation of practicable alternatives is intricately tied to any delay.  Plaintiffs have shown evidence that the Corps improperly coerced them to broaden the project purpose, but defendant has responded that plaintiffs' purpose may have been unduly narrow.  Plaintiffs' evidence of possible bad faith on the Corps part is substantial and troubling, but unlike *Louisiana Wildlife Federation*, altering the project purpose to allow for an investigation of longhaul as a possible alternative is not

necessarily inapposite to a landfill project.  Accordingly, the parties have again raised an issue of material fact that this court cannot decide on summary judgment.

viii.  Analysis of Practicable Alternatives

Once the parties finalized the project purpose, problems soon arose regarding the cost methodology that the Corps employed as part of its alternatives analysis.  Pls.' Supp. Mem. 14–15.  As explained above, the Corps must deny a permit application if there are other, less costly, alternatives available, which the applicant has the burden to disprove.

Plaintiffs initially believed, based on conversations between the Corps' representatives and Mr. Barrows, that the alternatives analysis would focus only on the difference in costs between plaintiffs' proposed landfill and the costs of longhaul:

> On one occasion, [the Corps' Project Manager] said there were not any other in-county sites that were practicable, so it would come down to the costs difference between the proposed landfill and longhaul.  My understanding of the Corps' position was the environmental issues could be dealt with, but it was not ready to say how much cost was too much cost.  It was clear that the project could be permitted if RII could demonstrate that longhaul was unreasonably expensive when compared with the cost of the proposed project.

Pls.' Ex. 80 at ¶ 5.  Under this standard, plaintiffs calculated that the Corps could not declare longhaul a practicable alternative because longhaul would cost about $24–$32 million more per year than plaintiffs' landfill.  Pls.' Ex. 43 at 361; Pls.' Mem. Summ. J. 12.  The Corps' recent approval of another landfill application, in which the Corps compared the costs of the proposed in-county landfill project to the cost of longhauling the waste to eastern Washington, further assured plaintiffs that longhaul was impracticable.  *Id.* at ¶ 7.

Therefore, plaintiffs were unpleasantly surprised when, during the preparation of the draft federal EIS, the Corps "announced that longhaul would be practicable no matter what the cost, because other political jurisdictions in Western Washington were longhauling."  Pls.' Ex. 80 at ¶ 14.  Plaintiffs assert that the Corps' insistence on comparing the costs of a longhaul alternative, as used in other districts, to the costs of longhaul from Pierce County was inappropriate because longhaul was not even available to plaintiffs as the permit applicant.  Pls.' Supp. Mem. 18; *see also* Pls.' Ex. 175 at ¶ 3.1–3.5 (explaining that "to be practicable under the [Corps'] guidelines, an alternative must be available to the applicant").  According to plaintiffs, the Corps wrongfully took the costs of the proposed project out of the calculation, and "instead decide[d] practicability based on what someone else may choose to spend[,]" because it meant that the Corps would deny the 404 permit.  Pls.' Ex. 80 at ¶ 14.  Moreover, plaintiffs argue that the Corps manipulated the cost analysis until it could reach the conclusion that other, less costly, alternatives to plaintiffs' project existed.  Pls.' Mem. Summ. J. 13.  For example, on February 15, 1995, the Corps asked plaintiffs to provide cost breakdowns for "1-can and 2-can service for the typical ratepayer in both the City of Tacoma and Pierce County."  Pls.' Ex. 78(B).  Next, on July 11, 1995, the Corps asked for costs by types of waste.  Pls.' Ex. 79 ¶ 16.  Plaintiffs assert that the only reason the Corps engaged in this analysis was to make the costs of longhaul less prohibitive.  Pls.' Mem. Summ. J. 13.

In contrast, defendant argues that the Corps denied the permit because plaintiffs could not meet their legal burden to demonstrate that no less environmentally damaging alternatives existed that would fulfill the project purpose. Def.'s Cross-Mem. Summ. J. 26. Defendant also asserts, perhaps curiously in the wake of *Resource I*, that any challenge to the validity of the Corps' alternatives analysis belongs in an APA claim, not a takings case. Def.'s Reply 17. Defendant's evidence suggests that, contrary to plaintiffs' assertion, a longhaul option was not only available to plaintiffs, but that Pierce County "had utilized from 1993 until mid-1996 out-of-county longhaul (through LRI and/or their affiliated companies) to a landfill in eastern Washington (Rabanco facility) for disposal of their solid waste." Def.'s Ex. 1(B) at 145.

Defendant is correct that challenges to the validity of an agency's conduct are correctly brought as an APA claim, not as a takings case. *See Florida Rock II*, 791 F.2d at 899; *NBH Land Co. v. United States*, 576 F.2d 317, 319 (Ct. Cl. 1978). Yet plaintiffs do not ask the court to determine that the alternatives analysis was unlawful, but rather, maintain that the Corps' conduct was part of extraordinary delay in the government decision-making process. Under these circumstances, the court does not assess whether the alternatives analysis was legally valid, but instead examines the Corps' conduct and assesses the reasons for the delay, while still affording the Corps deference in determining what additional information it might need to conform to its regulatory obligations. *See Wyatt*, 271 F.3d at 1098. Accordingly, this court weighs the evidence proffered by plaintiffs, showing that the Corps deviated from their typical methodology in analyzing the costs of practicable alternatives, against defendants' evidence showing that longhaul might have been available to plaintiffs. Moreover, because of the link between the statement of project purpose and analysis of practicable alternatives, the Corps acted consistently because it always maintained that the project purpose was too restrictive because it failed to permit consideration of longhaul. Thus, this court has identified another factual dispute in the evidence precluding a decision on summary judgment.

ix.  Result of Delays

In conclusion, this court cannot conclude on summary judgment that there was extraordinary delay even when viewing these delays as a whole. While the length of the delay alone does not make it extraordinary, it is one of the factors that a court must examine. Much depends on how the delays are calculated. Assuming for the purposes of this discussion that plaintiffs could prove all of these alleged delays, the delay would add up to roughly eight years, as some of the delays overlap. Coupled with plaintiffs' evidence suggesting bad faith on the part of the Corps, this might constitute extraordinary or substantial delay. However, *Resource I* issued in July 1998 and plaintiffs obtained their remaining ministerial permits within 17 months of that date. Assuming no intervention by the Corps, if plaintiffs had sought, and obtained, the remaining ministerial permits within 17 months after they obtained Solid Waste Permit in February 1996, they would have obtained these permits in July 1997, only a year before the *Resource I* opinion and only 20 months before plaintiffs actually began construction in October 1998. A year or two of delay, without bad faith, is exceedingly unlikely be extraordinary. But, because the Court cannot even determine if there was delay, let alone an extraordinary one, the Court cannot decide extraordinary delay on summary judgment and therefore will not proceed to the *Penn Central* test for this claim. The issue will have to wait for disposition at trial.

**7. Does Plaintiff Satisfy Application of the *Penn Central* Factor of the Economic Impact of the Corps' Denial on Plaintiffs?**

As a fallback to their categorical takings claim and extraordinary delay claim, plaintiffs also seek summary judgment on a temporary *partial* takings theory.  Plaintiffs contend that even if *Lucas* does not apply to the Corps' denial of their 404 permit application, this denial was nevertheless the sort of government regulation that went "too far," in the parlance of *Mahon*, and thus effected a taking.  Under the balancing test that the Supreme Court announced in *Penn Central*, which this court will now apply, plaintiffs assert that this court must grant them summary judgment that they suffered a partial taking because there are no genuine issues of material fact as to *any* of the three factors of the *Penn Central* balancing test.  Pls.' Mem. Summ. J. 4–5.

Regarding the first prong, the economic impact of the regulation on plaintiffs, it is not surprising that the parties disagree.  Plaintiffs argue that the Corps' denial of plaintiffs' 404 permit had the requisite economic impact because it deprived plaintiffs of all economically viable use of the project site and millions of dollars of revenue each year.  Alternatively, even if plaintiffs retained some economically viable use of their property, they assert that their property retained so little economically viable use and so little value that this court should grant summary judgment on this prong of *Penn Central*.

