# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔩𝔞𝔦𝔪𝔰

**No. 98-419 L**

June 4, 2010

---

**RESOURCE INVESTMENTS, INC. AND LAND RECOVERY, INC.,**

*Plaintiffs*,

**v.**

**UNITED STATES OF AMERICA,**

*Defendant.*

---

Expert Witness; *Touhy* Regulation; Housekeeping Regulation; Ethics in Government Act; 18 U.S.C. § 208; 5 C.F.R. § 2635.805; 32 C.F.R. §§ 516.41, 516.49, 516.52; Government as Litigant; FRE 702; RCFC 26; Conflict of Interest; Fifth Amendment

*Daniel D. Syrdal*, Orrick, Herrington & Sutcliffe LLP, *et al.*, Seattle, WA, for plaintiffs.

*James D. Gette*, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**BLOCK,** *Judge*.

In this complex, multi-year litigation, plaintiffs—Resource Investments, Inc. and Land Recovery, Inc.[1]—allege that defendant has taken their property without just compensation, in violation of the Fifth Amendment of the United States Constitution. In its January 23, 2009 Opinion and Order, the court denied the parties' cross-motions for summary judgment and set forth the unresolved substantive issues, setting the stage for trial. *Res. Invs.*, 85 Fed. Cl. at 525. As the parties prepared for trial, however, a dispute emerged over potential regulatory limits on plaintiffs' continuing ability to call upon the expert testimony of David Barrows (Barrows), their long-time expert witness, in light of Barrows's recent reemployment with the federal government.

The dispute prompted plaintiffs' instant motion for a protective order, pursuant to Rule 26 of the Rules of the United States Court of Federal Claims ("Rules of the Court" or "RCFC"). Therein, plaintiffs ask the court to enter a two-part order, "(1) allowing [p]laintiffs' expert witness David Barrows to testify at trial on [p]laintiffs' behalf," and "(2) halting [d]efendant's efforts to block [p]laintiffs' access to Barrows." Pls.' Mot. for Protective Order at 18 (July 27,

---

[1] *See Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 456 (2009) (explaining the relationship between these two interrelated companies and their joint interest in this matter).

2009) (hereinafter, "Pls.' Mot."). As explained below, the court concludes that the first part of the requested court order is inapposite to the current posture of the parties' dispute, and that the motion is, in this regard, premature. By the same token, the court concludes that the federal regulations at issue are themselves inapposite or otherwise intended to yield to the needs of the court, and that defendant has improperly blocked plaintiffs' access to a key witness.

Accordingly, the court grants plaintiffs' motion in part, and denies it in part. The court orders the parties to confer jointly with Barrows, within fourteen (14) days of the date of this opinion, in order to afford him the opportunity to communicate definitively whether he—of his own volition—wishes to continue in his role as plaintiffs' expert witness.

## I. BACKGROUND

Plaintiffs are two companies in the solid waste management business. *Res. Invs.*, 85 Fed. Cl. at 456. Plaintiffs acquired a tract of land in Pierce County, Washington, for use as a solid-waste landfill. *Res. Invs.*, 85 Fed. Cl. at 456–57. In order to pursue that intended use, plaintiffs needed to obtain seventeen federal, state and local permits, including a permit from the Army Corps of Engineers (the "Corps"), pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344.[2] *Id.* at 457.

In November 1993, the Corps—ironically in retrospect—recommended that plaintiffs retain Barrows, then with the private consulting firm of Woodward-Clyde, in order to assist them with the permitting process. Decl. in Supp. of Pls.' Mot., Ex. C at 1 (July 24, 2009) (hereinafter "Palmer Decl."). As a nineteen-year veteran of the Corps, Barrows had amassed considerable experience both in the private and public sectors. Palmer Decl., Ex. D at 2, 42–43. Barrows had held various positions during this nineteen-year tenure with the Corps, including that of Chief of the Regulatory Programs in the Fort Worth and Alaska Districts and Assistant for Regulatory Affairs in the Office of the Secretary of the Army. *Id.*, Ex. D at 2–3, 42–43. During that time, Barrows prepared guidance for implementation of the Corps' Section-404 guidelines, and was personally involved in processing over one thousand Section-404 permit requests. *Id.*, Ex. C at 1; Pls.' Mot. at 6. Spurred by the Corps' recommendation, plaintiffs also sought Barrows because of his prior success in helping another company secure a landfill permit in the Corps' Seattle District. Palmer Decl., Ex. C at 2. In 1994, plaintiffs retained, and the Corps' Seattle District approved, Woodward-Clyde as an independent third-party contractor, with Barrows as Project Manager, to assist plaintiffs in preparing the requisite environmental impact statement and otherwise navigating the permitting process. *Id.*, Ex. D at 6.

