# United States Court of Federal Claims
No. 98-419 L
March 17, 2011

| | |
|---|---|
| **RESOURCE INVESTMENTS, INC. AND LAND RECOVERY, INC.,** | Expert Witness; Subpoena; RCFC 45; 5 U.S.C. § 6322; Court-Ordered Leave for Pre-Trial Preparation |
| *Plaintiffs*, | |
| v. | |
| **UNITED STATES OF AMERICA,** | |
| *Defendant.* | |

*Daniel D. Syrdal*, Orrick, Herrington & Sutcliffe LLP, Seattle, WA, for plaintiffs.

*James D. Gette*, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION and ORDER

**BLOCK,** *Judge.*

In a complex litigation that is now well into its second decade, plaintiffs—Resource Investments, Inc. and Land Recovery, Inc.[1]—allege that defendant has taken their property without just compensation, in violation of the Fifth Amendment of the United States Constitution. On January 23, 2009, the court denied the parties' cross-motions for summary judgment, thus setting the stage for trial. *See Resource I*, 85 Fed. Cl. at 525. Trial preparation would soon fall into abeyance, however, as the parties became embroiled in a dispute over the continuing role of plaintiffs' long-time expert witness, David Barrows. *See Res. Invs., Inc. v. United States*, 93 Fed. Cl. 373, 376–78 (2010) ("*Resource II*").

The dispute began in 2009, when Barrows rejoined his former employer, the U.S. Army Corps of Engineers (the "Corps"), after an intervening career in the private sector. *See id.* at 376. In light of Barrows's status as a government employee, defendant asserted that federal regulations and criminal statutes would henceforth bar Barrows from providing expert testimony on plaintiffs' behalf. *See id.* at 377. In a prior opinion and order, the court held that defendant's assertions were either speculative or sought to extend federal regulations beyond their permissible reach. *Id.* at

---

[1] *See Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 456 (2009) ("*Resource I*") (explaining the relationship between these two interrelated companies and their joint interest in this matter).

381–82.  However, noting that Barrows's own wishes were "a critical unknown," the court ordered the parties to meet jointly with Barrows in order to ascertain his intentions.  *Id.* at 383.

Following that court-ordered meeting, Barrows expressed continuing anxiety about the prospects of criminal prosecution and disciplinary action by the Corps if he were to testify on plaintiffs' behalf either voluntarily or in exchange for compensation.  *See* Joint Status Report (July 1, 2010) ("July 2010 JSR"), Attach. ("Barrows Letter").  Accordingly, Barrows announced that he would testify only under subpoena and that he would not accept compensation from plaintiffs either for his testimony or for any necessary pre-trial preparation.  *See id.*  Thereafter, the Corps conveyed its intention to give Barrows paid leave for his time in court while under subpoena, but not for any time expended in pre-trial preparation.  *See* Decl. of Daniel D. Syrdal (Aug. 5, 2010) ("Syrdal Decl."), Ex. C (attached to Pls.' Mot. Re. Subpoena and Compensation of Expert Witness David Barrows).

This prompted plaintiffs' instant motion, which asks the court: (1) to "declare that it is appropriate and enforceable for [p]laintiffs to issue a subpoena" for Barrows's expert testimony; and (2) to order that Barrows "receive paid leave or other reasonable compensation in connection with the preparation for and taking of his testimony."  Pls.' Mot. Re. Subpoena and Compensation of Expert Witness David Barrows at 1 ("Pls.' Mot.").  As explained more fully below, plaintiffs' first request is premature.  In particular, the court's rules authorize plaintiffs' attorney to issue a subpoena for Barrows without advance approval from the court.  *See* Rules of the United States Court of Federal Claims ("RCFC") 45(a).  Unless and until it is later challenged on a motion to quash, such attorney-issued subpoena for Barrows will be enforceable as a court order through operation of law.  *See* RCFC 45(c)(3).  Therefore, no court intervention is warranted at this time.

Court intervention is necessary, however, in order to ensure that Barrows can adequately prepare for his trial testimony.  Having resolved to forego compensation from plaintiffs, Barrows must either prepare for trial on his own time and at his own expense or, as is more likely, forego pre-trial preparation altogether.  Yet, without adequate preparation, plaintiffs and the court would be deprived of the full benefit of the expert testimony of this critical witness.  Accordingly, plaintiffs' motion is granted in part and denied in part.  As set forth in more detail below, the court orders the Corps to give Barrows paid leave for a period of two weeks before the start of trial so that Barrows may adequately prepare for his expert testimony.

## I. BACKGROUND

Although the court's present ruling does not reach the merits of plaintiffs' claims, it is informed by the events giving rise to those claims and by Barrows's central role in those events. Accordingly, an account of the history of this litigation is warranted.

Plaintiffs are two companies in the business of solid-waste management.  *See Resource I*, 85 Fed. Cl. at 456.  In the mid-1980s, plaintiffs purchased a 320-acre tract of land (the "project site") in Pierce County, Washington, for use as a solid-waste landfill.  *See id.* at 456–57.  Before plaintiffs could begin construction of the landfill, they had to obtain a number of federal, state, and local permits.  *See id.* at 457.  In September of 1989, the Corps asserted jurisdiction over the federal permitting process, on the ground that construction of plaintiffs' landfill would involve the

discharge of "dredged or fill material" into wetlands located on the project site.[2]  *See id.* at 460. Accordingly, the Corps required plaintiffs to obtain a permit under Section 404 of the Clean Water Act.  *See id.*

In August of 1990, plaintiffs submitted their application for a Section 404 permit.  *See id.* After a three-year period that was "rife with disagreements between plaintiffs and the Corps," *id.*, the Corps recommended that plaintiffs retain the services of a third-party consultant who would review plaintiffs' application and recommend the best approach for successful completion of the permitting process.  Decl. of David B. Barrows ¶ 2 (Feb. 23, 2000) ("Barrows Decl.") (attached to Pls.' Mot. for Protective Order Re. Expert Testimony of David Barrows).  Spurred by the Corps' recommendation, plaintiffs sought to retain Barrows, then an environmental consultant with the private firm of Woodward-Clyde.  *See Resource II*, 93 Fed. Cl. at 375.  As a nineteen-year veteran of the Corps, Barrows had acquired substantial expertise in the intricacies of the permitting process under Section 404.  *See id.* at 375–76.  Barrows acquired this expertise through his work in senior positions with the Corps, at both the local and the national level.  *See id.*

At the local level, Barrows served as Chief of the Regulatory Programs in the Corps' Fort Worth and Alaska districts, where he oversaw implementation of the Corps' Section 404 permitting program.[3]  Expert Witness Report of David B. Barrows at 2 (March 21, 2000) ("Barrows Expert Report") (attached to Pls.' Mot. for Protective Order Re. Expert Testimony of David Barrows).  Barrows's responsibilities encompassed all aspects of permit processing under Section 404, including the review and approval of applicants' wetland mitigation plans, the preparation of environmental impact statements, and preparation of the Corps' Statements of Findings and Records of Decision.  *Id.* at 2–3.  All told, Barrows personally processed, reviewed, or approved more than one thousand applications for a Section 404 permit.  *Id.* at 3; *Resource II*, 93 Fed. Cl. at 376.