Defendant responds that the record is so replete with genuine issues of material fact on all three prongs of the *Penn Central* test that this court cannot grant summary judgment to plaintiffs.  Def.'s Resp. 19.  With regard to this prong of *Penn Central*, defendant contends that any economic impact is insufficient to establish a temporary taking because plaintiffs retained economically viable uses of the project site.  *Id.* at 33–35.  Moreover, defendant points out that plaintiffs and did not establish the difference in the project site's market value with and without the 404 permit as required to show the economic impact of the denial on the parcel's market value.  *Id.*

Under *Penn Central*, as discussed at some length in Section II-C, *supra* , the court must assess whether the regulation went "too far" by balancing: (1) the "economic impact of the regulation on the claimant"; and (2) "the extent to which the regulation has interfered with distinct investment backed expectations"; against (3) "the character of the governmental action."  *Penn Central*, 438 U.S. at 124.  This analysis requires this court to engage in an extensive examination of the facts to determine whether the regulation is simply "adjusting the benefits and burdens of economic life to promote the common good" or instead, whether the regulation "so frustrate[s] distinct investment-backed expectations as to amount to a 'taking.'"  *Id.* at 124, 127 (citing *Mahon*).

Yet despite the importance of these three factors, assessing a regulatory taking remains essentially *ad hoc* and fact-intensive, and does not lend itself to any "set formula."[77]  *See, e.g.*,

---

[77] Compared to a bright-line rule like that of *Lucas*, a multi-factor test is "hard to apply, jettisoning relative predictability for the open-ended rough-and-tumble of factors, inviting complex argument in a trial court and a virtually inevitable appeal."  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 547 (1995).

*Eastern Enters. v. Apfel*, 524 U.S. 498, 523 (1998) ("[T]he determination whether justice and fairness require that economic injuries caused by public action [must] be compensated by the government, rather than remain disproportionately concentrated on a few persons, is essentially *ad hoc* and fact intensive." (internal quotation marks omitted)); *Cienega Gardens IX*, 503 F.3d at 1279 (describing this assessment as an "*ad hoc*, factual inquir[y]" (quoting *Penn Central*; alteration in original)).   Thus, under the *Penn Central* test, satisfying any single factor does not decide the inquiry in favor of the plaintiff, but instead allows the *Penn Central* inquiry to continue; yet, failing to satisfy a factor will usually mean that a *Penn Central* claim will fail.

> But as the Federal Circuit recognized in *Florida Rock V*,
>
> *Lucas* teaches that the economic impact factor alone may be determinative; in some circumstances, no balancing of factors is required.   If a regulation categorically prohibits all economically beneficial use of land—destroying its economic value for private ownership—the regulation has an effect equivalent to a permanent physical occupation. There is, without more, a compensable taking. If, however, a regulation prohibits less than all economically beneficial use of the land and causes at most a partial destruction of its value, the case does not come within the Supreme Court's "categorical" taking rule.

18 F.3d at 1564–65 (footnotes and citations omitted).   Therefore, the *Lucas* test is an unusual type of regulatory taking in which the economic impact of the regulation on the claimant is so substantial that, like a physical invasion, it destroys the landowner's present *and future* ability to engage in economically viable use of the property.   *See id.*; subsection 3, *supra*.   As already discussed (*see* subsection 3, *supra*) plaintiffs have established that they lacked any economically viable use of the project site from September 30, 1996, when the Corps denied the 404 permit application through February 10, 1999, when *Resource I* become final.   Having established their lack of economically viable use, plaintiffs have also established the economic impact prong of *Penn Central*.   *See Florida Rock V*, 18 F.3d at 1564–65.   Any additional discussion of economic impact would, therefore, be superfluous.   *See id.*   Yet this court must also emphasize that, as with plaintiffs' categorical takings claim, causation remains unproven.   In other words, was it the actions of the Corps, the federal entity, and not the state or locality, that was responsible for the economic harm?   The court will deal with this issue below.   *See* subsection 10, *infra*.

### 8.  Interference with Investment-Backed Expectations

Having dealt with the economic impact prong, the court now considers whether plaintiffs had reasonable investment-backed expectations to operate a solid waste landfill on the project site.   The investment-backed expectations prong requires "an objective, but fact-specific inquiry into what, under all the circumstances, the [landowner] should have anticipated."   *Cienega Gardens VII*, 331 F.3d at 1346.   "[A] party's subjective expectation is irrelevant to whether that expectation is reasonable."   *Id.* at 1346 n.42.   Indeed, "[a] reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need."   *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06 (1984) (internal quotation marks omitted).   Further, "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations."   *Palazzolo*, 533 U.S. at 633; *see also Appolo Fuels*,

381 F.3d at 1349 ("[R]easonable investment-backed expectations are shaped by the regulatory regime in place as of the date it purchased the leases at issue.").

On this prong, plaintiffs argue that the Corps interfered with plaintiffs' state and local permit process, and plaintiffs' expectations that they would secure all necessary permits were reasonable.  Pls.' Mem. Summ. J. at 5.  Specifically, plaintiffs claim that Mr. Lakey's hydrogeological analysis of the project site (*see* subsection 3, *supra*) established their reasonable expectations that they would be able to develop a solid waste landfill.  *Id.* at 6–7, 60.  Plaintiffs further assert that the fact that they secured all necessary permits for the landfill site and that because they had secured the required non-federal discretionary permits, the CUP and the Solid Waste Permit, before the Corps denied their 404 permit application, they had reasonable investment-backed expectations.  Pls.' Mem. Summ. J. 60.  Plaintiffs estimate that they had invested upwards of twelve million dollars in the project site at the time of the Ninth Circuit's opinion.  *Id.* at 61.  According to plaintiffs, that they did obtain all necessary permits, coupled with their careful selection of the site for its hydrogeological characteristics also bolster that they had reasonable investment-backed expectations to develop the project site as a solid waste landfill.  *Id.* at 58–61 (citing *Bowles*, 31 Fed. Cl. 37).

Defendant responds that an extensive examination of all relevant facts before this court cannot support the conclusion that plaintiffs had reasonable investment backed expectations to develop a solid waste landfill on the project site, based on the complex regulatory schemes governing both landfills and wetlands.  First, defendant points out that the project site sat over an aquifer and involved the fill of wetlands, which was problematic in light of leakage from other landfill sites in Washington in the past.  Def.'s Cross-Mot. Summ. J. 52; *see supra* Section I-A.  Defendant argues further that plaintiffs acknowledged the CWA regulatory scheme and the Corps' role in it when plaintiffs first asked for a wetlands delineation then filed the 404 permit application.  Def.'s Cross-Mem. Summ. J. 53; Def.'s Resp. 27.  According to defendant, plaintiffs' belief was not unique; all the other federal, state, and local agencies also believed that plaintiffs' landfill would require a 404 permit from the Corps.  *See* Def.'s Ex. 34 at 482 (conditioning the grant of the Solid Waste Permit on the grant of a 401 certification from the state Department of Ecology and a 404 permit from the Corps, and on implementing a wetlands mitigation plan approved by the Corps through the 404 permitting process); Def.'s Cross-Mot. Summ. J. 53.  Defendant also dismisses as marred by hindsight bias plaintiffs' argument that receiving all necessary permits corroborated their expectations.  Def.'s Br. Opp'n 26–27.  Defendant also identifies the 1986 MOA between EPA and the Corps, on which the Ninth Circuit relied in deciding *Resource I*, as requiring EPA to promulgate new rules before it assumed jurisdiction from the Corps, which it did not do until 1991.  56 Fed. Reg. 50978 (1991).