Throughout that process, Barrows had extensive contact with the Corps concerning a variety of issues, and, correspondingly, made various recommendations to plaintiffs (which they followed) that would ameliorate the Corps' concerns and make approval of plaintiffs' permit application more likely. *Id.*, Ex. C at 2–4. Significantly, when Barrows perceived that the Corps' standard of review had changed, endangering, in his opinion, plaintiffs' chance of

---

[2] A Section 404 permit, as pertinent to this case, allows the dredge or fill of certain wetlands. *Res. Invs.*, 85 Fed. Cl. at 464.

receiving approval, he immediately instructed plaintiffs to stop all work on the permitting process. *Id.*, Ex. C at 5–6.

After the permitting process was terminated in 1996, plaintiffs retained Barrows as a litigation consultant. *Id.*, Ex. D at 6.  Barrows worked for plaintiffs as a non-testifying, consulting expert on their initial litigation in the U.S. District Court for the Western District of Washington. *Id.*; Pls.' Mot. at 3.  In that suit, plaintiffs successfully challenged the Corps' denial of their application for a Section 404 permit, as well as the Corps' assertion of jurisdiction over the permitting process, *ab initio*. *Res. Invs., Inc. v. U.S. Army Corps of Eng'rs*, 151 F.3d 1162, 1163–65 (9th Cir. 1998).

Plaintiffs then filed the instant lawsuit in 1998, alleging an uncompensated taking in violation of the Fifth Amendment.  Plaintiffs initially identified Barrows as a fact witness, then as a testifying, expert witness. Pls.' Mot. at 5.  Defendant twice deposed Barrows, first in Barrows's capacity as a fact witness in October 1999, then in his capacity as an expert witness in May 2000.  Palmer Decl. ¶¶ 4, 7.  Barrows also prepared a declaration, which the court quoted extensively in its January 23, 2009 Opinion and Order, as well as a lengthy expert witness report, originally prepared on March 21, 2000. *Id.* ¶¶ 5–6, Exs. C, D.

After the court denied the parties' cross-motions for summary judgment, the specter of trial began to loom.  What happened next is subject to minor discrepancies in the parties' briefs, but the essential elements are clear.  In June 2009, defendant's counsel became aware that Barrows had rejoined the Corps as Chief of the Regulatory Division for the Walla Walla District in Washington.  Def.'s Resp. to Pl.'s Mot. at 3–4 (August 13, 2009) (hereinafter, "Def.'s Resp."); Decl. of Stacy J. Kassover ¶ 3 (Aug. 13, 2009) (hereinafter "Kassover Decl.").  Thereafter, an attorney for the Corps advised Barrows that, given his employment with the Corps, he was not to have any contact with plaintiffs' counsel without the presence of a government attorney. Kassover Decl. ¶ 5.  The next day, plaintiffs' counsel contacted Barrows by telephone, whereupon Barrows, dutifully following the Corps attorney's advice, informed counsel that he could have no communications with him absent a government attorney. *Id.* ¶ 6; Palmer Decl., Ex. E at 1; Pls.' Mot. at 4.

Shortly thereafter, plaintiffs' counsel sent a letter to defendant's counsel.  Palmer Decl., Ex. E.  The letter set out plaintiffs' concerns over the "precarious position" in which this recent development had placed both Barrows and counsel. *Id.*, Ex. E at 1.  In this letter, plaintiffs' counsel twice expressed "hope" that the parties could "quickly reach agreement on this issue," *id.*, Ex. E at 1–2, and, to that end, proposed a telephone conference to discuss the matter, *id.*, Ex. E at 3.  Defendant's counsel responded by letter on July 14, 2009, revealing that the Corps had, indeed, instructed Barrows "not to have contact with counsel for [p]laintiffs until his status could be carefully evaluated by both parties." *Id.*, Ex. F at 1.  Apparently believing that no joint evaluation of Barrows's status would be needed, defendant's counsel simply wrote that controlling regulations "require that a government attorney be present when a government employee [such as Barrows] is to be interviewed or to testify." *Id.*, Ex. F at 3 (citing 32 C.F.R. § 516.48(b)).