At the national level, Barrows first supervised the Technical Section of the Regulatory Branch at Corps headquarters in Washington, DC.  Barrows Expert Report at 3.  In that capacity, Barrows was responsible for providing regulatory oversight and guidance to Corps districts, as well as developing Memoranda of Agreement ("MOA") between the Corps and other federal agencies.  *Id.*  Barrows also helped to develop national "procedures for wetlands delineation and other issues of geographic jurisdiction."  *Id.*

Ultimately, as Assistant for Regulatory Affairs in the Office of the Secretary of the Army, Barrows oversaw the Corps' regulatory program nationwide.  *Id.*  Barrows's responsibilities

---

[2] Under Section 404 of the Clean Water Act, the discharge of "dredged or fill material" into "the navigable waters" of the United States is prohibited, unless the Secretary of the Army, acting through the Corps, issues a permit for the proposed discharge.  33 U.S.C. § 1344.  In some instances, "the navigable waters" under Section 404 can include wetlands.  *See Rapanos v. United States*, 547 U.S. 715, 742 (2006).

[3] The Corps' offices are organized geographically into multiple divisions and, within those divisions, multiple districts.  *See Locations*, U.S. Army Corps of Engineers, http://www.usace.army.mil/about/Pages/Locations.aspx.

included the "development, or review and recommendation for approval, of regulations, policy, . . . and MOAs that would be implemented by Corps headquarters and the 11 divisions and 38 districts of the Corps." *Id.* at 3–4.  Barrows authored many "MOAs that the Corps implemented concerning wetland mitigation, enforcement, and geographic jurisdiction." *Id.* at 4.  Barrows also "developed and authored the Army's position on practicability of alternatives," a necessary component of the Corps' evaluation of permit applications under Section 404.[4]  *Id.*; *see Resource I*, 85 Fed. Cl. at 465, 508–09.  In addition, Barrows "taught all aspects" of the Corps' regulatory program to Corps staff in district and division offices, "as part of a concerted effort to establish improved implementation consistency throughout the Corps."  Barrows Expert Report at 4.

Finally, Barrows's experience included collaborations with other agencies and branches of the federal government.  Barrows led the Corps' collaboration with the Department of Justice "to develop supplemental guidelines to evaluate risk and avoid unanticipated 'takings,' including instructions for preparing Takings Implications Assessments (TIAs)[5] for Corps permit decisions." *Id.*  Barrows "testified before Congress . . . on matters concerning the Corps' implementation of Section 404." *Id.*  Barrows also served as an expert on several national fora addressing the regulatory issues surrounding wetlands preservation, "including the National Wetlands Policy Forum and the President's Task Force to address the policy issue of 'no net loss' of wetlands." *Id.* at 4–5.

Based upon this "significant hands-on experience," plaintiffs believed that Barrows's assessments and recommendations "would be reliable and carry some weight" with the Corps.  Barrows Decl. ¶ 2.  Plaintiffs were also encouraged by Barrows's record as a private consultant, particularly his then-recent success in helping another company to obtain a landfill permit from the Corps.  *Id.*  Accordingly, per the Corps' recommendation and ultimately with its approval, plaintiffs retained Barrows as a third-party consultant in late 1993.  *See Resource II*, 93 Fed. Cl. at 376; Barrows Expert Report at 5–6.

Over the next three years, Barrows was intimately involved in plaintiffs' efforts to secure a Section 404 permit.  *See* Barrows Decl. ¶¶ 3–17; Barrows Expert Report at 5–6.  Barrows began by assessing the prospects for approval of plaintiffs' permit application; this involved extensive

---

[4] Although the authority to issue Section 404 permits lies with the Corps, Congress directed the Environmental Protection Agency ("EPA") to promulgate guidelines for the Corps' exercise of that authority.  *See* 33 U.S.C. § 1344(b).  EPA's guidelines provide that "no discharge of dredged or fill material shall be permitted"—*i.e.*, no Section 404 permit shall issue—"if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  40 C.F.R. § 230.10(a).

[5] Pursuant to a 1988 Executive Order, executive agencies must analyze the takings implications of certain actions and must report any significant findings to the Office of Management and Budget: these reports are called "Takings Implications Assessments."  *See* Cong. Budget Office, *Regulatory Takings and Proposals for Change* 45 (1998) (discussing Exec. Order No. 12630, 53 Fed. Reg. 8859 (1988)), *available at* http://www.cbo.gov/doc.cfm?index=1051&type=0&sequence=6.

discussions with the Corps concerning a wide range of environmental issues. Barrows Decl. ¶¶ 3–5. Upon completing this "permittability assessment," Barrows provided plaintiffs with a number of specific recommendations, which he believed would address the Corps' concerns and make approval of plaintiffs' permit application more likely. *Id.* ¶¶ 6–8. Over the subsequent twenty months, Barrows again worked closely with the Corps, this time to prepare an environmental impact statement ("EIS")[6] for plaintiffs' proposed landfill. *Id.* ¶¶ 11–13; *see Resource I*, 85 Fed. Cl. at 461.

At one point during preparation of the EIS, however, Barrows perceived that the Corps had "completely changed its standard of review" with respect to the practicability of alternatives to plaintiffs' proposed landfill. Barrows Decl. ¶¶ 14–16. In response to Barrows's protest that its new standard "could never result in a favorable permit decision," the Corps equivocated. *Id.* However, subsequent attempts at clarifying the Corps' standard of review proved fruitless. *Id.* ¶ 17. So, plaintiffs requested that the Corps terminate the EIS process and, in June of 1996, the Corps did so without a final draft of the EIS. *Resource I*, 85 Fed. Cl. at 461. Ultimately, on September 30, 1996, the Corps issued its Record of Decision, officially denying plaintiffs' application for a Section 404 permit. *Id.*

Barrows's involvement did not end with the Corps' decision, but continued through the ensuing litigation. In particular, plaintiffs retained Barrows as a non-testifying, consulting expert for their initial suit in the U.S. District Court for the Western District of Washington. *See Resource II*, 93 Fed. Cl. at 376. In that suit, plaintiffs challenged the Corps' denial of their permit application as well as the Corps' assertion of jurisdiction over the permitting process. *See id.* On appeal, the U.S. Court of Appeals for the Ninth Circuit (the "Ninth Circuit") ruled in plaintiffs' favor, holding that the Corps had no authority to require plaintiffs to obtain a Section 404 permit in the first instance. *Res. Invs., Inc. v. U.S. Army Corps of Eng'rs*, 151 F.3d 1162, 1169 (9th Cir. 1998).

Shortly before the Ninth Circuit's ruling, plaintiffs filed the instant suit, alleging that the Corps' actions amounted to an uncompensated taking of their property in violation of the Fifth Amendment. *See* Compl. ¶¶ 47–49. Plaintiffs identified Barrows as both a fact witness and a testifying expert witness in this case. *See Resource II*, 93 Fed. Cl. at 376. Thereafter, in October of 1999, defendant deposed Barrows in the latter's capacity as a fact witness. *See id.* In the spring of 2000, Barrows prepared a sworn declaration and a lengthy expert witness report. *See supra*. Finally, in May of 2000, defendant deposed Barrows again, this time in the latter's capacity as an expert witness. *See id.* Following that second deposition, taken nearly eleven years ago,

---

[6] For all "major Federal actions significantly affecting the quality of the human environment"—which actions can include issuance of a permit under Section 404—the National Environmental Policy Act of 1969 requires a federal agency to prepare "a detailed statement" on "the environmental impact of the proposed action," including, *inter alia*, an assessment of "alternatives to the proposed action." 42 U.S.C. § 4332(C). This "detailed statement," *id.*, is commonly referred to as an "environmental impact statement" or "EIS." *See, e.g., Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 372 (2008). In this case, plaintiffs initially requested, and the Corps ultimately required, preparation of an EIS. *See Resource I*, 85 Fed. Cl. at 461.