In *Penn Central*, the Court's treatment of interference with reasonable investment-backed expectations was brief, given its conclusion on the minimal economic impact of the Landmark Law.  *See* 438 U.S. at 136.  Based on the owners' practice of operating Grand Central Station as a transportation hub with a few retail shops, the Court concluded that the Landmark Law "does not interfere with what must be regarded as [the owners'] primary expectation concerning the use of the parcel."  *Id.*  Thus, to decide which party has the better of the argument, about reasonable investment-backed expectations, this court must turn to Federal Circuit precedent, which governs our resolution of this issue.  This case law, in turn, will direct the court to the

relevant facts and whether there remain disputed issues of material fact that preclude granting summary judgment on this prong of *Penn Central*.

In *Cienega Gardens VII*, 331 F.3d 1319, a group of owners of low-income apartments ("LIAs") alleged that federal statutes abrogating their right to prepaying their federally-subsidized forty-year mortgages after 20 years effected a regulatory taking of their property interest in prepayment. *Id.* at 1323–24. After an exhaustive review of the law, facts before the court, and the history of the case,[78] the *Cienega Gardens* court held that the LIAs did have a property interest in prepaying their mortgages, both according to their contracts and the regulatory scheme at the time, and that this property right had vested before Congress abrogated this right via statute. *See id.* at 1325–36. The court first determined that the LIAs would not have invested but for their reliance on the previous regulatory regime. *See id.* at 1345–48. The court also concluded that these LIAs had no reason to expect, based on the explicit terms of their contracts and the federal regulations, that the government would abrogate their right to prepayment; the federal government did not have discretion to allow some LIAs to prepay while preventing others. *Id.* at 1348–49. Significantly, the Federal Circuit held that the nature of the

---

[78] *Cienega Gardens VII* was the fourth Federal Circuit opinion on these facts; *Cienega Gardens v.United States* (*Cienega Gardens VI*), 265 F.3d 1237 offers an concise history of the case to that point. The LIAs initially brought suit at the Court of Federal Claims on January 3, 1994, alleging breach of contract, a taking of property without just compensation, and unlawful administrative action. *Cienega Gardens VI* at 1239. The Court of Federal Claims initially granted summary judgment for the LIAs on their breach of contract claims but denied them summary judgment on their takings theory, and dismissed the unlawful administration actions claims. *Cienega Gardens v. United States* (*Cienega Gardens I*), 33 Fed. Cl. 196 (1995). After four model plaintiffs litigated and won the damages award for the breach of contract claim, *Cienega Gardens v. United States* (*Cienega Gardens II*), 38 Fed. Cl. 64 (1997), the government appealed the breach of contract issue to the Federal Circuit. The Federal Circuit vacated and remanded, finding no privity of contract between the LIAs and the United States on the right to prepay mortgages after twenty years. *Cienega Gardens v. United States* (*Cienega Gardens IV*), 194 F.3d 1231 (Fed. Cir. 1998). This also superceded a prior Federal Circuit opinion on the appeal, *Cienega Gardens v. United States* (*Cienega Gardens III*), 162 F.3d 1132 (Fed. Cir. 1998). On remand, the trial court then granted summary judgment for the government on the basis that the LIAs' takings claims were not ripe because the LIAs needed to exhaust their administrative remedies by requesting permission from HUD to prepay their mortgages to render the case justiciable; the trial court also dismissed the LIAs' claims that they were subject to a *per se* physical taking because the inability to prepay the mortgages meant that current low-income tenants would remain. *Cienega Gardens v. United States* (*Cienega Gardens V*), 46 Fed. Cl. 506 (2000). The LIAs appealed yet again, and the Federal Circuit affirmed the dismissal of the LIAs' *per se* takings claim. *Cienega Gardens VI*. However, the Federal Circuit also determined that the LIAs' regulatory takings claims were ripe because it would have been futile for plaintiffs to await a HUD ruling on prepayment permission because there was no dispute that HUD lacked statutory authority to grant such permission. *Cienega Gardens VII*, 331 F.3d at 1324 (citing *Cienega Gardens VI*). On remand, the trial court ruled, without a published opinion, that the LIAs lacked a compensable property interest in the right to prepay their mortgages, on the basis of a case with similarly-situated plaintiffs before the same judge. *Cienega Gardens VII* at 1327. The plaintiffs then appealed yet again to the Federal Circuit, which decided *Cienega Gardens VII*.

industry as heavily-regulated did not abrogate the reasonability of the LIAs' investment-backed expectations. *Id.* at 1349–53.  While "[a] business that operates in a heavily-regulated industry should reasonably expect certain types of regulatory changes that may affect the value of its investments. . . . that does not mean that all regulatory changes are reasonably foreseeable or that regulated businesses can have no reasonable investment-backed expectations whatsoever." *Id.* at 1350.  Instead, the court concluded that involvement in low-income housing was not such a highly-regulated field, in which "history shows consistent, intrusive and changing government regulation of all facets of all transactions even arguably within" the field, that the LIAs could not form reasonable expectations.  *Id.*  Thus, the court refused to rely on the mere *fact* of regulation, rather than its specific content, as abrogating any reasonable expectations in the LIAs.  *Id.* at 1350–51.

*Appolo Fuels*, 381 F.3d 1338, discussed in greater detail above, further clarified this prong of *Penn Central* test.  In *Appolo Fuels*, the owner of surface mine leases ("the owner") brought suit for just compensation under both *Lucas*[79] and *Penn Central* theories when the Office of Surface Mining Reclamation and Enforcement ("OSM") designated as unsuitable for mining the lands on which these surface mine leases sat.  *Id.* at 1341–43.  The Federal Circuit looked to its due process jurisprudence to help identify what investment-backed expectations were reasonable.  *Id.* at 1349 & n.5 (citing *Commonwealth Edison*, 271 F.3d 1327).  Just as reasonable investment-backed expectations are one of three factors of particular relevance to assessing partial regulatory takings, the Federal Circuit's inquiry highlights three factors that are of particular relevance to those same expectations.  *Id.* at 1349.  Thus, in considering reasonable investment-backed expectations, courts should consider:

> (1) whether the plaintiff operated in a 'highly regulated industry;' (2) whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property; and (3) whether the plaintiff could have 'reasonably anticipated' the possibility of such regulation in light of the 'regulatory environment' at the time of purchase."

*Id.* (quoting *Commonwealth Edison*, 271 F.3d 1327).  Further, the *Appolo Fuels* court cautioned that the claimant's purely subjective expectations, though necessary, are not sufficient, to establish reasonable investment-backed expectations.  *Id.* at 1349 & n.5.  Applying those three considerations to the facts at bar, the court first restated the query for reasonable investment-backed expectations as whether the proposed use would be barred, not as an absolute certainty, but "whether extension of existing law could be foreseen as reasonably possible."  *Id.* at 1350–51.  Moreover, the court observed that the statute allowing OSM to designate lands as unsuitable for mining was extremely broad, and permitted such a designation for many reasons. *Id.* at 1350.  Coupled with the observation that surface mining was such a highly-regulated industry and that the owner was clearly aware of OSM's broad discretion to designate lands as unsuitable for mining, the *Appolo Fuels* court concluded that the owner could not even establish sufficient reasonable investment-backed expectations to defeat summary judgment against for the defendant on the owner's *Penn Central* claim.  *Id.* at 1350–51.

---

[79] The *Appolo Fuels* court quickly disposed of the claimant's *Lucas* argument, holding that the loss of 92% of available coal from one lease and 78% from the other lease did not leave the owner without economically viable use of the parcel as a whole when the landowner could develop each separately from the other.  *Id.* at 1345–47.