- 3 -

More critically, defendant's counsel's letter stated that "[g]iven Mr. Barrows's current employment with the Corps of Engineers, . . . Mr. Barrows may no longer serve as a litigation consultant, expert, or opinion witness in this matter." *Id.*, Ex. F at 1.  And, despite the fact that the Corps had recommended Barrows to serve as plaintiff's expert, *see supra* p. 2, defendant's counsel went so far as to suggest that Barrows "could not have served as an expert or opinion witness *at any time*, given his employment with the Corps of Engineers prior to the commencement of this litigation."  *Id.* (emphasis added).  In support of this contention, defendant's counsel cited one section of the Ethics in Government Act,[3] as well as several federal regulations.  *Id.*, Ex. F at 1–2 (citing 18 U.S.C. § 208; 5 C.F.R. § 2635.805; 32 C.F.R. §§ 516.49, 516.52).  In his letter, defendant's counsel added further that "conflict of interest principles and ethics rules prevent Mr. Barrows from assisting an adversary of the United States either as a testifying expert or non-testifying consultant, regardless of his past role in the private sector."  *Id.*, Ex. F at 2.  With no acknowledgement of plaintiffs' counsel's request for a telephone conference, defendant's counsel concluded his letter as follows: "In light of these conclusions, we anticipate that you will claim the need to replace Mr. Barrows with a new expert witness for trial."  *Id.*, Ex. F at 3.

Shortly after receipt of this letter, plaintiffs filed the instant motion.  Therein, plaintiffs argue that the "regulations cited by [d]efendant are mere 'housekeeping' measures," which are explained more fully below, "that in no way allow [d]efendant to withhold evidence from the [c]ourt."  Pls.' Mot. at 10.  Plaintiffs ground this assertion of the court's and their entitlement to Barrows's trial testimony upon: (1) evidence that Congress never intended housekeeping regulations, such as those cited by defendant, to be used to withhold information from the public or the courts, *id.* at 10–12; (2) case law narrowly construing the specific regulations at issue and their authorizing statutes, *id.* at 14–15; and (3) binding precedent establishing the preemptive effect of both the Rules of the Court of Federal Claims and the Federal Rules of Evidence over any regulation that would impede their operation, *id.* at 12–13.  In addition, plaintiffs maintain that given Barrows's "intimate knowledge of the facts underlying the allegations at the very heart of this case," Barrows and his testimony are "critical" and "cannot be replicated."  *Id.* at 5.  Plaintiffs further explain that Barrows would adduce no new testimony at trial, but would only "reiterate facts and opinions that he has already provided to this [c]ourt and [d]efendant in a sworn declaration and in depositions."  *Id.* at 6.  In light of this, and as a matter of "fundamental fairness," plaintiffs plead that "[d]efendant cannot deny both the [c]ourt and [p]laintiffs access to a key expert witness by invoking regulations more than ten years *after* [d]efendant and the [c]ourt became aware of the witness."  *Id.* at 9–10.

For the most part, defendant declines to address the substance of plaintiffs' arguments and, instead, simply responds that "[p]laintiffs have jumped the gun."[4]  Def.'s Resp. at 1.  Principally, defendant contends that plaintiffs "should have subpoenaed [Barrows] or, at a minimum, employed some other means to determine whether [Barrows] desires to act as an expert witness for them."  *Id.*  Defendant argues that, given plaintiffs' failure "to meet this

---

[3] Codified at 18 U.S.C. §§ 201–227.

[4] Defendant, however, states no objection to Barrows's fact testimony at trial.  Def.'s Resp. at 11 n.6.

essential threshold," plaintiffs' "motion is, at best, premature." *Id*. Relatedly, defendant declares that it "has not yet invoked the . . . regulations [at issue] as a basis . . . to object to testimony in this case." *Id*. at 10.  Defendant insists, however, that "[p]laintiffs are not entitled to meet with Mr. Barrows without a government lawyer present." *Id*. at 13.

## II. DISCUSSION

The court begins by noting that the posture of this dispute, the issues involved, and the parties' mutually ill-attuned arguments have created something of a puzzle, one which the court has had to piece together in order to identify the issues presently fit for judicial decision, and to assess the appropriate scope for the court's intervention.