Barrows's active involvement in the litigation entered a period of hiatus pending further proceedings. *See* Syrdal Decl. ¶ 4.

The parties then spent an unavailing three years pursuing settlement[7] and submitted several rounds of summary judgment briefing. Ultimately, in January of 2009, the court denied the parties' cross-motions for summary judgment, *Resource I*, 85 Fed. Cl. at 525, in an opinion that cited Barrows's declaration extensively, *see id.* at 461, 503, 505, 506, 508–09, 515. At the time, the decade-old litigation had yet to outlast Barrows's career in the private sector. *See Resource II*, 93 Fed. Cl. at 376.

That soon changed, however, when Barrows rejoined the Corps in early 2009 as Chief of the Regulatory Division for the Walla Walla District. *See id.* Upon learning of Barrows's return to government employment, defendant instructed Barrows not to have any further contact with plaintiffs or their counsel without the presence of a government attorney. *See id.* Subsequently, through communications between counsel, defendant asserted to plaintiffs that Barrows's status as a government employee would henceforth bar Barrows from testifying as an expert on plaintiffs' behalf or otherwise assisting plaintiffs in their suit. *See id.* at 377. In support of this position, defendant's counsel alluded to potential conflicts of interest, but relied primarily upon several federal regulations and criminal statutes, including the Ethics in Government Act (codified at 18 U.S.C. §§ 201–27). *See id.* Defendant's actions led plaintiffs to move the court for a protective order, which motion was the subject of the court's *Resource II* opinion and order, issued on June 4, 2010. *See id.* at 373.

Therein, the court held that the federal regulations invoked by defendant were "intended to yield to the needs of the court, and that defendant ha[d] improperly blocked plaintiffs' access to a key witness." *Id.* at 375. The court also concluded that Barrows's anticipated trial testimony is "unlikely" to create any conflict of interest, given that Barrows would merely "reiterate facts and opinions that he has already provided" through his expert report, sworn declaration, and deposition testimony. *Id.* at 382. Finally, though not deciding the issue, the court found "speculative" defendant's suggestion that Barrows's provision of expert testimony at trial would subject Barrows to criminal prosecution. *Id.*

Nevertheless, mindful that "expert testimony is ordinarily a matter of private contract," *id.* at 378, the court noted that Barrows's own wishes had been "a critical unknown throughout the course of this dispute," *id.* at 383. Accordingly, the court ordered the parties to meet jointly with Barrows in order to ascertain definitively his intentions. *Id.* The court also provided guidance for the parties' course of action following that meeting. Notably, the court observed that plaintiffs would be free to issue a subpoena for Barrows's expert testimony, should Barrows indicate that he would not provide such testimony voluntarily. *Id.* Though recognizing that "it is not the usual practice," the court explained that an expert witness may be appropriately subpoenaed under some circumstances. *Id.* (citing, *inter alia*, *Kaufman v. Edelstein*, 539 F.2d 811, 822 (2d Cir. 1976) (identifying appropriate factors for a court to consider when ruling upon a motion to quash a subpoena for expert testimony)).

---

[7] The parties participated in the court's Alternative Dispute Resolution ("ADR") program from April 2002 to August 2005. *See* Order Referring Case to ADR (Apr. 14, 2002), ECF No. 117; Order Removing Case from ADR (Aug. 26, 2005), ECF No. 122.

Pursuant to the court's order, the parties met with Barrows on June 14, 2010. *See* July 2010 JSR at 4. Thereafter, in a letter sent to the parties' counsel via email on June 29, 2010, Barrows communicated his wishes as well as his ongoing concerns. *See* Barrows Letter. Barrows began his letter by writing that he was "presented with the difficult challenge to do what is morally right, legal, and ethical." *Id.* at 1. Barrows then explained how he had resolved to address that challenge.

Citing the interests of justice, the contractual commitment that he made to plaintiffs more than a decade ago, and his recognition that "expert testimony is for the benefit of the court," Barrows conveyed his unequivocal wish to testify at trial on plaintiffs' behalf. *Id.* at 1–2. However, based upon an ethics opinion from a Corps attorney, Barrows concluded that he must forego all further compensation from plaintiffs in order to shield himself from potential criminal prosecution. *Id.* at 1. Based upon the same ethics opinion, Barrows further concluded that testifying voluntarily on plaintiffs' behalf, even without compensation, would subject him to disciplinary action by the Corps. *Id.* Accordingly—even as he expressed his preference "to avoid the personal, professional, and financial hardship" of testifying without compensation—Barrows stated that he would make himself available to testify at trial "if compelled by subpoena." *Id.* at 2.

In light of Barrows's letter, plaintiffs resolved to seek issuance of a subpoena for Barrows's expert testimony once a trial date is set. *See* July 2010 JSR at 4; Pls.' Mot. at 4. Meanwhile, in an effort to spare Barrows the financial hardship that he evidently felt compelled to endure, plaintiffs sought to reach an agreement with the Corps regarding compensation for Barrows in connection with his anticipated trial testimony. Syrdal Decl. ¶¶ 7–8. In a letter to the district commander at the Walla Walla district where Barrows is employed, plaintiffs' counsel sought the Corps' consent for plaintiffs to compensate Barrows in accordance with their existing contract. *See* Syrdal Decl., Ex. B at 2. In the alternative, plaintiffs offered to reimburse the Corps for Barrows's salary and benefits during a period of paid leave that Barrows would spend preparing for and providing testimony at trial. *Id.*

Responding through district counsel, the Corps rejected both alternatives. *See* Syrdal Decl., Ex. C. Significantly, district counsel reiterated the Corps' and defendant's position that Barrows would commit a crime to accept any compensation from plaintiffs for his services as an expert witness in this case. *Id.* at 1 (citing the Ethics in Government Act, 18 U.S.C. § 205). However, district counsel noted that plaintiffs may lawfully reimburse Barrows for any travel expenses associated with his court attendance. *Id.* at 1–2 (citing 28 U.S.C. § 1821). More importantly, district counsel conveyed the Corps' intention to fulfill its statutory obligation to give Barrows paid leave—"without loss of, or reduction in, pay, or leave to which he is otherwise entitled"—for the period during which Barrows would be under subpoena. *Id.* at 1 (citing 5 U.S.C. § 6322). As to the time that Barrows would spend preparing for his testimony, however, district counsel asserted that she was "not aware of any federal statute that either authorizes the federal government to pay an employee duty time for witness preparation by a third party, or to accept compensation from a third party for such witness preparation." *Id.* at 2.

Plaintiffs then filed the instant motion, asking the court to issue a two-part order. *See* Pls.' Mot. at 1, 10–11. First, plaintiffs ask the court to issue an order "declaring that it is appropriate and enforceable for [p]laintiffs to issue a subpoena" for Barrows's expert testimony. *Id.* at 1. To be sure, plaintiffs recognize that no subpoena may yet issue for Barrows because no trial date has

been set. *Id.* at 4; *see* RCFC 45(a)(1)(A)(iii). Plaintiffs argue, however, that the circumstances warrant the court's advance approval of a subpoena for Barrows. *See* Pls.' Mot. at 1, 4. In particular, plaintiffs assert that they "would be prejudiced in their (likely futile) attempts to seek replacement testimony if made to wait until the [c]ourt sets a trial schedule to learn whether the [c]ourt would enforce their subpoena." *Id.* at 4.