As the foregoing recitation of regulations governing plaintiffs' landfill project demonstrates, municipal solid waste disposal, especially landfills, is an industry regulated at the federal, state, and local levels. *See* Section I-B, *supra* . The number of permits required of plaintiffs—17, not including the 404 permit—only reinforces that plaintiffs operated in a regulated industry. But as was the case in *Cienega GardensVII*, we cannot conclude that the solid waste disposal is so "highly regulated" that plaintiffs cannot have reasonable expectations to use their property for investment purposes. *See Cienega Gardens VII*, 331 F.3d at 1350–51. It is only where a scheme of regulation is so pervasive, generally because the industry or area of regulation is one of great risk or exigency, that the regulated entity has little or no reasonable expectation for unrestrained use of the property. *See Commonwealth Edison*, 271 F.3d at 1348–49 (observing that nuclear energy production is one of the most highly-regulated industries); *Rith Energy*, 270 F.3d at 1351 (noting that coal mining is a heavily-regulated industry pursuant to SMCRA); *Branch v. United States*, 69 F.3d 1571, 1575 (recognizing that "[b]anking is a highly regulated industry" to the extent that no compensation would be due if the federal government takes the holdings or premises of an unlawful or insolvent bank); *Mitchell Arms*, 7 F.3d at 215 (holding that revocation of firearm import permits is not a taking because of lack of reasonable expectation in an area subject to pervasive federal power). Unlike the "so heavily-regulated" banking industry that the *Cienega Gardens VII* court discussed, the history of solid waste disposal does not "show[] consistent, intrusive and changing government regulation of all transactions even arguably within" the field. *See* 331 F.3dat 1350–51. What is more, as discussed above, the mere fact that a business operates in even a highly-regulated industry does not mean that all regulatory changes are reasonably foreseeable nor that the business cannot have reasonable investment-backed expectations. *See id.*

To be sure, that plaintiffs took over operation of the Hidden Valley landfill after it had problems with leaks and groundwater contamination indicates the possibility of the Corps' asserting jurisdiction over a landfill site in certain instances. Plaintiffs purchased most of the parcels comprising the project site from 1986 through 1988. At this time, the 1986 MOA between the EPA and the Corps remained in effect, but the EPA had not yet promulgated the 1991 regulations. Plaintiffs would have known then that the Corps retained jurisdiction until the EPA promulgated the regulations, a then-unknown date. Yet, plaintiffs would not have expected the Corps to assert jurisdiction after agreeing that jurisdiction belonged to the EPA. As Ms. McNeill explains, it was the county Planning and Health Departments that first made plaintiffs aware that the project site contained wetlands that might require a 404 permit.[80] Pls.' Ex. 79 ¶ 2. Plaintiffs subsequently ordered a site reconnaissance from their wetlands consulting firm, which reported that, under the Corps' wetlands delineation guidelines, the project site likely contained jurisdictional wetlands. *Id.* at ¶ 3. Plaintiffs then met with Corps officials to determine whether the Corps would require a 404 permit. *Id.* at ¶¶ 3–4.

However, plaintiffs' investments were reasonable, because plaintiffs had no reason to believe that they would not be able to procure all of the necessary permits, given the pressing need for a new landfill and their familiarity with waste disposal in Pierce County. "[T]he nature and extent of permitted development under the regulatory regime vis-a-vis the development sought by the claimant may also shape legitimate expectations." *Palozzolo v. Rhode Island*, 533 U.S. at 634 (O'Connor, J., concurring); *see also Bowles v. United States*, 31 Fed. Cl. 37

---

[80] This court previously explained why Ms. McNeill's affidavit is sufficient evidence for summary judgment purposes. *See* subsection 6-iii, *supra*.

(1994) (finding evidence that landowner would have met state's conditions to build sufficient to establish investment-backed expectations). Even before the Corps asserted jurisdiction, plaintiffs had performed three years of environmental studies and engineering design, and submitted a detailed Environmental Assessment to Washington State showing that the project protected groundwater and complied with all permitting requirements. Pls. Ex. 7, 8, 79 at 998. That plaintiffs eventually obtained all of the necessary state and local permits, some multiple times, supports that their expectations were in fact reasonable. Pls.' Ex. 80 at 1105 ¶ 1. David Barrows, a former environmental manager whom plaintiffs hired to help them navigate the 404 permit process, further corroborates that plaintiffs' expectations were reasonable. Pls. Ex. 80 ¶ 3 ("My review of the permit files and discussions with the Corps did not reveal any fatal flaws for the proposed landfill"); ¶ 6 ("I briefed RII that they had a good chance of getting a permit from the Corps if they could meet the burden of proof that longhaul was more expensive than the proposed project."); *see also Laguna Gatuna v. United States*, 50 Fed. Cl. 336, 347 (2001) (finding that obtaining the necessary state permits and disposing of salt water on its property in compliance with state law demonstrated that plaintiff had reasonable investment-backed expectations); Def.'s Cross-Mem. Summ. J. 7–15.

Nor would plaintiffs have received their permits if their expectations, based on Mr. Lakey's analysis, of the vanishingly small probability of groundwater and surface water contamination, were not confirmed by Pierce County. *See* Pls.' Ex. 46 ¶¶ 8R, 9R. Mr. Barrows also stated that plaintiffs "had a good chance of getting a permit from the Corps if they could meet the burden of proof that longhaul was unreasonably more expensive than the proposed project[,]" a burden that plaintiffs were apparently able to meet. Pls. Ex. 80 at 1107–09. Moreover, the SWMP identified an in-county landfill as Pierce County's preferred long-term waste disposal option. This preference, coupled with the decrease in available landfill capacity and particular hydrogeological features of the project site, are objective criteria that doubtless increased plaintiffs' expectations that they would eventually obtain administrative approval for the landfill. Pls.' Reply 32–33. Though plaintiffs could not be certain that they would obtain approval for their proposed landfill, all that is required are reasonable expectations, not absolute certainties. Nor did Plaintiffs have reason to expect the Corps would overstep its jurisdictional boundaries set by the 1986 MOA with the EPA. *See Palozzolo v. Rhode Island*, 533 U.S. at 633 (O'Connor, J., concurring) ("[T]he regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations."). To be sure, the Corps' "unreasonable" basis for asserting jurisdiction, *see Resource I* at 1169, is thus difficult to square with plaintiffs' "reasonable investment-backed expectations."

But despite plaintiffs' compelling evidence that they had reasonable investment-backed expectations, defendant disagrees. Defendant instead argues that plaintiffs could not have had such expectations as a matter of law due to the heavily-regulated nature of the solid waste disposal industry.[81] This disagreement presents the court with a disputed issue of material fact, precluding summary judgment on this prong of the *Penn Central* test.

---

[81] To be sure, defendant has established that plaintiffs were not and could not be *certain* that they would be able to acquire all necessary permits. But showing that plaintiffs could not have been without some doubt is not incompatible with a finding that plaintiffs reasonably expected that they would be able to proceed with their proposed landfill. Requiring a claimant to show that it would have inevitably received all necessary permits would improperly warp the requirement of "reasonable investment-backed expectations" into "absolute investment-backed certainties."

### 9. What Is the Character of the Government Action?

Turning to the final prong of the *Penn Central* test, the character of the government action, the parties' positions could not be further apart. Each party maintains that the character of the government action cuts in favor of its own position and against that of its opponent.

Plaintiffs contend, echoing their extraordinary delay argument (*see* subsection 5, *supra*) that *Resource I* conclusively establishes that the character of the Corps' action was "unreasonable." Pls.' Mem. Summ. J. at 5. In addition, plaintiffs assert that the Corps treated plaintiffs' landfill application as a public project rather than a private endeavor. Pls.' Mem. Summ. J. 59. In particular, plaintiffs take exception to the Corps' requiring plaintiffs to rework the statement of their project purpose. As originally stated by plaintiffs, the project purpose was to "[c]onstruct and operate a municipal solid waste landfill to respond to the requirements of the Pierce County Solid Waste Management Plan and to comply with Federal, State, and local sitting requirements." Pls.' Ex. 79(J) at 1083. Plaintiffs assert that the Corps required them to restate their project purpose so that it read to "provide the unincorporated areas and the incorporated cities in Pierce County . . . with a viable, affordable, environmentally sound solid waste project . . . ." Pls.' Ex. 79(P) at 1102. Plaintiffs contend that this involuntary revision converted their private enterprise into a *de facto* public project, thus forcing them alone to shoulder what should be the public burden of protecting a public good. Pls.' Mem. Summ. J. 59.