### A. The Posture of the Dispute Limits the Appropriate Scope for the Court's Intervention

Given the current posture of the parties' dispute, the court agrees with defendant that plaintiffs' motion is, in part, premature.  Notably, plaintiffs' status as the joint movants here is incongruous with their request for a court order "allowing" Barrows to testify at trial. Pls.' Mot. at 18.  Such a request would be appropriate only in opposition to a motion from defendant, pursuant to RCFC 45(c)(3), seeking to bar Barrows's subpoenaed testimony.  Yet no such motion is, or has ever been, before the court.  To be sure, defendant's counsel opined decidedly, in his letter to plaintiffs' counsel, that purportedly "controlling regulations" create an evidentiary privilege that bars Barrows's expert testimony.  Palmer Decl., Ex. F. at 1–2.  However, defendant's counsel's "opinion letter" on the matter carries no weight of authority, and certainly does not constitute a formal motion with the court.  Therefore, notwithstanding plaintiffs' refrain that they are "not seeking to compel Mr. Barrows' testimony," Pl.'s Reply in Supp. of Pls.' Mot. at 8 (hereinafter, "Pls.' reply"), plaintiffs' posture as the moving party leaves the court no logical choice but to treat plaintiffs' request as a motion to compel.

Yet, a motion to compel testimony is inappropriate unless and until the witness in question refuses to testify, which Barrows has not yet done.[5]  Indeed, plaintiffs seem to presume that Barrows's wishes are to the contrary.  *See, e.g.*, *id*.  The need to ascertain definitively Barrows's wishes is particularly salient, because expert testimony is ordinarily a matter of private contract and may not be compelled.  *But see infra* p. 12.  Put another way, hollow indeed would be a court "order" that "allows" a witness, whose intentions are unknown, to testify over the motion and formal objection of no one.  An order compelling Barrows's testimony at trial is thus premature until such time as Barrows has the opportunity to announce his wishes to the parties and, thereby, to the court.

Plaintiffs are correct, however, that "only this [c]ourt's protection" will permit Barrows such an opportunity.  Pls.' Reply at 4.  Defendant, through counsel's letter, has invoked the

---

[5] Strictly speaking, a motion to compel would be anomalous, even in that circumstance. A party seeking to compel an uncooperative witness' testimony ordinarily does so through issuance of a subpoena, pursuant to RCFC 45(a); it is the opposing party that would then proceed via motion, in seeking either to quash or modify that subpoena, RCFC 45(c)(3).

aforementioned federal regulations in an unmistakable and, so far, successful attempt to block plaintiffs' access to Barrows.  The letter's decided assertions that the "controlling regulations are clear on th[e] point," Palmer Decl., Ex. F at 1, belie defendant's refrain that it "has not yet invoked the[se] . . . regulations as a basis . . . to object to testimony in this case." Def.'s Resp. at 10.  As noted above, defendant has not sought the court's enforcement of these regulations, and has filed no motion premised upon their authority.  Nevertheless, defendant has unquestionably "invoked" and acted upon the authority of these regulations, creating a very real chilling effect to plaintiffs' significant prejudice.

In this regard, the court also finds dubious defendant's representation that it extended an "invitation [to plaintiffs' counsel] to continue efforts to reach a resolution of the issues regarding Mr. Barrows."  *Id.* at 5.  Anticipating "the need to replace Mr. Barrows with a new expert witness for trial," Palmer Decl., Ex. F at 3, the letter from defendant counsel's made crystal-clear that defendant considered the central issue—Barrows's ability to testify—already resolved and the ultimate conclusion foregone.

Finally, the court is unmoved by defendant's repeated attempts to fault plaintiffs for failing to ascertain Barrows's wishes.  *See* Def.'s Resp. at 1, 6.  Plaintiffs' failure in this regard is attributable entirely to defendant and its standing instruction to Barrows that he refuse any communication with plaintiffs' counsel absent a government attorney.  *See* Kassover Decl. ¶ 5; Palmer Decl., Ex. F at 1.  Notably, this instruction to Barrows, like defendant's assertions that Barrows's government employment precludes his expert testimony at trial, is premised upon the authority of purportedly controlling federal regulation.  Palmer Decl., Ex. F at 3 (citing 32 C.F.R. § 516.48(b)).  The court concludes that plaintiffs' motion for an order halting defendant's interference with their access to Barrows, so as to allow plaintiffs the opportunity to ascertain Barrows's wishes, is eminently mature for decision.

## B. Governing Principles and the *Touhy* Problem

To that end, the court must determine whether the so-called *Touhy* regulations cited by defendant create an evidentiary privilege that prevents Barrows from offering his expert testimony at trial, should he so choose.  The court begins, however, by setting out the conceptual and historical framework that informs its analysis.