Second, plaintiffs ask the court to order that Barrows "receive paid leave or other reasonable compensation in connection with the preparation for and taking of his testimony." *Id.* at 1, 11. Plaintiffs recognize that the Corps intends to give Barrows paid leave while he is under subpoena, *i.e.*, for the period during which Barrows would be in court. *Id.* at 9. Plaintiffs assert, however, that Barrows "must [also] be allowed time—compensated time—to *prepare* for his testimony." *Id.* at 8 (emphasis added). Without compensation for this preparation time, either from plaintiffs or from the Corps, plaintiffs assert that Barrows may have no opportunity to prepare for his testimony at all. *Id.* In turn, plaintiffs argue, "to subpoena [Barrows] to testify without providing him the opportunity to prepare without undue hardship would undermine the [c]ourt's truth-seeking functions." *Id.*

## II. DISCUSSION

For the second time in the course of the parties' dispute over Barrows, the court is presented with a motion that is, at least in part, premature and inapposite to the procedural posture of the case. *See Resource II*, 93 Fed. Cl. at 378 (citing the "puzzle" that the "posture of the dispute" and the parties' "mutually ill-attuned arguments" created for the court when ruling on plaintiffs' motion for a protective order regarding Barrows). And once again, the parties' dispute presents a question that has scarcely been addressed by other courts and is all but one of first impression.

### *A. Advance Approval of a Subpoena for Barrows Is Unwarranted*

As recounted above, in order to shield himself from potential criminal prosecution and adverse employment action, Barrows resolved to testify only under the command of a subpoena. *See* Barrows Letter at 2. Believing that the court's *Resource II* opinion "reserved the question of the actual issuance of a subpoena," *id.*, plaintiffs ask the court to enter an order "declaring that it is appropriate and enforceable for [p]laintiffs to issue a subpoena" for Barrows's expert testimony. Pls.' Mot. at 10. Plaintiffs alternatively characterize their request as one for advance approval of a future subpoena for Barrows. *See id.* at 1 (stating that the "question presented" is whether the court should "approve in advance" plaintiffs' issuance of a subpoena for Barrows). On either formulation, however, plaintiffs' motion is premature and at odds with the procedural posture of the case. As explained below, no advance court approval of a subpoena for Barrows is necessary, and any court order or declaration regarding the subpoena's enforceability would be inappropriate and premature.

The court begins with the plain language of Rule 45, which governs the issuance of subpoenas. The rule provides that "[a]n attorney authorized to sign filings under RCFC 83.1 . . . may issue and sign a subpoena as an officer of the court." RCFC 45(a)(3); *see also* RCFC 45(c)(1) (referring to the "attorney responsible for issuing and serving a subpoena"). This authorization is not otherwise qualified or made subject to court approval. In turn, the rule

provides that the "court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena." RCFC 45(e).

By making "explicit that the attorney acts as an officer of the . . . court when issuing and signing subpoenas," Rule 45 makes clear that an attorney-issued subpoena "has the force of the court behind it." 9A Wright & Miller, Fed. Prac. & Proc. § 2453 (3d ed. 1998) (discussing the analogous federal rule, Fed. R. Civ. Proc. ("FRCP") 45).[8] Two circuit courts of appeals that "have touched on the issue" have "described lawyer-issued subpoenas as mandates of the court." Advisory Committee Notes on 1991 Amendment ("Committee Notes") to FRCP 45(a)(3) (citing *Waste Conversion, Inc. v. Rollins Envtl. Servs. (NJ), Inc.*, 893 F.2d 605 (3d Cir. 1990) and *Fisher v. Marubent Cotton Corp.*, 526 F.2d 1338, 1340 (8th Cir. 1975)). And lower courts have consistently treated attorney-issued subpoenas as court orders. *See, e.g.*, *Higginbottom v. KCS Int'l, Inc.*, 202 F.R.D. 444, 455–56 (D. Md. 2001) ("Even though subpoenas are issued by attorneys, they are issued on behalf of the [c]ourt and should be treated as orders of the [c]ourt."); *Jackson v. Brinker*, 147 F.R.D. 189, 197–98 (S.D. Ind. 1993) (holding that an attorney-issued subpoena satisfied a state law prohibiting access to state medical records unless the access is "ordered by a court").

In turn, the failure to obey an attorney-issued subpoena is "an act in defiance of a court order and exposes the defiant witness to contempt sanctions" under Rule 45(e). Committee Notes on FRCP 45(a)(3). Indeed, refusal to comply with an attorney-issued subpoena may subject the noncompliant witness to prosecution for criminal contempt. *See Waste Conversion*, 893 F.2d at 608–09 (assuming that the criminal contempt statute, 18 U.S.C. § 401, encompasses the failure to comply with an attorney-issued subpoena); *Iron Workers' Local 25 Pension Fund v. Watson Wyatt & Co.*, 2009 WL 648503, *2 (E.D. Mich. Mar. 10, 2009) (concluding that disobedience to an attorney-issued subpoena is punishable under 18 U.S.C. § 401); *cf. Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 821 (1987) (Scalia, J., concurring in judgment) (concluding that courts are empowered to prosecute for criminal contempt "those who . . . disobey orders necessary to the conduct of [their] business (such as subpoenas)").

As a general matter, therefore, an attorney-issued subpoena is enforceable as a court order through operation of RCFC 45. Accordingly, absent a motion to quash or modify an attorney-issued subpoena, it is generally "a waste of the [c]ourt's and the parties' time to litigate the issuance of superfluous additional orders." *Jackson*, 147 F.R.D. at 198.

This is no less true in this instance. To be sure, as the court previously observed, an expert witness "retained by a party through private, voluntary agreement [] is ordinarily not the proper

---

[8] In interpreting RCFC 45, the court looks to case law construing the corresponding federal rule, to which RCFC 45 "conforms . . . to the extent feasible given the court's nationwide jurisdiction," Rules Committee Notes on RCFC 45. *See Widdoss v. Sec'y of the Dept. of Health and Human Srvs.*, 989 F.2d 1170, 1178 n.7 (Fed. Cir. 1993) (examining "general federal law interpreting the scope of the corresponding Federal Rule of Civil Procedure as persuasive" in applying RCFC 60); *Tutor-Saliba Corp. v. United States*, 32 Fed. Cl. 609, 610 n.4 (1995) (examining case law interpreting the corresponding federal rule when applying RCFC 45, and noting that, "[i]n interpreting its rules, the court looks to the general federal law interpreting analogous provisions of the Federal Rules of Civil Procedure").

object of a subpoena." *Resource II*, 93 Fed. Cl. at 383.  However, Rule 45 itself contemplates the issuance of a subpoena for expert testimony.  In particular, Rule 45 provides that the court "may"—not must—"on motion, quash or modify the subpoena if it requires . . . disclosing an unretained expert's opinion."  RCFC 45(c)(3)(B)(ii).  Further, the rule expressly provides that the court may order the appearance of the subpoenaed expert "if the serving party . . . shows a substantial need for the testimony . . . and ensures that the subpoenaed person will be reasonably compensated."  RCFC 45(c)(3)(C).  As the Committee Notes on the analogous federal rule explain, "[e]xperts are not exempt from the duty to give evidence."  Committee Notes on FRCP 45(c)(3)(B)(ii).  By establishing "the right of such persons to withhold their expertise" pending denial of a motion to quash, the rule primarily seeks to provide "assurance of reasonable compensation" to subpoenaed experts.  *Id.*  Accordingly, a subpoena for expert testimony is enforceable under RCFC 45, unless and until it is challenged on a motion to modify or quash.