In addition to once again disputing plaintiffs' collateral estoppel argument, defendant also insists that the character of the government action prong favors it and not plaintiffs. Def.'s Resp. at 30–31. Defendant asserts that the Corps was acting for an important public function—protecting wetlands and the aquifer underlying Pierce County. Def.'s Cross-Mot. Summ. J. 48–49. Moreover, defendant denies that the dispute over the statement of project purpose singled out plaintiffs to bear a public burden because the CWA is a comprehensive statutory program treating all applicants similarly. Def.'s Resp. 24–25. According to defendant, until *Resource I*, the Corps had no reason to doubt its authority to regulate landfills on wetlands; moreover, the EPA actively participated in the 404 permit process. Def.'s Cross-Mem. Summ. J. 50; Def.'s Ex. 1 at 15–18. Defendant further asserts that, notwithstanding *Resource I*, even today new landfill projects must obtain a 404 permit before they can fill wetlands. Def.'s Reply 20.

In assessing the character of the government action, the Court considers, as a threshold matter, plaintiffs' argument that the Ninth Circuit's opinion in *Resource I* conclusively establishes that the character of the government action at issue before this court is unreasonable. *See* Pls.' Mem. Summ. J. 58. Certainly, this Court is bound by the Ninth Circuit's holding that the Corps lacked the authority under CWA to require plaintiffs to obtain a Section 404 permit because that jurisdiction properly belonged to the EPA, devolved to the states under RCRA. *See Resource I*, 151 F.3d at 1163–64 ("We hold that the construction of a municipal solid waste landfill on a wetlands site is regulated by the Environmental Protection Agency (EPA) or states with solid waste permit programs approved by the EPA under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6941–6949a, not by the Corps under section 404 of the CWA."). But, as discussed above in the context of extraordinary delay, *see* subsection 5, *supra*, *Resource I* concerned the legal issue of the Corps' jurisdiction and thus does not preclude this

court's determination of the character of the government action, which is also an intensely factual inquiry focusing on agency action.

But if *Resource I* does not decide this issue, how should this court determine the character of the government action?  In *Cienega Gardens VII*, discussed more fully above, the Federal Circuit observed that the government action was not mere regulation or eliminating a nuisance, but was instead a taking, albeit temporarily, of a property interest.  *Id.* at 1338–39. The Federal Circuit has made very clear that good intentions motivating an otherwise lawful purpose do not negate liability for takings.

> Congress' *purpose* in enacting the statutes may have been entirely legitimate but the government has not shown that the *actions* Congress took . . . were within its powers to exercise without also granting compensation.  The disproportionate imposition on the [LIAs] of the public's burden of providing low-income housing is not rendered any more acceptable by worthiness of purpose.  The principles, as used by the trial court in this context, misconstrue what type of government action counts as a compensable taking by focusing on the purpose rather than the nature of the action.

*Id.* (emphasis added).  Thus, this court recognizes that the mere *purpose* of the government action being beneficial or deriving from a intent to help the public does not immunize the government's actions under this prong of *Penn Central*.  *See id.*; *see also Mahon*, 260 U.S. at 146 (cautioning that even "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change").

Instead, the court must consider the nexus between the regulation and its effects, looking at "the relative benefits and burdens associated with the regulatory activity."  *Bass Enters.*, 381 F.3d at 1370; *see also Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1194 (Fed. Cir. 2004) (considering the nexus between the regulation and underlying lawful purpose).  In doing so, the court reviews "[t]he purposes served, as well as the effects produced, by a particular regulation [to] inform the takings analysis."  *Palazzolo*, 533 U.S. at 633–34 (O'Connor, J., concurring) (quoting *Penn Central*; internal citations omitted).  Yet,

> [t]hat the purpose and function of the regulatory imposition is relevant to drawing the line between mere diminution and partial taking should not be read to suggest that when Government acts in pursuit of an important public purpose, its actions are excused from liability. To so hold would eviscerate the plain language of the Takings Clause, and would be inconsistent with Supreme Court guidance. It is necessary that the Government act in a good cause, but it is not sufficient. The takings clause already assumes the Government is acting in the public interest.

*Florida Rock V*, 18 F.3d at 1571.  To be sure, the claimed failure of a regulation to substantially advance a legitimate government interest, alone, cannot effect a taking.  *See Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 540–43 (2005) (holding this sort of claim to be properly addressed as a violation of Due Process).  However, the court must still consider "the *magnitude or*

*character of the burden* a particular regulation imposes upon private property rights," and how that "regulatory burden is *distributed* among property owners."  *See id.* at 542 (emphases in original).

The Federal Circuit has also read this prong of *Penn Central* to a weigh the benefits, burdens, and distribution of a regulatory burden as part of this prong.  This requires an "inquir[y] into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented." *Creppel v. United States*, 41 F.3d 627, 631 (Fed. Cir. 1994).  Thus, "[i]f the regulation prevents what would or legally could have been a nuisance, then no taking occurred," because a landowner never had the right to create a nuisance.  *See id.*; *see also Lucas*, 505 U.S. at 1022, 1026, 1029 (the landowner's property interest never includes the right to create a nuisance).  But "government action designed to protect health and safety" that prevents the unacceptably high *risk* of a nuisance may not require just compensation.  *Appolo Fuels* at 1351 (internal quotation marks omitted).  *See id.* at 1343, 1347 & n.2, 1350–51.  In *Appolo Fuels*, preventing mining *likely* to harm the availability of potable water in the surrounding area was "the type of governmental action that has typically been regarded as not requiring compensation for the burdens it imposes on private parties who are affected by the regulations." *Id.* at 1351.

It is beyond cavil that a purpose for and an effect of Section 404 of the CWA is to protect navigable waters by preserving wetlands hydrologically linked to those navigable waters.  *See, e.g.*, *Riverside Bayview*, 474 U.S. 121, 133 (1985) ("[W]etlands adjacent to navigable waters do as a general matter play a key role in protecting and enhancing water quality . . . ."); *Mall Properties v. Marsh*, 672 F. Supp. 561, 567 (D. Mass. 1987) ("Section 404 was enacted to protect the quality of water and to protect critical wetlands." (internal quotation marks omitted)).  *See generally* 33 U.S.C. § 1251.  Conserving wetlands, pursuant to the CWA and its implementing regulations, helps to preserve a public good and prevent degradation of navigable waters.  *See, e.g.*, *Florida Rock II*, 791 F.2d at 904 ("[T]he preservation of wetlands bears a substantial relationship to the public welfare."); *Texas Comm. Natural Res. v. Van Winkle*, 197 F. Supp.2d 586, 621 (N.D. Tex. 2002) ("The intent of Section 404 is to protect the nation's waters from indiscriminate discharge of material capable of causing pollution, and to restore and maintain the chemical, physical and biological integrity of these areas.").

Further, there always remains some finite probability, however small, that a complication from a landfill may develop into a nuisance.  Washington State has had problems with contamination from landfills, and the Corps was concerned about the potential of adding to that history.  *See* Def.'s Cross-Mem. Summ. J. 15–16 (alleging that Washington State had a "troubled history" with landfills, because six former landfills were listed on EPA's National Priorities List ("NPL"), and that two landfills in Pierce County had also been listed on either the NPL or the CERCLA Information System).  However, unlike *Appolo Fuels*, the evidence here also shows that contamination is exceedingly unlikely.  *See* Pls.' Resp. 48–55 (summarizing the specific features showing infinitesimal risk of groundwater contamination); *see, e.g.*, Pls.' Ex. 47 at 460 (suggesting no danger of nitrates in leachate); Pls. Ex. 139 at 2140 (citing the Corps' independent EIS consultant's assessment, performed at the Corps' direction, concluding that the actual risk of groundwater contamination was one in one ten *quintillion*).  In evaluating, and ultimately granting plaintiffs' CUP permit, the Hearing Examiner recognized the serious potential for public health problems should the landfill leach into the groundwater, but

concluded that the hydrogeologic features of the project site protected the aquifer from potential groundwater contamination.  *See, e.g.*, Pls.' Ex. 43 at 343, 350.  Accordingly, the potential for the landfill to develop into a nuisance appears vanishingly small, albeit theoretically possible.