### 1. General Principles

First, as a general matter, "[t]he Government as a litigant is, of course, subject to the rules of discovery."  *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 (1958).  Even when the Government asserts a claim of privilege, the "court must be satisfied from all the evidence and circumstances" that the privilege is warranted, and may not abdicate to the executive branch its control over the evidence before it. *United States v. Reynolds*, 345 U.S. 1, 9–10 (1953). Quite simply, the Government, like any litigant, cannot dictate what evidence is admissible in a court of law, or whose testimony the court may hear.  *Accord Romero v. United States*, 153 F.R.D. 649, 652 (D. Colo. 1994).

- 6 -

Second, absent clear congressional intent to the contrary, no federal regulation may contravene or otherwise impede the operation of the Federal Rules or the Rules of the Court. The Federal Rules of Civil Procedure ("FRCP") and the Federal Rules of Evidence ("FRE") are "as binding as any statute duly enacted by Congress," *Bank of N.S. v. United States*, 487 U.S. 250, 255 (1988), and "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect," 28 U.S.C. § 2072(b). Likewise, it is "well established" that the Rules of the Court of Federal Claims, which are promulgated pursuant to statutory authority, have "the force and effect of law." *M.A. Mortenson Co. v. United States*, 996 F.2d 1177, 1183–84 (Fed. Cir. 1993). "This position is only strengthened when the rule in question specifically adopts its corresponding FRCP, which itself was proposed by the Supreme Court and implicitly adopted by Congress." *Id.* at 1184. Moreover, a "rule, once adopted by the court, is binding on both the court and the parties litigating before the court," including the Government. *Id.* In short, the Federal Rules and the Rules of the Court—and the needs of the court, generally—supersede any agency regulation in conflict therewith. *See In re Bankers Trust Co.*, 61 F.3d 465, 470–71 (6th Cir. 1995); *Carter v. Miss. Dep't. of Corr.*, 1996 WL 407241 at *3 (N.D. Miss. 1996) ("absent some specific grant of authority from Congress, executive agencies . . . may not impose restrictions upon the power of this court to call witnesses before it and compel them to testify."). And, as a general matter, any regulation purporting to dictate whose expert testimony the court may hear stands in conflict with several rules. These rules include FRE 702, which provides that, if specialized knowledge or skill can assist the trier of fact, *any* properly qualified witness may give opinion testimony, as well as RCFC 26, which sets forth the court's broad discovery powers.

## 2. The *Touhy* Problem

The history of disclosure-limiting "*Touhy*" regulations—such as those invoked by defendant through the aforementioned letter—traces back more than two centuries. In 1789, "housekeeping" statues were enacted "to help General Washington get his administration underway by spelling out the authority for executive officials to set up offices and file government documents." H.R. Rep. No. 85-1461 (1958), *as reprinted in* 1958 U.S.C.C.A.N. 3352, 3352. Thereafter, unfortunately, executive officials, it was perceived, sought to extend the reach of these statutes and their regulatory progeny, using them as a "convenient blanket to hide anything Congress may have neglected or refused to include under specific secrecy laws." *Id.* at 3352–53. One such attempt was at issue in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

In *Touhy*, the Supreme Court held that the trial court could not adjudge in contempt an executive department subordinate for refusing to comply with a subpoena *duces tecum*, because the department head had withdrawn from the subordinate all discretion in the matter, *id.* at 467–68, a power the Court sanctioned, *id.* at 470. Notably, however, *Touhy* did not address the ultimate authority of the department head to refuse "to produce at a court's order the government papers in his possession." *Id.* at 467. Indeed, in the wake of *Touhy*, disclosure-limiting regulations proliferated, and thereafter were ascribed the ostensibly validating label of "*Touhy* regulations," as agencies continued to invoke them as authority for refusing the court-ordered

production of documents.   26A Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5682.

A few years later, Congress amended the housekeeping statute at issue in *Touhy*, to provide that "[t]his section does not authorize withholding information from the public or limiting the availability of records to the public."  1958 U.S.C.C.A.N. at 3353.  Congress was concerned that the statute "ha[d] been twisted from its original purpose as a 'housekeeping' statute into a claim of authority to keep information from the public and, even, from the Congress."  *Id*.  Undeterred, however, executive agencies simply turned to other statutes for the authority to promulgate disclosure-limiting *Touhy* regulations.  *See, e.g.*, *Dean v. Veterans Admin. Reg'l Office*, 151 F.R.D. 83 (N.D. Ohio 1993) (*Touhy* regulation promulgated pursuant to Ethics in Government Act).  Significantly for the instant case, agencies also began to construe their *Touhy* regulations to apply to subpoenas *ad testificandum*, as well as to subpoenas *duces tecum*.  *E.g.*, *In re Boeh*, 25 F.3d 761 (9th Cir. 1994).