All the same, the court has gleaned a twofold impetus for plaintiffs' request for advance approval of a subpoena for Barrows's expert testimony.  As explained below, the first impetus appears to be plaintiffs' misreading of the court's opinion in *Resource II*; the second is plaintiffs' concern that there may be additional chapters to this protracted dispute.  *See* Pls.' Reply in Supp. of Pls.' Mot. Re. Subpoena and Compensation of Expert Witness David Barrows at 2–3 ("Pls.' Reply").

To begin, plaintiffs misread *Resource II* when positing that the court therein "reserved the question of the actual issuance of a subpoena" for Barrows or otherwise put in question the subpoena's enforceability in the absence of opposition.  *Id.*  *Resource II* did nothing of the sort.  Rather, the court merely declined to prejudge a hypothetical motion to quash a future subpoena for Barrows.  *Resource II*, 93 Fed. Cl. at 383.  By way of general guidance to the parties, however, the court explained that there is no categorical bar against the issuance or enforcement of a subpoena for expert testimony.  *Resource II*, 93 Fed. Cl. at 383 (citing *Carter-Wallace, Inc. v. Otte*, 474 F.2d 529, 536 (2d Cir. 1972) and *Kaufman v. Edelstein*, 539 F.2d 811, 822 (2d Cir. 1976)).

By overlooking the procedural posture in *Kaufman*, plaintiffs also misread the court's previous citation to that particular authority.  *See* Pls.' Mot. at 4.  In *Kaufman*, the court of appeals was asked to review, not the initial decision to issue a subpoena for expert testimony, but the trial court's denial of a motion to quash that subpoena.  *See Kaufman*, 539 F.2d at 812.  In affirming the trial court's ruling, *Kaufman* identified "factors appropriate for consideration" when determining whether an expert should be "excused" from complying with a subpoena.  *Id.* at 822.  This court thus cited *Kaufman* to explain that, even when a subpoena for expert testimony is challenged on a motion to quash, an expert's compliance with the subpoena is not to be automatically excused.  *See Resource II*, 93 Fed. Cl. at 383.  With no motion to quash before the court—indeed with a subpoena for Barrows yet to issue—applying the *Kaufman* analysis would be premature at this time, and the court declines plaintiffs' invitation to do so.  *See* Pls.' Mot. at 4–5 (arguing that a subpoena for Barrows's expert testimony satisfies the *Kaufman* factors).

Regardless of the analysis to be employed, any court declaration regarding the enforceability of a future subpoena for Barrows's expert testimony, beyond the clarifying discussion above, would be premature and inappropriate.  *See* Pls.' Mot. at 1 (asking the court "to declare" that a subpoena for Barrows's expert testimony would be "appropriate and enforceable").  As already explained, an attorney-issued subpoena for Barrows will be enforceable, through

operation of RCFC 45, as an order of this court.  Any further pronouncement on the matter would come too close to presaging the court's ruling on a hypothetical future motion to quash; this the court cannot do.

To be sure, the court is sympathetic to plaintiffs' eagerness to remove, once and for all, any remaining uncertainty as to Barrows's ability to provide expert testimony at trial.  *See* Pls.' Reply at 3 (expressing plaintiffs' worry that they "are in most respects no closer now to being able to work" with Barrows).  Yet, especially in light of the court's present ruling on the question of compensation for Barrows, *see infra*, it appears that the uncertainty is already at an end.  For, none expect Barrows himself to challenge plaintiffs' anticipated subpoena.  After all, it is Barrows who all but invited the subpoena so that its command would provide him safe harbor from potential adverse consequences to his expert testimony, testimony that he has conveyed an unequivocal wish to provide.  *See* Barrows Letter at 1–2; Syrdal Decl. ¶ 6.

And, for its part, defendant has made repeated and unambiguous representations to the court that it will not move to quash or otherwise oppose a subpoena for Barrows's expert testimony.  *See* Def.'s Resp. to Pls.' Mot. Re. Subpoena and Compensation of Expert Witness David Barrows at 2, 5, 8 ("Def.'s Resp."); July 2010 JSR at 5.  Strictly speaking, plaintiffs are correct that defendant's present intention does not preclude a future change in position.  *See* Pls.' Mot. at 5.  Still, defendant would be hard-pressed to reconcile a future motion to quash with its present commitment to the court.  *See* Def.'s Resp. at 2 ("The United States has committed in writing to [p]laintiffs and to the [c]ourt that it would not seek to quash a subpoena issued to [] Barrows for expert testimony.").  It appears unlikely, therefore, that a subpoena for Barrows's expert testimony will be met with opposition from either Barrows or defendant.  Plaintiffs' anxiety is thus exaggerated and, in any event, cannot alter the appropriate scope for the court's intervention at this time.  For, even if a motion to quash were expected, it would be inappropriate for the court to prejudge that motion or to anticipate or address arguments that have not yet been made.  *See, e.g.*, *United States v. Hoffenberg*, 1998 WL 695933, *1 (2nd Cir. 1998) (affirming the trial court's "refus[al] to adjudicate" a motion that was "hypothetical and premature"); *Royal Marco Point 1 Condo. Ass'n v. QBE Ins. Corp.*, 2011 WL 470561, *6 (M.D. Fla. 2011) (denying as premature a pre-trial motion for an adverse-inference jury instruction where it was "not yet known what proofs and documents w[ould] be offered and admitted at trial").

Once a trial date is set, plaintiffs' attorney will have the authority as an officer of the court to issue a subpoena for Barrows's expert testimony pursuant to RCFC 45.  Significantly, like all other rules of the court, RCFC 45 has the force and effect of law.  *See M.A. Mortenson Co. v. United States*, 996 F.2d 1177, 1183–84 (Fed. Cir. 1993); *Resource II*, 93 Fed. Cl. at 379.  Thus, plaintiffs' attorney-issued subpoena for Barrows will be enforceable, upon issuance and through operation of law, as an order of this court summoning Barrows to appear at trial and testify on plaintiffs' behalf.  Any additional court order or declaration regarding the subpoena's enforceability would come too close to prejudging a hypothetical future motion to quash.  *See, e.g.*, *Hoffenberg*, 1998 WL 695933, at *1; *QBE*, 2011 WL 470561, at *6; *see generally Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

*B. Court-Ordered Paid Leave for Barrows's Pre-Trial Preparation*

Far from hypothetical, however, is the parties' dispute over whether and how Barrows may be compensated for his pre-trial preparation. As discussed above, plaintiffs intend to issue a subpoena for Barrows once a trial date is set, and no opposition to the subpoena is expected. However, absent court intervention, it is doubtful that Barrows would have any opportunity to prepare for his testimony before the start of trial.