As for the burdens, the litany of plaintiffs' economic harm resulting from the permit denial need not be repeated; it suffices to say that plaintiffs suffered substantial economic harm. *See* subsections 3, 7, *supra*.  But whether plaintiffs "are solely burdened and unbenefitted" by the regulation is also relevant to the discussion.  *Penn Central*, 438 U.S. at 134.  In *Penn Central*, the character of the governmental action weighed against a taking, despite the economic impact on that plaintiff, because New York City's historical zoning laws did not single the plaintiff out for adverse treatment by the city.  *Id.* at 135.  Rather, other private buildings were subject to the same regulation, as "31 historic districts and over 400 individual landmarks [had] been finally designated," as protected historical areas that required a permit for any changes to be made.  *Id.* at 111.  As discussed above, *see* subsection 6, *supra*, plaintiffs identify a number of factual discrepancies strongly suggesting that the Corps treated them differently than other similarly-situated applicants.  Although plaintiffs' evidence is not sufficient to *prove* that they were singled out for special treatment, it suffices to highlight a factual dispute on a material issue.

Given these disputed factual issues, this court cannot determine on summary judgment whether the character of the government action weighs in favor of plaintiffs or defendant.  Certainly, there is a valid public interest in clean water and healthy wetlands that is protected by the CWA.  Parties wishing to construct new landfills continue to be subject to the statutory scheme of the CWA, and in that sense, plaintiffs were not singled out by the CWA itself.  However, plaintiffs certainly suffered a severe economic impact, one that left them without economically viable use of their land when the Corps did not have jurisdiction in the first place.  Nor can we conclude that the Corps reviewed plaintiffs' 404 permit application with the same standards as other applications, or that plaintiffs were not singled out when improperly subjected to the Corps' jurisdiction.  Yet, that the Corps asserted jurisdiction under color of authority raises a genuine issue of material fact preventing this court from deciding this prong of the *Penn Central* test in favor of plaintiffs at summary judgment.

Therefore, this court cannot grant summary judgment in favor of plaintiffs on their *Penn Central* claim.  While plaintiffs certainly established severe economic impact, this court cannot assess the character of the government action, nor can it make a finding on whether plaintiffs had reasonable investment-backed expectations without relying on contested factual issues.  Because this court does not know the weight of two of the three *Penn Central* factors, it cannot, therefore, complete the required balancing on summary judgment.  Moreover, just as with their *Lucas* claim, plaintiffs have not established that the causation element that this court needs to conclude that the Corps has effected a taking, as this opinion will discuss in detail below.  Thus, this court must deny plaintiffs' motion for summary judgment on their *Penn Central* claim.

**10.  The Issue of Causation: Whether the Federal, State, or Locality Caused the Alleged Harm**

"A judgment as a matter of fact and law in a takings case requires proof of causation.  Proof of actual and proximate causation of plaintiffs' damages . . . is a difficult undertaking on

summary judgment." *Applegate v. United States*, 35 Fed. Cl. 406, 415–16 (1996). Where the injury is sufficient, but the plaintiff is unable to show a direct causal link between the injury and the government's action, the plaintiff has not met its burden. *Hendler v. United States*, 175 F.3d 1374, 1376 (Fed. Cir. 1999). Like tort causation, in addition to cause-in-fact (or "but-for" causation), a plaintiff must also establish that their injury was the "foreseeable or predictable result" of the government's actions, also known as "proximate causation." *See Moden v. United States*, 404 F.3d 1335, 1343 (Fed. Cir. 2005). This requires plaintiffs to establish that the their harm was the "direct, natural, or probable" result of authorized government activity. *See Ridge Line*, 346 F.3d at 1355; *see also Hansen*, 65 Fed. Cl. at 117. Because neither party discusses causation as an underlying issue in takings, this court will examine the issue *sua sponte* after identifying the relevant legal standards.

The Supreme Court elaborated on the causation requirement in takings law in *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 328–29 (1922), in which a landowner contended that his property was taken because its value had been destroyed by the cumulative effect of the government's repeated firing of a battery of cannons over the property. Assessing the government's intent to appropriate the landowner's property, the Court opined that if the government "with the admitted intent to fire across the claimants' land at will should fire a single shot or put a fire control upon the land, it well might be that the taking of a right would be complete." *Id.* at 329. However, the Court did not find the government's lack of intent dispositive, holding that "even when the intent thus is not admitted, while a single act may not be enough, a continuance of them in sufficient time may prove it. Every successive trespass adds to the force of the evidence." *Id.* at 329–30. Thus, government intent to appropriate property, while sufficient to establish causation for a taking, is not necessary. *See also Hansen*, 65 Fed. Cl. at 106. What is more, before remanding, the Court advised the trial court that, "[a]s the United States built the fort and put in the guns and the men, there is a little unnatural willingness to find lack of authority to do the acts even if the possible legal consequences were unforeseen." *Portsmouth Harbor*, 260 U.S. at 330; *see also Hansen*, 65 Fed. Cl. at 106. As this court previously observed, *id.*:

> Portsmouth represents the culmination of the law in this area. For a taking to be cognizable, causation—that is a direct, as opposed to an indirect or consequential, appropriation or seizure of property—must be shown. Portsmouth's causation requirement—today often referred to as the "natural, probable consequence test," *see Ridge Line*, 346 F.3d at 1355, is significant because such a test simply requires proof that the government is the cause-in-fact of the harm for a taking to occur. Causation thus does not require proof that government agents must have specifically intended, and thus could foresee, the specific harm that [effected] the taking.

The Federal Circuit further clarified the causation requirement in *Ridge Line v. United States*, 346 F.3d 1345 (Fed. Cir. 2003), "the culmination of decades of takings jurisprudence." *Hansen*, 65 Fed. Cl. at 116. In *Ridge Line*, the landowner alleged that the government's construction of a building adjacent to and uphill from the landowner's property effected a taking by dramatically increasing storm water runoff, which in turn caused flooding and soil erosion on the landowner's property. *Ridge Line*, 346 F.3d at 1350–51. The Federal Circuit instructed that the trial court should not find a property loss compensable as a taking (as

opposed to a tort) unless "the government intends to invade a protected property interest *or* the asserted invasion is the direct, natural, or probable result of an authorized activity [rather than an] incidental or consequential injury inflicted by the action." *Id.* at 1355 (emphasis added); *see also Hansen*, 65 Fed. Cl. at 117 (recognizing that either intent or "the direct, natural, or probable result of an authorized activity" can establish takings causation).  The landowner in *Ridge Line* did not allege intent, but as the Federal Circuit concluded, that did not bar his claim. *Ridge Line*, 346 F.3d at 1356.  Instead, the Federal Circuit instructed the trial court to "determine whether the increased runoff on the [landowner's] property was the predictable result of the government action [in constructing the building]." *Id.*  This sort of predictability was not whether the government had actually foreseen the harm to the landowner's property, but instead whether the construction "initiated a series of events all . . . in their natural order, by which the landowner was deprived of the beneficial use of portions of its land." *Id.*  Moreover, this court has emphasized "the fine distinction" that this predictability refers to causation, not to the intent to harm—*i.e.*, whether the government's actions would cause the harm in question, not whether the government's agents knew or should have known that their actions would result in harm.  *See Hansen*, 65 Fed. Cl. at 119.