With near unanimity, however, those courts considering the issue have concluded that, when the United States is a party to the litigation, the reach of disclosure-limiting *Touhy* regulations ends at the courthouse doors.  *See Young v. United States*, 181 F.R.D. 344, 347–48 (W.D. Tex. 1997) (addressing 5 C.F.R. § 2635.805); *Dean*, 151 F.R.D. at 86–87 (same); *In re Air Crash Disaster at Detroit Metro. Airport on Aug. 16, 1987*, 737 F. Supp. 399, 404–05 (E.D. Mich. 1989) (addressing the Ethics in Government Act); *United States ex rel. Roby v. Boeing Co.*, 189 F.R.D. 512, 514 (S.D. Ohio 1999) (addressing *Touhy* regulations pursuant to 5 U.S.C. § 301); *Romero*, 153 F.R.D. at 651 (addressing 32 C.F.R. § 516.42, the predecessor to 32 C.F.R. § 516.49); *Alexander v. FBI*, 186 F.R.D. 66, 69–71 (D.D.C. 1998) (addressing 5 U.S.C. § 301, and finding that "neither the federal Housekeeping Statute nor the *Touhy* decision authorizes a federal agency to withhold documents or testimony from a federal court"); *McElya v. Sterling Med., Inc.*, 129 F.R.D. 510, 514–15 (W.D. Tenn. 1990) (holding that 5 U.S.C. § 301 does not grant authority to assert an evidentiary privilege not recognized by the Federal Rules of Civil Procedure or the law of evidence).

## C. The Federal Regulations at Issue Do Not Create an Evidentiary Privilege

With this conceptual and historical framework in place, the court now considers the force and effect of the specific authorities invoked by defendant, turning first to 32 C.F.R. §§ 516.49, 516.52, then to the Ethics In Government Act and regulations promulgated pursuant thereto.

### 1. *Touhy* Regulations 32 C.F.R. §§ 516.49, 516.52

First, defendant's counsel's letter identifies two virtually identical regulations, 32 C.F.R. §§ 516.49, 516.52, which were promulgated pursuant to over fifteen different statutes.  Neither the letter, nor defendant in its brief to the court, point to any evidence that Congress intended, through any of these fifteen statutes, to empower executive departments to contravene the Federal Rules of Evidence or the Rules of the Court of Federal Claims.  And, in looking, *sua sponte*, at the fifteen authorizing statutes for these two regulations, the court finds no indication of such Congressional intent.  In this regard, it is noteworthy that the authorizing statutes include

5 U.S.C. § 552, a section of the Freedom of Information Act, the "dominant objective" of which is "disclosure, not secrecy." *Chrysler Corp. v. Brown*, 441 U.S. 281, 290 n.10 (1979). Therefore, the court concludes that these regulations, which are clearly in conflict with the court's authority as set forth in the Federal Rules of Evidence and the Rules of the Court, can have no force or effect. *See supra* p. 7. Notably, the only other court that has considered the effect of these particular regulations, when the United States is a party to the litigation, concurs. *See Romero*, 153 F.R.D. at 651–52 (considering 32 C.F.R. § 516.42, the near-identical predecessor to 32 C.F.R. § 516.49).

## 2. The Ethics in Government Act and Its Regulatory Progeny

Likewise absent is any Congressional intent that regulations promulgated pursuant to the Ethics in Government Act have preclusive effect over the testimony that a court may hear. *See, e.g.*, *Young*, 181 F.R.D. at 347–48; *Dean*, 151 F.R.D. at 86–87; *In re Air Crash*, 737 F. Supp. at 404–05. The stated purpose of the Ethics in Government Act is "to prevent corruption and other official misconduct before it occurs, as well as penalizing it once it is uncovered." S. Rep. No. 170, at 31 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 4216, 4247. The court is persuaded, therefore, that the Act "was not enacted for the purpose of limiting the use of relevant testimony which would ostensibly violate its prohibitions." *In re Air Crash*, 737 F. Supp. at 405. As another court put it, there is simply "no authority" for "permitting the ethics regulation"—referring to 5 C.F.R. § 2635.805, the sole regulation cited by defendant—"to restrict [the court's] broad discovery powers." *Dean*, 151 F.R.D. at 86.