After all, for more than a year and a half, defendant has maintained that it would be criminal for Barrows to accept any compensation from plaintiffs in connection with his testimony in this case. *See, e.g.*, Barrows Letter at 1; Syrdal Decl., Ex. C at 1 (citing 18 U.S.C. § 205); Def.'s Resp. at 6 (same); Def.'s Resp. to Pls.' Mot. for Protective Order Re. Expert Testimony of David Barrows at 7 (Aug. 13, 2009) (citing 18 U.S.C. §§ 201–27). Faced with this dire prospect, Barrows has resolved to forego all further compensation from plaintiffs. *See* Barrows Letter at 1. For its part, though it has conveyed its intention to give Barrows paid leave for the duration of plaintiffs' anticipated subpoena, *see* Syrdal Decl., Ex. C at 1 (citing 5 U.S.C. § 6322),[9] the Corps has categorically rejected the possibility of extending that paid leave to include time for pre-trial preparation, *see id.* at 1–2, Def.'s Resp. at 9–10. Accordingly, plaintiffs seek the court's intervention in order to ensure that Barrows will have an adequate opportunity to prepare for his testimony, an opportunity that is all but foreclosed by the status quo. *See supra*; Pls.' Mot. at 8.

If Barrows's testimony is to be of any value to the court, plaintiffs posit, "Barrows must be allowed time—compensated time—to prepare for his testimony." Pls.' Mot. at 8. Plaintiffs estimate that Barrows would require two weeks "to adequately review the record in preparation for his expert testimony." *Id.* (citing Syrdal Decl. ¶ 4). Plaintiffs argue that to "subpoena [Barrows] to testify without providing him the opportunity to prepare without undue hardship would undermine the [c]ourt's truth-seeking functions." *Id.*

The court agrees. A full and fair adjudication of this case requires that Barrows be provided a meaningful opportunity to prepare for his testimony. Although the precise circumstances of this case present a question of first impression for the court, fundamental principles all but dictate the answer. As elaborated below, and in light of Barrows's central role in this case, the interests of justice and indeed the needs of this court require that Barrows receive paid leave from the Corps so that he may adequately prepare for his testimony.

---

[9] In pertinent part, and with exceptions not applicable here, the statute provides that an employee of the federal government is "entitled to leave, without loss of, or reduction in, pay, leave to which he otherwise is entitled, credit for time or service, or performance of efficiency rating, during a period of absence with respect to which he is summoned, in connection with a judicial proceeding, by a court or authority responsible for the conduct of that proceeding, to serve-- . . . as a witness on behalf of any party in connection with any judicial proceeding to which the United States . . . is a party." 5 U.S.C. § 6322(a).

**1. Court-Ordered Compensation from Plaintiffs Is Not Viable**

Admittedly, this is an unusual remedy. *See infra*. So, the court begins by explaining why the ordinarily simpler alternative, court-ordered compensation from plaintiffs, is not viable in this instance. Quite simply, no such court order can resolve Barrows's dilemma or shield him from the albeit remote prospect of criminal prosecution that he so fears. *See* Barrows Letter at 1–2. And plaintiffs' proffer of RCFC 45 as a possible ground for such a court order is unavailing.

Plaintiffs point to the dual command of RCFC 45 that a party issuing a subpoena must "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena" and that the "court must enforce this duty." Pls.' Mot. at 5–6 (quoting RCFC 45(c)(1)). Plaintiffs also point to the rule's provision that the court may set "specified conditions" for the enforcement of a subpoena, including that a subpoenaed expert "be reasonably compensated" for his testimony. *Id.* (quoting RCFC 45(c)(3)(C)). With these provisions in mind, plaintiffs argue that RCFC 45 gives the court "the authority and indeed the mandate to order that [] Barrows be compensated" by plaintiffs for his pre-trial preparation. *Id.* at 6; *see id.* n.5.

RCFC 45, however, is wholly inapplicable to the issue before the court. By its plain terms, RCFC 45(c) addresses the burden or expense attending a witness' compliance with a subpoena's command. In this case, plaintiffs' anticipated subpoena will not—as it cannot—command Barrows to prepare for his testimony; the subpoena can only command Barrows to appear in court and testify. *See* Committee Notes on FRCP 45(c) (noting that experts "cannot be compelled to prepare themselves to give effective testimony"); *Carter-Wallace*, 474 F.2d at 536 (though "a court does have the power to subpoena an expert witness, . . . it cannot require him . . . to prepare himself for trial"). Indeed, this is precisely why the expected outcome, absent court intervention, is that Barrows will forego pre-trial preparation altogether.

Moreover, even if the command of plaintiffs' anticipated subpoena could encompass pre-trial preparation, RCFC 45(c) would still be inapposite to the posture of this case. After all, the duties imposed by RCFC 45 fall plainly and squarely on the party "responsible for issuing and serving a subpoena" or "the serving party." RCFC 45(c). And plaintiffs, the serving parties in this case, are only too eager to fulfill those duties. Plaintiffs have expressed their willingness to compensate Barrows in accordance with their existing contract, they have offered to reimburse the Corps for Barrows's salary and benefits if the Corps gives Barrows paid leave for pre-trial preparation, and they have filed the instant motion urging the court to protect Barrows from undue hardship. *See* Pls.' Mot. at 5–10.

In the end, however, plaintiffs' efforts are beside the point. The rub in this case is that plaintiffs, though willing to fulfill their duties under RCFC 45, will be unable to compensate Barrows because Barrows has decided not to accept such compensation. *See* Barrows Letter at 1. To be sure, Barrows made this decision grudgingly. *See id.* at 2 (noting that he "would prefer to avoid the personal, professional, and financial hardship" of testifying without compensation). And plaintiffs are correct to question whether Barrows truly had a choice in the matter. *See* Pls.' Mot. at 5, 7; Pls.' reply at 7. Barrows's letter certainly suggests that he felt coerced by defendant's counsel's "continued comments" concerning "legal risks" and potential "vulnerab[ility] to charges of conflict of interest or criminal penalties." Barrows Letter at 1. Nevertheless, Barrows's

decision clearly signals his fear of the prospect of criminal prosecution, although this prospect is at best hypothetical.[10]

Thus, court-ordered compensation from plaintiffs might spare Barrows the financial burden of preparing for trial on his own time, but would substitute for it the burden of exposure to possible criminal prosecution. This would hardly resolve Barrows's dilemma or effectuate the command of RCFC 45(c) to spare Barrows undue burden. This is why court-ordered paid leave from the Corps is the only way to ensure—without substituting one undue burden for another—that Barrows will have an adequate opportunity to prepare for his testimony.[11] Although this is an unusual remedy, it is not entirely without precedent. *See Mitchell v. Baldridge*, 662 F. Supp. 907 (D.D.C. 1987).

### 2. Persuasive Precedent for Court-Ordered Paid Leave for Pre-Trial Preparation

The precedent of *Mitchell*, a Title VII anti-discrimination suit brought by a federal employee,[12] accordingly deserves extended discussion. In *Mitchell*, the court granted the plaintiff's motion for paid leave "for time reasonably expended in pre-trial activity." 662 F. Supp. at 909. The *Mitchell* court based its decision on three grounds: the importance of the right being vindicated in a Title VII suit, basic notions of fairness, and the fact that its plaintiff was a tested litigant with a particularly meritorious claim. *See id.* at 908–09.