The Federal Circuit offered additional guidance in *Moden v. United States*, 404 F.3d 1335, 1338–39 (Fed. Cir. 2005), where it dismissed a takings claim that failed to allege an intentional invasion by the United States (and thus did not satisfy the first prong of *Ridge Line*). On appeal, the Federal Circuit required the property owner to prove that a taking was the predictable result of the government action "either because it was the direct and necessary result of the act or because it was within the contemplation of or reasonably to be anticipated by the government." *Id.* at 1343 & n.2 (quoting *Vaizburd v. United States*, 384 F.3d 1278, 1282–83 (Fed. Cir. 2004) (internal quotations omitted)).  Yet, the Federal Circuit emphasized that a plaintiff must prove that the government "should have predicted or foreseen the resulting injury," in addition to the causation-in-fact requirement, which the plaintiff failed to do.  *Id.* at 1343–45.  Thus, unless the government intends to make an invasion, proximate causation requires that the government had or should have foreseen the type of harm that a plaintiff suffers.  *See id.*

Therefore, to prevail on their takings claims, plaintiffs must demonstrate that but for the Corps' actions, plaintiffs would have: (1) retained some economically viable use of the project site; (2) received their state and local permits before February 1996; and, (3) would have been able to proceed with landfill development by February 10, 1999.  *See Bass Enters.*, 45 Fed. Cl. at 122; RESTATEMENT (THIRD) OF TORTS § 26 (Tentative Draft No. 2, 2007) ("Conduct is a factual cause of harm when the harm would not have occurred absent the conduct.").  To do this, plaintiffs contend that the Corps caused a number of delays, ranging from the laundry list discussed in the extraordinary delay section, above, to the delays associated with plaintiffs' appeals of the Hearing Examiner's decisions.  In their filings, plaintiffs assert that:

> but for the Corps' involvement, Plaintiffs would have been able to complete the state and local discretionary permitting process (and of course, the subsequent ministerial permitting process) years earlier . . . . [S]ubstantial delays in the state and local permitting process, on the order of many years, are directly and indisputably 'attributable' to (and not 'independent' of) the Corps actions.

Pls.' Supp. Mem. 3–4.   Plaintiffs also allege the loss of "millions of dollars in income, a significant 'economic impact'" resulting from the Corps' imposing the 404 permit process.  *Id.* at 27.  On top of plaintiffs' alleged extraordinary delays, *see* subsections 7–9, *supra*, Mr. Goode testified that when the Corps takes an inordinately long time to process an application, it "encourages state and local jurisdictions to move into the slow lane since the Corps has not acted, and vice versa."  Pls.' Ex. 175 at ¶ 9.1.  Plaintiffs also cite statistical evidence showing that the average CUP permitting process takes 18 months to 2.5 years, assuming no delays from litigation.  Pls.' Ex. 174 at 2342–43.  From their initial CUP application on December 29, 1989, Pls.' Ex. 8, to May 23, 1999, when the state Court of Appeals reversed the RUE condition on plaintiffs' CUP, *Weyerhaeuser II*, 976 P.2d at 1283, the CUP process in this case took just under ten years.

Unlike Mr. Goode's estimate, the state and local permit processes did have litigation delays.  *See Weyerhaeuser I*, 873 P.2d at 498 (detailing the litigation history surrounding the CUP at issue).  Plaintiffs nevertheless blame the time spent on these appeals on the Corps.  Plaintiffs maintain that they considered the imposition of the RUE by the Hearing Examiner legally unnecessary, and chose to appeal only because they were waiting for the Corps to act, while simultaneously obtaining the RUE permit itself.

> The decision was made to pursue appeals, but not without seriously weighing the impact on the timeliness of the project . . . since we were in limbo with the Corps process and the Corps gave every indication that it would not enter a decision any time soon.
>
> * * *
>
> We would not have done so were it not for the delays being imposed by the Corps.

Pls.' Ex. 79 at ¶¶ 25–26; *see also* Pls.' Resp. 14.  Moreover, from February 1993 until May 1994, plaintiffs sought direct review in the Washington Supreme Court of the terms of the CUP and the adequacy of the SEIS.  Pls.' Ex. 79 ¶ 26.  Although, like the RUE appeal, plaintiffs elected to pursue this appeal, they blame the Corps for the delay.  Plaintiffs assert that "had it not been for the Corps' interference, plaintiffs would have accepted the Superior Court decision, and *immediately* reopened the hearings for the additional testimony as ordered by the Superior Court."  Pls.' Resp. 14.  Again, plaintiffs cite Ms. McNeill's affidavit:

> We would not have [sought review from the Washington Supreme Court] were it not for the delays being imposed by the Corps.  After all, the reversal had been on procedural grounds, and redoing the EIS would have been fairly straightforward. But the work on the state EIS could not even begin until we could determine what project configuration would be acceptable to the Corps.  Therefore, since we could not start re-doing the EIS until we knew the project description to analyze, and since this knowledge from the Corps would be a lengthy wait, we had nothing to lose by taking the appeal.

Pls.' Ex 79 at ¶ 26.

Furthermore, plaintiffs assert that because the CUP and the Solid Waste Permit both required that plaintiffs obtain a 404 permit as a condition for issuance, the federal and state/local permitting processes were inevitably intertwined, not independent.  Pls.' Supp. Mem. 6 & n.3.  That condition, according to plaintiffs, barred them from obtaining the remaining ministerial permits until they had obtained the 404 permit while the Corps retained jurisdiction.  *Id.* at 7, 14.  As proof, plaintiffs note that it only took them approximately 2.5 months after the Ninth Circuit's final mandate to obtain all of these permits.  *Id.*

Defendant responds that the state and local permitting processes were complex and took time on their own; thus any delays there were separate from, and not attributable to, the Corps.  Def.'s Supp. Br. 15.  Defendant points to the deposition of Bill Leonard, from the state Department of Ecology, who explained that the state and local processes proceeded separately from the 404 process:

> [W]ithin the department we have a policy, unwritten perhaps, but kind of an informal policy that we will not hold up a project based on the outcome of an Alternatives Analysis.  So even though we thought there was a chance, and there were all kinds of opinions of what the chance would be, there was a chance that this project would be kicked out, would be denied by the Corps based on the Alternatives Analysis, so, you know, that's a big part of the process, but we couldn't hold up our end looking at mitigation, looking at assessment of the impacts, awaiting the outcome of the Alternatives Analysis.

Def.'s Ex. 75 at 750.  Moreover, defendant notes that plaintiffs had argued to the Hearing Examiner that issuance of one of their ministerial permits should not be influenced by the Corps' ROD[82] because the Corps' review constituted "another, totally separate case and process."  Def.'s Ex. 80 at 768.  However, this court cannot determine the weight of that contention on summary judgment, merely that it shows yet another genuine issue of material fact.

Defendant also objects to plaintiffs' attributing the time for appeals of the CUP and Solid Waste Permit to the Corps.  According to defendant, plaintiffs' willingness to pursue the appeal of the RUE requirement until the May 1999 decision, almost a year after the Ninth Circuit issued its opinion, undermines plaintiffs' contention that they would not have appealed the January 1992 CUP but for the delays caused by the Corps.  Again, defendant attacks the source of plaintiffs' evidence, Ms. McNeill's affidavit.  Def.'s Supp. Br. 15.  Moreover, as defendant points out, other aspects of the federal, state, and local processes continued to proceed, even while plaintiffs' appeals were pending.  Def.'s Supp. Br. 16.  These included obtaining the RUE permit itself, progress on the Solid Waste Permit, and additional mitigation studies that the Corps ordered.  *See* Def.'s Supp. Br. 16–17; Def.'s Ex. 92 at 799; Pls.' Ex. 79 at ¶¶ 20, 26.

---

[82] Plaintiffs object to defendant's use of the ROD, arguing that it is hearsay and that defendant admitted as much.  Pls.' Resp. 36–37.  Defendant denies having made such an admission.  Def.'s Reply 16.  In either case, the ROD, as a public document, falls within an exception to the hearsay rule.  *See* FED. R. EVID. 803(8).  It can also constitute a business record.  FED. R. EVID. 803(6).  Moreover, on February 28, 2000, plaintiffs filed a motion requesting that the Court strike the ROD as hearsay.  Pls.' Motion to Strike Def.'s Citation to Its Record of Decision & Mem. In Supp. Thereof (Feb. 28, 2000) [Docket No. 44].  On November 15, 2000, the Court denied plaintiffs' Motion to Strike and declines to revisit that order now.  Order (Nov. 15, 2000) [Docket No. 86].