Defendant seeks to distinguish the above cases on the ground that they involved the testimony of treating physicians, who are "unique experts that cannot be replaced." Def.'s Resp. at 11. Defendant argues that such "[t]reating physicians have a unique relationship to the facts" and "have the expertise to address opinions related to the patient's condition at the time of treatment, which no alternative expert witness can later recreate or test." *Id.* Of course, the courts in these cases did not purport to limit their reasoning to physician experts. Defendant also overlooks other cases where non-physician experts were allowed to testify, in spite of an agency's *Touhy* regulation purporting to bar their testimony. *E.g.*, *Boeing*, 189 F.R.D. at 512–14 (granting the defendant's motion for a protective order for the non-physician expert witness).

More importantly, rather than distinguishing the physician cases, defendant's incisive characterization of the unique role of a treating physician reveals these cases to be squarely on point. Given the pivotal role he played in guiding plaintiffs through the permitting process at issue in this case, as well as his extensive contacts with the Corps during that process, *supra* p.2, Barrows has a patently "unique relationship to the facts" of this case, *see* Def.'s Resp. at 11. And it would be impossible for any other expert to match Barrows's ability to offer expert opinions formed contemporaneously with the injury (the taking) alleged here. And, of course, that expertise is informed by Barrows's nineteen-year tenure with the Corps, during which he was personally involved in processing over one thousand applications for the very permit that plaintiffs sought. *See supra* p.2. Finally, plaintiffs are unlikely to find a similarly qualified expert, if one exists, this close to trial. *See United States v. Lecco*, 495 F. Supp. 2d 581, 586 (S.D. W. Va. 2007) (concluding that its criminal defendant can call federal employee as expert,

particularly where there is a "select group" of individuals able to offer the needed expert testimony and trial is "nearly imminent").

In sum, the legislative history of the Ethics in Government Act and the weight of authority are clear: the Act was never intended to create an evidentiary privilege. As such, regulations enacted pursuant to it must yield to the needs of the court, and to the Federal Rules of Evidence and Rules of the Court.

**D. Other Potential Grounds for Precluding Barrows's Testimony Are Speculative**

Beyond the regulations invoked in its letter, defendant repeatedly alludes to, but does not formally advance, two "possible" grounds for precluding Barrows's expert testimony. Def.'s Resp. at 2, 9–11, & 9 n.5. First, defendant suggests that Barrows's testimony "may" create a conflict of interest. *Id.* at 9 n.5; *see also* Palmer Decl., Ex. F at 2. Yet it appears unlikely to the court that any such conflict exists. At trial, plaintiffs seek only to have Barrows "reiterate facts and opinions that he has already provided to this [c]ourt and [d]efendant in a sworn declaration and in depositions." Pls.' Mot. at 6. These are facts and opinions that Barrows learned or formed, respectively, during his work for plaintiffs as a private contractor. *See, e.g.*, Declaration of David B. Barrows (February 23, 2000). Defendant knows exactly what information Barrows intends to provide at trial, having deposed him twice, *see* Palmer Decl. ¶¶ 4, 7, yet fails to point to any specific information that raises conflict-of-interest concerns. In short, defendant articulates no factual or legal predicate for the purported conflict of interest, and even insists that it "does not seek a ruling [] on whether Mr. Barrows should be disqualified from offering expert testimony." Def.'s Resp. at 9 n.5. Accordingly, the court need not, and cannot, decide the issue at this time.

Similarly speculative is defendant's suggestion that Barrows's expert testimony may expose him to criminal prosecution, under the Ethics in Government Act. *Id.* at 7; Palmer Decl., Ex. F at 2 (citing 18 U.S.C. § 208). The potential for criminal liability is, of course, a factor that Barrows would weigh in considering whether to continue in his role as an expert witness on plaintiffs' behalf. However, unless and until Barrows is subpoenaed and asserts his Fifth Amendment right against self-incrimination, the question of criminal sanctions is too remote and hypothetical for the court to decide. *See, e.g.*, *In re Air Crash*, 737 F. Supp. at. 401–03; *Conrad v. United Instruments, Inc.*, 988 F. Supp. 1223, 1225–26 (W.D. Wis. 1997). Moreover, absent compelling circumstances not alleged here, only Barrows has standing to raise the issue and to seek the court's determination of the applicability *vel non* of any criminal statute. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *In re Air Crash*, 737 F. Supp. at 403–04.