*Mitchell* relied upon the importance of the right being vindicated in a suit brought under Title VII, a law that seeks "to afford to those suffering from discrimination an efficacious remedy, unencumbered by unnecessary difficulties and obstacles." *Id.* at 908 (quoting *Davis v. Bolger*, 496 F. Supp. 559, 564 (D.D.C. 1980)). In "a very significant sense," the *Mitchell* court explained, the plaintiff in a Title VII lawsuit against the federal government "is not on the other side." *Id.* Rather, the "United States has a substantial interest of its own in the elimination of discrimination . . . in its ranks—an interest at a minimum sufficient to preclude the creation of artificial obstacles

---

[10] As noted earlier, the statutory provision that Barrows fears, and which arguably would expose him to criminal sanctions should he accept compensation from plaintiffs, is 18 U.S.C. § 205. *See, e.g.*, Def.'s Resp. at 3. Section 205 provides that "[w]hoever, being an officer or employee of the United States in the executive, legislative, or judicial branch of the Government or in any agency of the United States, other than in the proper discharge of his official duties— . . . receives any gratuity, or any share of or interest in any [claim against the United States], in consideration of assistance in the prosecution of such claim . . . shall be subject to the penalties set forth in section 216 of this title." 18 U.S.C. § 205.

[11] Notably, the court cannot ground its order upon the authority of 5 U.S.C. § 6322. By its terms, the statute mandates leave only for the period of time during which a government employee "is summoned, in connection with a judicial proceeding." 5 U.S.C. § 6322(a). This statutory mandate is limited to involuntary appearances and does not extend to time spent in voluntary pre-trial preparation. *See, e.g.*, *Aaron v. United States*, 62 Fed. Cl. 50, 52–53 (2005); *Shelborne v. Runyon*, 1997 WL 527352, *16 (D.D.C. 1997).

[12] Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000e, 2000e-1–17, prohibits discrimination on the basis of race, color, religion, sex, or national origin, *id.* § 2000e-2.

in the path of those whose actions tend to vindicate that interest." *Id.* *Mitchell* concluded that it would be "utterly inconsistent" with the remedial purpose of Title VII for a plaintiff—"who may face substantial hardship if forced to use annual leave when he must be preparing for litigation"—to be subject to "a choice between his livelihood and his lawsuit." *Id.* at 908–09.

In turn, the importance of the right being vindicated made any departure from basic notions of fairness particularly troubling to the *Mitchell* court. *See id.* Instructive in this regard is *Mitchell*'s extensive reliance on *Davis*, an earlier Title VII case in which the court ordered that one of the plaintiff's witnesses, a federal employee, receive paid leave for court attendance. *See Davis*, 496 F. Supp. at 566. The *Davis* court concluded that any contrary ruling "would offend basic notions of fair play, equal protection, and the even-handedness of the judicial process." *Id.* Citing *Davis*, the *Mitchell* court saw "no reasoned way to draw [a] distinction" between paid leave for court attendance and paid leave for pre-trial preparation. *Mitchell*, 662 F. Supp. at 909. Noting that it is "the plaintiff's rights that are at issue in the lawsuit," *Mitchell* concluded that "[t]o allow witnesses to be paid for their trial participation, and to deny the allegedly injured plaintiff the right to prepare those witnesses without further financial hardship, would make little sense indeed." *Id.*

Finally, *Mitchell* relied upon the fact that its plaintiff was "not an untested litigant," but rather had a "particularly strong" claim and had already survived one round of appeal. *Id.* This further buttressed the court's decision because the successful Title VII plaintiff is entitled to reimbursement for any unpaid leave used for pre-trial preparation. *See id.* Subsequent decisions by the same court have underscored this particular ground for the decision in *Mitchell*. *See Moore v. Summers*, 113 F. Supp. 2d 5, 29 (D.D.C. 2000); *Shelborne v. Runyon*, 1997 WL 527352, *16 (D.D.C. 1997).[13]

### 3. The Need for Court-Ordered Paid Leave for Barrows Is Compelling

*Mitchell*'s reasoning proves equally compelling when extended to this case. First and foremost, no less than in *Mitchell*, plaintiffs' own rights hang in the balance. Defendant tries to distinguish *Mitchell* on the ground that the pre-trial preparation at issue in *Mitchell* was that of the plaintiff, not a witness. *See* Def.'s Resp. at 9. "In contrast" to *Mitchell*, defendant argues, "Barrows is not vindicating his own rights against the United States; he is offering expert testimony to assist [p]laintiffs in the vindication of their alleged rights." *Id.* This argument—presumably prompted by *Mitchell*'s observation that "it is the plaintiff's rights that are at issue in the lawsuit," *Mitchell*, 662 F. Supp. at 909—misses the mark. While it is Barrows who would bear the personal and financial burden of preparing for his testimony on his own time, the burden

---

[13] Both *Shelborne* and *Moore* sought to narrow the appropriate circumstances for ordering paid leave for case preparation by limiting *Mitchell*'s application to the "tested" litigant. *See Moore*, 113 F. Supp. 2d at 29 (concluding that its plaintiffs were not entitled to paid leave for case preparation because they were "still in the early stages of the litigation," while "*Mitchell*'s case had already been tried and appealed, so that Mitchell was not 'an untested litigant'"); *Shelborne*, 1997 WL 527352, at *16 (distinguishing *Mitchell* on the ground that "*Mitchell* was clear in stating that the underlying reason for its ruling was that [the] plaintiff was a tested litigant since [he] already had gone through a trial and an appeal"). This limitation does not alter the court's present analysis because, as in *Mitchell*, plaintiffs here are tested litigants. *See infra*.

of Barrows's more likely decision to forego pre-trial preparation would fall squarely on plaintiffs. Specifically, as the court explains below, plaintiffs would then be denied the benefit of fully prepared, cogent testimony from this crucial expert witness, on whom plaintiffs' entire case arguably hinges.

After all, Barrows's expertise with regard to the Corps' permitting process under Section 404—an expertise acquired over the course of a nineteen-year career with the Corps—is all but singular. As noted above, during his time at the Corps' Fort Worth and Alaska Districts, Barrows personally processed or reviewed more than one thousand Section 404 permit applications. *See* Barrows Expert Report at 3; *Resource II*, 93 Fed. Cl. at 376. Later, at Corps headquarters, Barrows provided regulatory oversight and guidance to Corps districts nationwide, authored inter-agency Memoranda of Agreement relating to the Corps' jurisdiction and enforcement authority, and "taught all aspects" of the Corps' regulatory program to Corps staff across the country. Barrows Expert Report at 3–4. Barrows also worked with the Department of Justice to develop guidelines for the takings implications of the Corps' permit decisions. *Id.* at 4. Indeed, such is Barrows's expertise that he was called to testify before Congress on the Corps' permitting program under Section 404. *Id.*

More importantly, Barrows played a central role in the permitting process at issue in this case. For three years as a third-party consultant, Barrows worked extensively both with plaintiffs and with the Corps. *See* Barrows Decl. ¶¶ 3–17; Barrows Expert Report at 5–6. During that time, Barrows engaged in extensive discussions with the Corps regarding environmental and other concerns relating to plaintiffs' landfill proposal. *See* Barrows Decl. ¶¶ 3–5. Pursuant to those discussions, Barrows recommended specific and targeted changes to plaintiffs' permit application, all aimed at securing the Corps' approval. *See id.* ¶¶ 6–8. Barrows also worked closely with the Corps over the course of many months to draft the EIS for plaintiffs' landfill. *See id.* ¶¶ 11–13; *Resource I*, 85 Fed. Cl. at 461. Indeed, as the court previously observed, "[g]iven the pivotal role he played in guiding plaintiffs through the permitting process at issue in this case, as well as his extensive contacts with the Corps during that process, Barrows has a patently unique relationship to the facts of this case." *Resource II*, 93 Fed. Cl. at 381 (internal citations and quotation marks omitted). Quite simply, no other witness can offer expert opinions so intimately connected to the events in question and formed contemporaneously therewith. *See id.* The combination of Barrows's regulatory expertise and unique knowledge of the facts thus makes his expert testimony pivotal to plaintiffs' case and to the court's own ability to reach an impartial and informed decision on the merits.