Defendant maintains that plaintiffs' motivation for appealing the SEIS reversal is also suspect because, contrary to plaintiffs' claims, the SEIS was reversed not just on procedural grounds, but because it also did not contain sufficient analysis of alternatives and did not comply with the SWMP.  Def.'s Resp. 21; Def.'s Supp. Reply 33; *see also Weyerhaeuser I*, 873 P.2d at 501, 507–08.

Finally, defendant argues that not only are any possible delays caused the Corps ultimately irrelevant because the state and local permitting process was incomplete when the Corps denied plaintiffs' 404 application in September 1996, but plaintiffs still had not completed the state and local permitting process as of July 1998, when the Ninth Circuit overturned the Corps' exercise of jurisdiction.  Def.'s Supp. Br. 10.  As defendant explains, plaintiffs could not start construction in early 1996 after receiving the Solid Waste Permit because the other ministerial permits were still outstanding.  Def.'s Supp. Reply 4.  Moreover, defendant argues that because plaintiffs obtained some of their ministerial permits before the Ninth Circuit's opinion, it proves that the 404 permit requirements in the CUP and Solid Waste Permit did not effect a moratorium on plaintiffs' project.  *See* Def.'s Ex. 73 (identifying that the two NPDES permits issued on February 16, 1996, and the Industrial Wastewater Discharge Permit issued on February 15, 1996).

Plaintiffs have produced compelling evidence suggesting that the Corps caused some of plaintiffs' delays, and that plaintiffs would have obtained their ministerial permits much faster if the Corps had not been involved.  If plaintiffs could prove that the Corps caused each of the alleged delays, combined they would no doubt constitute substantial, rather than consequential, harm.  *See General Motors*, 323 U.S. at 380; *Applegate*, 35 Fed. Cl. 417–18.  While plaintiffs have compelling evidence that their economic injuries were the direct, natural, or probable result of the Corps' actions; they have not shown that the record can support no other conclusion.  *See Ridge Line*, 346 F.3d at 1355.  Nor have plaintiffs shown that it was the Corps' denial of their 404 permit application, and not the pendency of the state and local permits, that left them without economically viable use of the project site.  For example, plaintiffs' state timber permit application was denied in 1990, pending approval of all permits for the landfill in its final configuration; this Court cannot conclude at summary judgment that this denial was the fault of the Corps.  Pls.' Ex. 107 at 1781 (8:10–15), 114 at 2027; Def.'s Ex. 73.  To be sure, that plaintiffs completed the CUP and Solid Waste Permit roughly three years before the decision in *Resource I* leans heavily in plaintiffs favor, as does the fact that plaintiffs obtained their remaining ministerial permits in only 17 months after publication of *Resource I*.  Nonetheless, this evidence also cuts against plaintiffs because it suggests that the 404 permit process did not hold up the state and local processes.  The testimony of Mr. Leonard on the lack of dependence between the state and local permitting and the federal permitting further supports that there is no material issue of fact.  In addition, the county Hearing Examiner created the RUE requirement, and the state court reversed the SEIS; neither of these actions can be attributed to the Corps.

Furthermore, even if plaintiffs only appealed the RUE permit requirement because they were waiting on the Corps, the evidence suggests that plaintiffs may not have experienced any delay as a result of this appeal because plaintiffs obtained the RUE permit itself on November 27, 1996, before the reversal of the RUE requirement, on May 29, 1999.  This was three months after the Ninth Circuit's mandate issued.  Without proof of a delay in the first place, any evidence as to the motivation for the appeal is irrelevant to whether the Corps' conduct created any alleged delays resulting from the RUE and SEIS appeals.  Plaintiffs calculated that the

length of the Corps process would permit them to appeal aspects of the state and local permitting process without postponing the process further.  In this way, plaintiffs seek to apportion blame on a symptom, not the disease.  Similarly, in *Hendler*, the court rejected the plaintiffs' taking claim that the government's "access order," which gave the government a right of entry on plaintiffs' property for the purposes of remediating and removing toxic wastes had stigmatized the property as a source of toxic waste.  175 F.3d at 1376.  The plaintiffs produced evidence demonstrating that public knowledge of the previous toxic waste interfered with their ability to develop the property after the government completed remediation and toxic clean up.  *Id.* at 1385.  There was not a taking because the toxic contamination, not the access order authorizing the clean-up, was what stigmatized the property.  *Id.* at 1386.  In the same way, plaintiffs here apportion blame on the Corps because plaintiffs thought they could appeal aspects of the state and local permitting process without creating additional delays in the permitting process.  But, like *Hendler*, the actual cause of any delay is the length of time it took the case to wind its way through the court system, not plaintiffs' estimation that the court system would finish before the Corps completed its process.

Finally, that the CUP and Solid Waste Permit both required the completion of the 404 permit process "as required by law" strongly supports plaintiffs' contention that they could not proceed to obtain the ministerial permits and commence construction of the permits until the Corps either granted their permit or relinquished jurisdiction.  However, plaintiffs were able to obtain at least three of the ministerial permits in advance of the Ninth Circuit's decision, thus undermining their argument that the 404 permit process retarded, if not prevented, progress on the state and local permitting processes.  Therefore, this court cannot decide on summary judgment whether plaintiffs could obtain all such permits before the *Resource I* decision.

Nor can the court determine whether the Corps intended, foresaw, or should have foreseen the type of injury that plaintiffs suffered from the denial of their 404 permit application.  Thus, this court must deny plaintiffs' motion for summary judgment because they have failed to show that there is no disputed issue of material fact that the Corps, and not plaintiffs or the local governments, effected a taking.  *See Applegate*, 35 Fed. Cl. at 418 (denying summary judgment because landowners did not prove that the government construction project caused severe erosion of their beachfront properties).

Given the competing evidence of causation for any delays in the state and local permit processes, there are genuine issues of material fact on the issue of causation as well, precluding this court from granting summary judgment.

### III.  CONCLUSION

Based on the foregoing, plaintiffs have clearly established that they: (1) had a valid property interest, (2) can maintain their claim for a categorical taking even though it has been "cut short," and (3) were without economically viable use of their land.  But for the issue of causation, plaintiffs have established their *Lucas* claim at summary judgment.

Similarly, (4) plaintiffs can maintain their extraordinary delay claim after the alleged delay has ended.  But (5) this court disagrees with plaintiff, having concluded that *Resource I* does not have collateral estoppel effect establishing that all delay attributable to the Corps is *per se* extraordinary.  Having considered the record and the parties filings, (6) this court cannot

determine here, at the summary judgment stage, whether plaintiffs suffered delay, whether that delay was extraordinary, and to whom any such delay is attributable.

Nor can this court determine plaintiffs' *Penn Central* claim, at the summary judgment stage. To be sure, (7) plaintiffs have established sufficient economic impact by showing that they were without economically viable use of their land. But this court cannot conclude here, at summary judgment, that there is no genuine issue of fact concerning (8) whether plaintiffs had sufficient reasonable investment-backed expectations that they would be able to construct a solid waste landfill. Similarly, (9) this court cannot determine the character of the government action at summary judgment, and therefore, cannot complete the *Penn Central* inquiry, which requires a balancing of all three factors.

But the deeper problem is that (10) this court cannot establish the crucial issue of causation without relying on disputed issues of material fact. Being unable to determine whether the Corps was responsible for plaintiffs' lack of economically viable use, this court cannot grant summary judgment to either party.

Thus, for the reasons stated above, plaintiffs' Renewed Motion for Summary Judgment is **DENIED** and defendant's Cross-Motion for Summary Judgment is **DENIED**.

This court also orders the parties to confer and file a joint status report by Friday, February 27, 2009, regarding trial on the issues—(6) whether plaintiffs suffered extraordinary delay, (8) whether plaintiffs had reasonable investment-backed expectations, (9) the character of the government action and the required *Penn Central* balancing, and (10) causation—that this opinion did not decide.

**IT IS SO ORDERED.**

s/ *Lawrence J. Block*

Lawrence J. Block
Judge