**E.   Defendant Identifies No Applicable Regulation That Requires the Presence of a Government Attorney During Plaintiffs' Meetings with Barrows**

Finally, defendant claims that "regulations that govern Mr. Barrows' conduct as a current employee of the United States direct that counsel for the United States be present at any meeting Mr. Barrows may have with [p]laintiffs' counsel." Def.'s Resp. at 13 (citing 32 C.F.R. § 516.48(b)); *see* Palmer Decl., Ex. F at 3 (same). To support this claim, defendant cites a single

sentence from 32 C.F.R. § 516.48(b), which provides that "[a] JA [Judge Advocate] or DA [Department of the Army] civilian attorney should be present during any interview or testimony to act as legal representative of the Army."  However, there is more to the regulation, which provides that a JA or DA attorney must be present only "[i]n instances involving § 516.47(a)(1)," where "the deciding official determines that the information may be released."  32 C.F.R. § 516.48(a), (b).  In turn, the referenced regulation is limited, by its terms, to "private litigation."  *Id.* § 516.47(a).  Expectedly, "private litigation" is defined as "[l]itigation *other* than that in which the United States has an interest."  *Id.* § 516, App. F (emphasis added).  As the defendant in this litigation, the United States has more than an "interest" herein.  Therefore, because the case at bar is not "private litigation," 32 C.F.R. § 516.48 is wholly inapplicable.

Defendant also cites *Romero*, which considered the same regulation (though, at the time, codified at 32 C.F.R. § 516.41(b)) and concluded that the requirement for having an attorney present was appropriate.  153 F.R.D. at 652–53.  However, this court finds the *Romero* court's conclusion and reasoning less than persuasive, because that court failed to undertake the initial step of determining whether the regulation, on its face, applied to the litigation before it, litigation in which the United States was the defendant.  Beyond this, defendant points to no regulation or statute that would require the presence of a government attorney during any meetings between Barrows and plaintiffs' counsel, a requirement that the court notes would run counter to ordinary practice.

In sum, the court concludes that none of the regulations invoked by defendant creates an evidentiary privilege or otherwise prevents Barrows from offering his expert testimony at trial, if he so chooses.  Similarly, defendant's claim that controlling regulations require that a government attorney be present for any meeting between plaintiffs' and Barrows appears baseless.  Accordingly, defendant may not invoke these regulations to assert an evidentiary privilege that would bar Barrows's testimony, or to block plaintiffs' access to this critical witness.

## F. Court-Ordered Conference with Barrows

As discussed above, however, a critical unknown throughout the course of this dispute has been whether Barrows himself desires to continue to serves an expert witness on plaintiffs' behalf.  Therefore, the court orders the parties to meet jointly with Barrows,[6] in order to ascertain definitively Barrows's intentions.  So informed, the parties can then determine their next steps in seeking to resolve their present impasse.  At least at this initial meeting, despite the discussion directly above, the court sees no harm in allowing defendant's counsel or other government attorney to be present.  Indeed, the presence of defendant's counsel may allow Barrows to make a more informed decision, in light of both parties' viewpoints and in light of the court's present opinion.

Should Barrows choose to continue as an expert witness on plaintiffs' behalf, defendant shall have fourteen (14) days from the date of the parties' meeting with Barrows to file with the

---

[6] Barrows may want to have his own attorney present at this meeting.

court any formal objections to Barrows's testimony.  On the other hand, should Barrows refuse to continue as plaintiffs' expert, plaintiffs may then seek the issuance of a subpoena.  An expert witness—retained by a party through private, voluntary agreement—is ordinarily not the proper object of a subpoena.  *See Young*, 181 F.R.D. at 346; *Carter-Wallace, Inc. v. Otte*, 474 F.2d 529, 536 (2d Cir. 1972).  However, although "it is not the usual practice, a court does have the power to subpoena an expert witness."  *Carter-Wallace*, 474 F.2d at 536; *see Bello v. Astrue*, 241 Fed. Appx. 426, 427 (9th Cir. 2007) (finding that an Administrative Law Judge abused her discretion by denying a subpoena of a "crucial" witness); *Kaufman v. Edelstein*, 539 F.2d 811, 822 (2d Cir. 1976) (identifying "[a]ppropriate factors" for a court to consider when deciding whether to subpoena an expert witness).  Of course, the court need not decide, at this juncture, whether a subpoena of Barrows would be appropriate.

### III. CONCLUSION

For the foregoing reasons, plaintiffs' motion for a protective order is DENIED-in-PART and GRANTED-in-PART.  The parties SHALL meet jointly with Barrows within fourteen (14) days of the date of this opinion.  If, at that meeting, Barrows communicates a decision to testify at trial, defendant SHALL, within fourteen (14) days thereof, file with the court any objections to Barrows's expert testimony.  Each party SHALL bear its own costs associated with this motion.

**IT IS SO ORDERED.**

s/ *Lawrence, J. Block*

Lawrence J. Block
Judge