Juxtaposed against the critical importance of Barrows's testimony is the passage of more than a decade since Barrows was last involved in this litigation. When testifying at trial, Barrows will be expected to have a thorough and detailed knowledge of a voluminous record, including a fifty-page expert report and 400 pages of deposition testimony dating back eleven or twelve years. *See* Pls.' Mot. at 8. Barrows will also be expected to recall events, along with contemporaneously formed impressions and expert opinions, dating back nearly twenty years. *See supra*. It will be impossible for Barrows to meet these expectations for thoroughly informed and coherent testimony without a substantial investment of time (two weeks by plaintiffs' estimate, *see* Pls.' Mot. at 8) in advance of trial. Yet, Barrows would forego this investment of time if it requires enduring the personal and financial hardship of either taking unpaid leave from the Corps or investing his own time during nights and weekends over the course of many weeks.

In sum, three things are clear. First, absent court intervention, Barrows will have no source of financial support for the two-week period he would need to prepare for his testimony. Accordingly, given the financial hardship it would entail, Barrows is almost certain to forego pre-trial preparation altogether. Second, given the passage of time, the sheer volume of the record, and the complexity of the issues in this case, Barrows's testimony would be vitiated by this lack of preparation. Third, without the full benefit of Barrows's critical testimony, plaintiffs' case would virtually collapse. Barrows's ability to prepare for his testimony and plaintiffs' ability to vindicate their rights are thus inexorably linked: as in *Mitchell*, plaintiffs' own rights are very much at stake.

Those rights, in turn, are no less important than the right at issue in *Mitchell*. The civil right to be free from discrimination was considered by the court in *Mitchell* to be so important as to implicate the United States' own interests. *See Mitchell*, 662 F. Supp. at 908. Here, plaintiffs seek to vindicate an equally important right—their constitutional right of private property and the attendant right to just compensation for the alleged taking of that property. *See* U.S. Const. amend. V (providing that "nor shall private property be taken for public use without just compensation"). To be sure, like other rights enumerated in the Bill of Rights, this right has been characterized as "fundamental." *See, e.g., McCoy v. Union Elevated R. Co.*, 247 U.S. 354, 365 (1918) (characterizing the right to just compensation as a "fundamental right"); *Hendler v. United States*, 175 F.3d 1374, 1376 (Fed. Cir. 1999) (referring to the "fundamental Constitutional principle" that "if private property is taken for public use, just compensation must be paid"); *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1578 (Fed. Cir. 1993) (discussing the origins of the Fifth Amendment's takings clause, and noting that "James Madison, author of the Bill of Rights, recognized property rights as fundamental to liberty").

Also as in *Mitchell*, plaintiffs here are tested litigants. *See Mitchell*, 662 F. Supp. at 909. Most notably, plaintiffs survived the summary judgment stage. *See Resource I*, 85 Fed. Cl. at 493. In denying the parties' cross-motions for summary judgment in 2009, the court found "no genuine issue of material fact that [the] Corps' denial of plaintiffs' 404 permit application left plaintiffs without economically viable use of the project site." *Id.* The court thus concluded—over defendant's opposition—that, except for the outstanding issue of causation, plaintiffs have stated a claim for a temporary categorical taking. *Id.* (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992)). Plaintiffs' claims have thus withstood some judicial scrutiny. *See Mitchell*, 662 F. Supp. at 909. And, like the successful Title VII plaintiff, successful plaintiffs in a takings case are entitled to all "reasonable costs, disbursements, and expenses" incurred in connection with their suit, including fees paid to expert witnesses. 42 U.S.C. § 4654(c); *see Fla. Rock Indus., Inc. v. United States*, 23 Cl. Ct. 653, 658 (1991).

Attempting to distinguish *Mitchell* in this regard, defendant observes that Barrows's decision to refuse further compensation means that plaintiffs, even if ultimately successful in this suit, "will not have recoverable expert [witness] fees from this point forward relating to" Barrows. Def.'s Resp. at 9–10. This accurate observation, however, only underscores the need for court-ordered paid leave in this case. Instructive on this point is the one case expressing categorical disagreement with *Mitchell*. *See Jones v. Babbitt*, 52 F.3d 279, 282 (10th Cir. 1995), *overruled in part on other grounds by Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995). In the *Babbitt* panel's view, a successful plaintiff's entitlement to recover litigation expenses argues *against* court-ordered paid leave while suit is pending. *See id.* The *Babbitt* panel reasoned that "a federal employee who is successful in his or her litigation is not without remedy" and, essentially, can

wait to be made whole after a favorable judgment is entered. *Id.* Here, absent court-ordered paid leave from the Corps, Barrows would likely forego all pre-trial preparation. If this occurs, no post-judgment remedy could ever make plaintiffs whole: they, and the court, will have been irrevocably deprived of the full benefit of Barrows's critical testimony. The court, therefore, has a clear and present obligation to eliminate artificial obstacles to Barrows's ability to provide cogent, thoroughly prepared testimony at trial. *See Mitchell*, 662 F. Supp. at 908.

Finally, the same basic principles of fairness and equal protection that moved the *Mitchell* court also dictate the outcome in this case. *See Mitchell*, 662 F. Supp. at 908–09; *Davis*, 496 F. Supp. at 566. After all, defendant has designated several Corps employees to appear on its behalf at trial, employees who presumably will be afforded paid leave not only for their time in court but also for their pre-trial preparation. Barrows, of course, is likewise a Corps employee. Basic fairness thus requires that defendant accord Barrows the same treatment that it accords its own employee-witnesses. More critically, in mounting a vigorous defense, defendant will surely pay its own retained experts to conduct extensive pre-trial preparation for their testimony. Without court-ordered leave, however, Barrows would appear in court with little or no preparation. To tolerate that outcome would be to deny plaintiffs their right to a fair adjudication of their claims, an adjudication based upon an equal and meaningful presentation of evidence by both sides.

The court's present decision thus rests, not only upon precedent, but also upon fundamental principles of fairness, equal protection for the parties before the court, and truth-seeking in the judicial process. The court has both the authority and the obligation to ensure that such fundamental principles are not disregarded or undermined, no matter how novel the factual circumstance or how rarely used the requisite remedy. Although no statute or rule requires it, the interests of justice and the needs of the court require that Barrows have an adequate opportunity to prepare for his expert testimony. Under the circumstances of this case, court-ordered paid leave from the Corps is the only way to provide Barrows with that opportunity.

### III. CONCLUSION

For the foregoing reasons, plaintiffs' motion is GRANTED in PART and DENIED in PART. The Corps (1) SHALL give Barrows paid leave for a period of two weeks—without loss of, or reduction in, pay, credit for time or service, or leave to which Barrows is otherwise entitled—so that Barrows may adequately prepare for his trial testimony. This court-ordered paid leave (2) SHALL be in addition to the statutorily mandated leave, under 5 U.S.C. § 6322, to which Barrows will be entitled while under subpoena (for the two-week period of trial), and (3) SHALL span the two-week period immediately preceding the start of trial, unless compelling circumstances necessitate, or plaintiffs and Barrows jointly consent to, an alternate two-week period.

**IT IS SO ORDERED.**

*s/ Lawrence J. Block*
Lawrence J. Block
Judge